REDACTED VERSION

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EOD TECHNOLOGY, | ) | |
| Plaintiff, | ) | |
| | ) | No. 08-283C |
| v. | ) | |
| | ) | (Judge C. Lettow) |
| THE UNITED STATES, | ) | |
| | ) | Filed: April 23, 2008 |
| Defendant, | ) | |
| and | ) | |
| AMERICAN K-9, INC., | ) | |
| Intervening Defendant. | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to the Court's request during the April 18, 2008 hearing regarding EOD Technology's ("EODT") bid protest, the Government submits this memorandum of law accompanied by the declaration of Major Michael A. Tomm, Ex. 1, opposing EODT's application for a temporary restraining order and motion for a preliminary injunction. The Court requested that the Government address whether the award subject to the override of the automatic stay of performance imposed by the Competition in Contracting Act ("CICA") authorized by the United States Army on April 11, 2008 should have been a multiple provider award rather than a sole source award.

As supported by the declaration of Major Tomm, the sole source override was justified based on several factors. Initially, the Army currently only requires [redacted] Canine Working Dog ("CWD") teams, and this number is [redacted] until after the award of a new contract. American K-9 ("AMK-9") is fully meeting these requirements and was the only company with enough certified dogs available to continue service without interruption on April 1, 2008, the bridge contract start date.

Further, even if the Army needed additional CWD teams, adding another contractor will [redacted] mission effectiveness. Not only will it disrupt the integrity of the teams working together, but – as the events described by Major Tomm confirm – it will elicit [redacted] mission effectiveness. Thus, the Army had a rational basis for its sole source award CICA override, and the Government respectfully requests that the Court deny the injunctive relief requested by EODT.

**STATEMENT OF FACTS**

On February 10, 2008, the Kandahar Regional Contracting Center ("RCC") issued Solicitation No. W91B4L-08-R-0013 requesting proposals for highly specialized canine teams to be used in Afghanistan in support of U.S. combat operations. Specifically, the RCC requested proposals for CWD services at Kandahar Airfield and ISAF Regional Command South. The CWD support outlined in the request for proposals ("RFP") included providing [redacted] ("EDD"), as well as trained and certified handlers and staff to conduct operations at Kandahar Airfield, the Regional Command South Area of Operation, and the Combined Joint Special Operations Area

("CJSOA"). Pl. Ex. H. The contractor is responsible for planning and executing the fielding of CWD teams to Kandahar, Afghanistan, which serves as a base of operations for CWD services at Forward Operating Bases ("FOB") and Provincial Reconstruction Teams ("PRT") throughout the NATO International Security Assistance Force ("ISAF") Regional Command South Area of Operation. Id. The contractor also manages the CWD teams to achieve mission accomplishment, and interfaces with the Force Protection Officer, NATO Forces, Kandahar Airfield Provost Marshal, Unit Headquarters, Commanders, and Soldiers. Id. The RFP requested that proposals be submitted by February 20, 2008.

Four offerors submitted proposals in response to the RFP that were evaluated in accordance with the solicitation. After reviewing the proposals, RCC awarded Contract No. W91B4L-08-M-0232 to EODT on February 28, 2008 based on being evaluated as the best overall value to RCC. Pl. Ex. D.

On March 11, 2008, one of the offerors, AMK-9, filed a protest with the Government Accountability Office ("GAO"). On March 16, 2008, pursuant to FAR 52.233-3, RCC issued a stop-work order to EODT. After receiving the protest, RCC reexamined the award to EODT and became aware of several problematic issues which threatened the viability of the solicitation. Pl. Ex. E at 10. Based on these circumstances, RCC terminated for convenience Contract No. W91B4L-08-M-0232.

On March 28, 2008, RCC requested that AMK-9 submit a proposal on RFP No. W91B4L-08-R-0016 for a sole source six-month bridge contract to provide canine detection services at Kandahar Airfield and outlying FOBs. RCC's Justification and Approval for Other Than Full and Open Competition, issued pursuant to FAR 6.302-2(a)(2), stated:

> In order to implement corrective action regarding the [AMK-9] protest[,] a bridge contract must be awarded to ensure continuity of service. This bridge contract will serve as a stop-gap measure while the KAF RCC office conducts a re-acquisition for services. The intent of a six-month bridge allows three months for competitive sourcing of the new contract and three months for transition and mobilization concerns.
>
> The current contract did not fully address the requirements for: 1) a net [redacted] (one handler and one canine); 2) [redacted]; and 3) [redacted] specifications. These requirements will be fully clarified in the new solicitation. As a matter of note, the incumbent for the bridge contract, AMK9, is already complying with these additional requirements. . . .
>
> Currently AMK9 is considered the only firm able to fulfill this urgent and compelling need, with no mobilization lead-time required.

Ex. 2. RCC also noted the value of the services to be provided:

> CWDs perform an invaluable service and any labse in service could result in security breaches at entry control points and in the FOBs. To date CWD teams have discovered [redacted] in and around [redacted] outlying FOBs.

Id. RCC awarded AMK-9 the six-month sole-source bridge contract on March 31, 2008.

On April 1, 2008, EODT filed its protest with the GAO challenging, among other things, the six month sole-source contract issued to AMK-9. EODT alleged that the sole source award was improper because there was no official notice evidencing its intent to make such an award. EODT also alleged that the contracting officer did not determine that any of the conditions set forth by 10 U.S.C. § 2304(c) existed to justify such an award. EODT's protest remains pending before the GAO. Based on EODT's protest, on April 6, 2008, RCC issued a stop work order to AMK-9 on the six month sole source.

On April 8, 2008, RCC determined that the six month sole source contract (Contract No. W91B4L-08-M-0257) should be authorized to proceed despite the GAO protest filed by EODT. Pl. Ex. E. The contracting officer concluded that "continued contract performance by [AMK-9] involves urgent and compelling circumstances that significantly affect the interests of the United States and its Allies, and will not permit waiting for the GAO's decision on the protest." Id. The contracting officer's memorandum further states:

> Since AMK9 is already fully mobilized with certified teams meeting the requirements of the protested contract, the US and its Allies would not suffer any lapse of service. During the bridge contract, this offices' full intent is to build a new solicitation that adequately addresses the outstanding government requirements that until this time have not been adequately defined.

Id. at 1.

On April 11, 2008, the Acting Deputy Assistant Secretary of the Army determined that "urgent and compelling circumstances, which significantly affect the interests of the United States, will not permit waiting for the GAO's decision." Ex. 3. This protest followed.

## ARGUMENT

### I. Standard Of Review

"A preliminary injunction is a 'drastic and extraordinary remedy that is not to be routinely granted.'" National Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d 1319, 1324 (Fed. Cir. 2004) (quoting Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993)). Because the grant of an injunction is "extraordinary relief," the Court applies "exacting standards." Lermer Germany GmbH v. Lermer Corp., 94 F.3d 1575, 1577 (Fed. Cir. 1996). To obtain this extraordinary relief, the movant must establish that (1) it is likely to succeed upon the

merits; (2) it will suffer immediate irreparable harm if preliminary relief is not granted; (3) the balance of the hardships tips in its favor; and (4) a preliminary injunction is in the public interest. FMC Corporation v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993). Absence of any prong of this test results in denial of injunctive relief. Id..

The party seeking injunctive relief bears the extremely heavy burden of demonstrating that it is "entitled to injunctive relief by clear and convincing evidence." Cincom Systems, Inc. v. United States, 37 Fed. Cl. 266, 268 (1997) (citing Baird Corp. v. United States, 1 Cl. Ct. 662, 664 (1983)). A party faces an even greater burden when it seeks injunctive relief that, if granted, would interfere with Governmental operations. Yakus v. United States, 321 U.S. 414, 440 (1940); Virginia Railway Co. v. Systems Federation No. 40, 300 U.S. 515, 552 (1937).

## II. The Only Issue Before The Court Is Whether The Army Had A Rational Basis For The CICA Override

EODT's protest before the GAO challenges the Army's six month sole source award to AMK-9. In its protest before this Court, EODT challenges the Army's justification for its override of the CICA stay. Pl. Br. at 14-22. Thus, the only issue before this Court is whether the Army had a rational basis for the CICA override, and any injunctive relief granted by the Court is limited to the CICA override. To the extent that the Government understands the Court to be inquiring as to whether the Army failed to procure all of its needs or whether the Army should have awarded the contract for CWD services to multiple companies as opposed to a sole source award to AMK-9, these issues are unrelated to whether the Army was justified in overriding the CICA stay.

## III. EODT Is Not Likely To Succeed On The Merits

Although the filing of a protest action by a disappointed bidder on a federal contract triggers an automatic stay of performance under CICA, 31 U.S.C. §§ 3551-56. RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286, 1287 (Fed. Cir. 1999), CICA permits an agency to override the automatic stay upon the issuance of a written finding that: (1) "performance of the contract is in the best interests of the United States"; or (2) "urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting" for the bid protest decision. Id.; 31 U.S.C. § 3553(d)(3)(C).

Courts review challenges to agency override decisions pursuant to the standard set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA"). 28 U.S.C. § 1491(b)(4); Chapman Law Firm Co. v. United States, 67 Fed. Cl. 188, 191 (2005). Under the APA, a reviewing court may overturn such a decision only upon finding the agency's action to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id.; 5 U.S.C. § 706(2)(A).

The arbitrary and capricious standard is a narrow one. Bowman Transp., Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 284 (1974); Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000). A reviewing court may not substitute its judgment for that of the agency. Bowman Transp., 419 U.S. at 285. Rather, the court must sustain an agency decision "evincing rational reasoning and consideration of relevant factors." Id. at 285. Even a decision "of less than ideal clarity" is to be upheld "if the agency's path may reasonably be discerned." Id. at 286.

In determining whether an agency acted arbitrarily or capriciously, the Supreme Court has

observed that courts should contemplate whether the agency: (1) relied upon factors that Congress did not intend it to consider; (2) entirely failed to contemplate an important aspect of the problem; (3) offered an explanation for its decision that runs counter to the evidence; or (4) offered an explanation so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Chapman Law Firm Co., 67 Fed. Cl. at 191 (citing Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

Moreover, this Court has distilled from the relevant cases the following factors for consideration of whether an agency properly determined to override a CICA stay: (1) whether significant adverse consequences would occur absent the override; (2) whether reasonable alternatives to the override were available; (3) how the potential cost of proceeding with the override, including the costs associated with the potential that GAO might sustain the protest, compared to the benefits associated with the approach being considered for addressing the agency's needs; and (4) the impact of the override on the competition and integrity of the procurement system. Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 711 (2006) (citations omitted) (recognizing that "override decisions are, by nature, fact specific . . . .").

### A. Significant Adverse Consequences Would Occur Absent The Army's Override

CWD services play a vital role in the security of the Kandahar Airfield and ISAF Regional Command South. The canine units are used [redacted]. Tab O at 9. At Kandahar Airfield, Canine units are stationed at [redacted]. Id. *The units provide security for over*

[redacted] at Kandahar Airfield, including [redacted]. Id. The units are used [redacted] Id. Between the forward operating bases and the Kandahar Airfield, [redacted] Id.

For FOBs, canine searches are the only defensive permiter measure they possess other than a physical barrier. Id. CWD teams have discovered [redacted]. Ex. 2 at 2. Additionally, the special forces use CWDs in [redacted]. Id. Earlier this year, [redacted]. Id.

**B. <u>Reasonable Alternatives To The CICA Override Were Not Available</u>**

As supported by Major Tomm's declaration, adding another contractor to provide CWD services in southern Afghanistan is not only unnecessary, but "[redacted]." Tomm Decl. ¶ 15. Thus, the Army had a reasonable basis for awarding a sole source award to AMK-9.

As Major Tomm's April 8, 2008 memorandum requesting the override stated, "[u]tilizing another contractor to meet the Government's requirements is . . . not an option under the circumstances." Tab O at 8. Major Tomm further stated:

> The incumbant is the only company that has enough certified dogs available to continue this service without interruption and to start on the contract start date of 1 April 08. It is not possible for another contractor's dog teams to be certified rapidly enough to prevent a lapse in service and any lapse in service could result in security breaches at entry control points at KAF and various FOBs. Although EODT had begun mobilization under the contract

> awarded on 29 Feb 08, [redacted] . . . . At this specific moment in time, EODT cannot meet the contract requirements because they lack a sufficient number of certified dogs.

Pl. Ex. E at 8.

Further, as Major Tomm's declaration makes clear, the current requirement for Contract No. W9-1B4L-08-M-0257 (the "bridge contract") is [redacted], which American K-9 is fully satisfying. Tomm Decl. at ¶¶ 5-6. Although the Court noted at the April 18, 2008 hearing that the Army's current and future needs are not clear based on the April 8, 2008 memorandum, in his declaration, Major Tomm clarifies the Army's current and future needs. The April 8, 2008 memorandum states that "[o]verall, the requirement for dog teams has grown in the past month from [redacted]." Pl. Ex. E at 5. Major Tomm's declaration clarifies this portion of the memorandum, stating that this "was referring to the conversations with U.S. and Coalition forces concerning their future requirements." Tomm Decl. at ¶ 8 (emphasis added). The future needs of the U.S. and Coalition forces were [redacted] than Major Tomm had previously understood when Solicitation No. W91B4L-08-R-0013 was issued. Id. at ¶ 9. Major Tomm anticipates that the [redacted] will begin occurring after the award of the new contract, which is expected to be June 1, 2008. Id. at ¶ 11.

Placing an additional contractor into the established rotations with American K-9 ("AMK-9") will also negatively impact mission effectiveness. According to Major Tomm, adding another CWD contractor will disrupt the integrity of the teams currently working together and, more importantly, [redacted]. Id. at ¶ 14.

Based on the competition for this contract, EODT and AMK-9 have [redacted]. Id. For example, between the the award of Solicitation No. W91B4L-08-M-0232 to EODT, February 28, 2008, and the stop work order based upon AMK-9's protest, March 16, 2008, Major Tomm became aware of the following incidents: [redacted]. Id. at ¶ 17.

With such a short time period that this bridge will be in place, the handlers for rival companies will also feel pressure to outperform each other, which could result in [redacted]. Id. at ¶ 20. The motivation for these contractor personnel would be to either help their current employer, or to distinguish their individual capabilities for a greater potential for future employment from their rival contractor. Id. at ¶ 21. [redacted]. Id. at ¶ 22.

Based on these circumstances, the Army had a rational basis for its sole source award to AMK-9.

C. **The Override Is In The Interest Of The United States**

As the Army's April 8, 2008 memorandum concludes, "there is no cost high enough to outweigh the benefits of continued performance of these critical services." Pl. Ex. E at 9. CWD

services are absolutely essential for the safety of the [redacted] in southern Afghanistan. Id. Thus, there is no question that the override is in the interest of the United States.

**D. The Override Will Have A Positive Impact On Competition And The Integrity Of The Procurement System**

As the Justification and Approval for the six month sole source award established, the bridge contract with AMK-9 was required because the solicitation for Contract No. W91B4L-08-M-0232 did not fully address the requirements for: (1) an [redacted] in the number of dog teams, and (2) [redacted]. Ex. 2. Additionally, the Justification and Approval noted that the length of the contract would be extended from a six month to a one year base. Id. As the contracting officer's April 8, 2008 memorandum states, the sole source award was not an attempt to circumvent the competition requirements of the federal procurement system, but rather, its purpose was to "ensure that the Government's requirements were met and that the solicitation, evaluation and award of the follow-on contract was beyond reproach." Pl. Ex. E at 10. Finally, as Major Tomm states in his declaration, the future requirements will be resolicited by mid-May 2008, and the goal is to award the contract on June 1, 2008. Tomm Decl. at ¶ 19. Thus, any contractor that is able to provide dog teams as an additional source during the bridge will have the ability to compete for the new contract that will be solicited in mid-May. Id.

**IV. EODT Will Not Suffer Immediate Irreparable Harm If Injunctive Relief Is Denied**

[redacted]." Pl.

Br. at 23. This collateral effect, however, does not amount to irreparable harm.

> "Economic loss does not, in and of itself, constituted irreparable harm." . . . Only economic loss that threatens the survival of a movants business constitutes irreparable harm. . . . The plaintiffs do not claim that they will be destroyed if they do not obtain an injunction. Rather, they merely claim that they risk losing a valuable contract and some of their employees. This is insufficient.

Foundation Health Fed'l Servs. v. United States, 1993 WL 738426 (D.D.C. 1993) (quoting Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n, 758 F.2d 669, 674 (D.C. Cir.1985)) (additional citation omitted); see also Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381-82 (1997) ("However, economic harm, without more, does not seem to rise to the level of irreparable injury.") (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983)).

Further, this Court has determined that purely financial or economic injury does not constitute irreparable injury. See Bannum Inc., v. United States, 56 Fed. Cl. 453, 456 (Fed. Cl. 2003); see also United Int'l Investigative Services, Inc. v. United States, 42 Fed. Cl. 73, 75 (1998), aff'd, 194 F.3d 1335 (1995) (Table) ("Plaintiff's allegation of harm (that it would suffer an 'unjust loss of a valuable business opportunity with the Government') does not rise to the level of the irreparable harm that must be shown to receive injunctive relief"); Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381-82 (1997) ("Economic harm, without more, does not seem to rise to the level of irreparable injury.") (citing Zenith Radio Corp., 710 F.2d at 810). To constitute irreparable harm, the alleged injury must be "certain and great," not theoretical. Tenacre Foundation v. INS, 78 F.3d 693, 695 (D.C. Cir. 1996); Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). The "harm must be imminent or certain, not merely speculative"

or remote. Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir. 1995).

Here, not only is [redacted]. Therefore, EODT has not shown that it will suffer irreparable harm if a permanent injunction is not issued.

## V. The Balance Of The Hardships And The Public Interest Favors Denial Of Injunctive Relief

Because this is a national security procurement, the balance of hardships and the public interest favors denial of injunctive relief. In considering whether the balance of the hardships tips in the favor of a protester in a post-award bid protest, the Court must balance the potential harm to the protester of not granting the injunction against the potential harm to both the Government and the awardee should the injunction be granted. Gentex Corp. v. United States, 58 Fed. Cl. 634, 654 (2003). Any harm to the protester and the systemic, long-term interest which the public has in the integrity of the procurement process must be weighed against potential damage to the public interest from other causes. Id.

The Court must consider the interest of national defense in its bid protest decisions. Id. at 655; see 28 U.S.C. § 1491(b)(3). The importance of military preparedness to the national defense can tip the balance of harms in favor of the Government. Cincom Systs., 37 Fed. Cl. at 269. Indeed, the public interest militates against awarding injunctive relief when national defense and national security interests are concerned. Id. The Court should err on the side of caution when

such vital interests are at stake. See Gentex Corp., 58 Fed. Cl. 654.

Here, as the Acting Deputy Assistant Secretary of the Army concluded, "urgent and compelling circumstances, which significantly affect the interests of the United States," justified the CICA override. Ex. 3. Further, as we have already discussed, the CWD services play a vital role in the security of the Kandahar Airfield, forward operating bases, and the Kandahar International Airport. Pl. Ex. E at 9. These hardships certainly outweigh the [redacted]. Thus, the balance of hardships and the public interest favors denial of injunctive relief.

## VI. The Court Should Not Exercise Jurisdiction And Reach The Merits

Finally, the Court should not reach the merits of whether CICA was violated because the Army has established legitimate interests of national defense and national security. Congress specifically instructed this Court to "give due regard to the interests of national defense and national security." 28 U.S.C. § 1491(b)(3). As this Court has determined, "where legitimate 'interests of national defense and national security' have been asserted and established to the court's satisfaction, it is 'not necessary' for the court to reach the merits of whether 31 U.S.C. § 3553(d)(3)(C)(i) was violated 'in connection with a procurement[.]'" Kropp Holdings v. United States, 63 Fed. Cl. 537, 548-49 (2005) (citation and footnote omitted); see also Maden Tech Consulting Inc. v. United States, 74 Fed. Cl. 786, 792-93 (2006). Here, the CWD services play a vital role in the security of the U.S. and Coalition forces in southern Afghanistan, and therefore, letigitimate interests of national defense and national security are at stake. Thus, it is not necessary for the court to reach the merits.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny EODT's request for injunctive relief.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Mark A. Melnick
MARK A. MELNICK
Assistant Director

/s/Sean M. Dunn
SEAN M. DUNN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tele: (202) 307-0367
Fax: (202) 514-7969
Attorneys for Respondent

April 23, 2008

## CERTIFICATE OF FILING

I hereby certify that on this 23rd day of April, 2008, a copy of the foregoing "DEFENDANT'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Sean M. Dunn

# EXHIBIT 1

CONTAINS CONFIDENTIAL MATERIAL SUBJECT TO COURT OF FEDERAL CLAIMS PROTECTIVE ORDER – TO BE FILED UNDER SEAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| EOD TECHNOLOGY, | |
| Plaintiff, | No. 08-283C |
| v. | (Judge C. Lettow) |
| THE UNITED STATES, | Filed: April 23, 2008 |
| Defendant, | |
| and | |
| AMERICAN K-9, INC., | |
| Intervening Defendant. | |

DECLARATION OF MAJOR MICHAEL A. TOMM

I, Michael A. Tomm, make the following declaration in accordance with 28 U.S.C. § 1746.

1. I make this declaration based upon my personal knowledge.

2. I am a Major in United States Air Force serving for approximately 10 years. I am currently the Deputy Chief, Kandahar Regional Contracting Center.

3. I have been contracting officer for Contract No. W91B4L-08-M-0257 since its award on March 31, 2008.

4. As contracting officer, my role is to ensure that the contractor complies with the terms and conditions of the contract.

5. The current requirement for Contract No. W91B4L-08-M-0257 is [redacted] Contract Working

Dog ("CWD") teams (one dog, one handler), which adequately satisfies the current Regional Command ("RC") South Commander's mission.

6. As described in more detail below, the reference to an anticipated requirement of [redacted] dog teams in the April 8, 2008 memorandum supporting the agency's CICA override, which I authored, referred to an eventual end state of performance and to foreseeable customer needs over the life of a future contract.

7. The anticipated requirements stemmed from the projected increase in U.S. and Coalition forces in southern Afghanistan. American K-9 ("AMK-9") can fulfill the current need.

8. When I stated that "[o]verall, the requirement for dog teams has grown in the past month from [redacted]" I was referring to the conversations with U.S. and Coalition forces concerning their future requirements.

9. Their future needs were [redacted] when Solicitation No. W91B4L-08-R-0013 was issued.

10. Further, this statement was intended to simply demonstrate the difference between the bridge contract, which was [redacted] that was expiring, and the future needs expected of U.S. and Coalition forces in Southern Afghanistan.

11. The anticipated increase will begin occurring after award of the new contract – which is anticipated to be June 1, 2008 – and is expected based upon [redacted]

12. In the context of justifying the cancellation of the solicitation, I believed it was necessary for the Head of Contracting Agency ("HCA"), and the Deputy Assistant Secretary of the Army (Policy and Procurement) ("DASA(P)") to understand the [redacted] to which the requirement was changing based upon input from the forces in the field. At the time, I

was getting new information on a daily basis concerning the future size of U.S. and Coalition forces in RC South, and it became readily apparent that Solicitation No. W91B4L-08-R-0013 would [redacted] that the commanders in RC South needed.

13. Besides the fact that the current requirement is satisfied with the [redacted] CWD teams, adding another contractor into the mix will [redacted] effectiveness.

14. Placing another contractor into the established rotations with AMK-9 handlers will [redacted] More importantly, the type of [redacted]

15. For example, EODT and AMK-9 have [redacted] on competition for this contract. I believe that an [redacted]

16. [redacted]

17. [redacted]

b. [redacted]

c.

d.

18. Based on the current need of the commanders upon the ground being fulfilled by the AMK-9 bridge contract, [redacted]

19. The future requirements will be resolicited by mid-May 2008, and the goal is to award the contract on June 1, 2008. Thus, any contractor that is able to provide dog teams as an additional source during the bridge will have the ability to compete for the new contract that will be solicited in mid-May.

20. Regardless of the additional company (or companies) that would be chosen to perform during the bridge, with such a short time period that this bridge will be in place, [redacted] that could [redacted] of U.S. and Coalition forces.

21. The motivation for these contractor personnel would be to either help their current employer, or to distinguish their individual capabilities for future employment opportunities from their rival contractor.

22. These concerns, [redacted] provides all of the ingredients required for [redacted]

23. The Army fails to see the wisdom in introducing this [redacted]

[redacted]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 21, 2008.

MICHAEL A TOMM, Maj, USAF

# EXHIBIT 2

Control No: JA08-023

**Justification and Approval for Other Than Full and**

**Open Competition Justification**

1. **Contracting Activity:** Kandahar RCC

2. **Description of Action:** Approval is requested to award a firm-fixed price contract to American K-9 Detection Services (AMK9) for a period of six (6) months as a bridge contract until the re-acquisition of canine explosive and narcotic detection services can be performed in a sufficient manner with realistic milestones.

3. **Description of Supplies/Services:** This bridge contract will provide for an immediate need of canine detection services at Kandahar Airfield and outlying Forward Operating Bases (FOBs). Period of performance 1 Apr 08 – 30 Sep 08, estimated value of $3.5M using OMA.

4. **Authority Cited:** Authority to award other than full and open competition is based on 10 U.S.C. 2304(c)(2) as implemented by FAR 6.302-2(a)(2). Unusual and Compelling Urgency.

5. **Reason for Authority Cited:** On 28 Feb 08 the KAF RCC awarded a firm-fixed price contract for explosive and narcotic detection services to EOD Technologies (EODT) to begin 1 Apr 08, with a mobilization period starting 1 Mar 08, that was subsequently protested by AMK9. In order to implement corrective action regarding the protest a bridge contract must be awarded to ensure continuity of service. This bridge contract will serve as a stop-gap measure while the KAF RCC office conducts a re-acquisition for services. The intent of a six-month bridge allows three months for competitive sourcing of the new contract and three months for transition and mobilization concerns.

The current contract did not fully address the requirements for: 1) a net increase of [redacted] (one handler and one canine); 2) [redacted] and 3) [redacted] specifications. These requirements will be fully clarified in the new solicitation. As a matter of note, the incumbent for the bridge contract, AMK9, is already complying with these additional requirements. Additionally, considering [redacted] to write a contracting working dog (CWD) contract the period of performance of the new solicitation will be extended from a 6-month to a one (1) year base.

A critical element not in the protested contract is [redacted] requirement for handlers interacting with US and Canadian Special Forces personnel. Rationale for this requirement is due to the fact that [redacted]

[redacted]

Currently AMK9 is considered the only firm able to fulfill this urgent and compelling need, with no mobilization lead-time required. Mobilization includes flying equipment, personnel and CWDs into theater using limited military and commercial transport, establishing a footprint at Kandahar Air Field for lodging and kennel facilities, sending personnel to FOBs, and acclimating teams to a new working environment.

6. **Efforts to Obtain Competition:** In accordance with FAR 5.202(a)(2) no synopsis will be publicized under www.fedbizopps.gov as the Government would be seriously harmed by complying with the synopsis time period prescribed in FAR 5.203.

6. **Actions to Increase Competition:** This office will issue a solicitation reflecting the requirements of all customers.

8. **Market Research:** There are no known firms that can readily, effectively and efficiently perform the required effort. Since AMK9 is already in place performing the required services, no other contractor is in a position to avoid mobilization costs and lead-time and effectively perform the required services by the required start date.

9. **Interested Sources:** Other sources are known to exist and feasibly could provide the service but due to the urgency of this requirement they are unable to fulfill the requirement and meet the needed start date of 1 Apr 08.

10. **Other Facts:** As a matter of force protection a lapse in this critical service cannot occur. CWDs perform an invaluable service and any lapse in service could result in security breaches at entry control points and in the FOBs. To date [redacted] Since inception requests for CWD teams have [redacted] at Kandahar Airfield.

11. **Technical Certification:** Include the following statement:

I certify that the supporting data under my cognizance which are included in the justification are accurate and complete to the best of my knowledge and belief.

Typed Name: Date: Frederic L. Storm, MSgt, US Provost Sergeant
Title: Signature: [signature] 8 Apr 08

12. **Requirements Certification:** Include the following statement:

I certify that the supporting data under my cognizance which are included in the justification are accurate and complete to the best of my knowledge and belief.

Typed Name: Date: Frederic L. Stoom, MSgt, US Provost Sergeant
Title: Signature: [signature] 8 Apr 08

13. **Fair and Reasonable Cost Determination:** Include the following determination:

I hereby determine that the anticipated cost to the Government for this contract action will be fair and reasonable.

Provide the basis for this determination (e.g., describe techniques to be used to determine fair and reasonable price, such as cost analysis, price analysis, audit, should cost, independent Government estimate, etc.). As part of this basis, indicate whether certified cost or pricing data will be required or if one of the exceptions in FAR 15.403 will apply.

Typed Name: Date: [illegible handwriting]
Title: Signature: Contracting Officer [signature]

14. **Contracting Officer Certification:** This certification shall be made by the contracting officer who will sign the contract resulting from this justification and approval. Include the following statement:

I certify that this justification is accurate and complete to the best of my knowledge and belief.

Typed Name: Date: [illegible handwriting]
Title: Signature: Contracting Officer [signature]

**Approval**

Based on the foregoing justification, I hereby approve the procurement of CWD Services on an other than full and open competition basis pursuant to the authority of 10 U.S.C.2304(c)(2), subject to availability of funds, and provided that the services and property herein described have otherwise been authorized for acquisition.

Date: 30 March 08
Signature: [signature]

# EXHIBIT 3

DEPARTMENT OF THE ARMY
OFFICE OF THE ASSISTANT SECRETARY OF THE ARMY
ACQUISITION LOGISTICS AND TECHNOLOGY
103 ARMY PENTAGON
WASHINGTON DC 20310-0103

PROTECTED MATERIAL
TO BE DISCLOSED IN ACCORDANCE WITH
GAO PROTECTIVE ORDER

APR 11 2008

SAAL-ZPI

MEMORANDUM FOR HEAD OF CONTRACTING ACTIVITY FOR
JOINT CONTRACTING COMMAND-
IRAQ/AFGHANISTAN, APO, AE 09348

SUBJECT: Request for Authority to Proceed Notwithstanding Government Accountability Office (GAO) Protest

Reference Joint Contracting Command-Iraq/Afghanistan memorandum, dated April 10, 2008 and signed by RDML Kathleen M. Dussault, subject as above.

In your referenced memorandum, you request approval to continue performance under contract W91B4L-08-M-0257 awarded to American K-9 Detection Services (AMK9). Based upon the referenced memorandum and the Determination and Findings, approval to proceed with performance of this contract is granted while Protest B-311349.2, filed by EOD Technologies, Inc (EODT) is resolved by the GAO. Based upon the referenced memorandum and your Determination Findings, I find that urgent and compelling circumstances, which significantly affect the interests of the United States, will not permit waiting for the GAO's decision on protest B-311349.2. The Contracting Officer shall comply with the notice requirements of the Federal Acquisition Regulation (FAR), Subpart 33.104(d).

My point of contact for this action is Mrs. Doris H. Mayo, commercial (703) 696-1422, DSN 426-1422, e-mail: doris.mayo@hqda.army.mil.

Dale A. Ormond
Acting Deputy Assistant Secretary of the Army
(Policy and Procurement)