IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

**REDACTED VERSION**

| | | |
|---|---|---|
| **EOD TECHNOLOGY, INC.,** | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| **THE UNITED STATES,** | ) | Case No. ________ |
| Defendant, | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION**

Of Counsel:
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859

John E. Jensen
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7560
(703) 770-7686 (protected facsimile)

Counsel for Plaintiff
EOD Technology, Inc.

April 16, 2008

400810905v1

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iv

I. STATEMENT OF THE CASE .......... 1

II. QUESTION PRESENTED .......... 3

III. STATEMENT OF FACTS .......... 3

A. The Army's Recent History of Procuring Contract Working Dog Services .......... 3

B. The April 2, 2008 Memo .......... 5

C. The Army Has Been Keenly Aware Of Its "Changing Requirements" .......... 6

D. EODT Can Meet The Army's "Changing Requirements" .......... 8

E. AMK-9 Lacks The Ability To Meet The Army's "Changing Requirements" .......... 9

F. The Use Of Contract Working Dogs Is One Of Many Security Measures .......... 11

IV. ARGUMENT .......... 11

A. Standard of Review .......... 11

B. EODT Is Likely To Prevail On The Merits .......... 12

1. Even Before The Army's Unlawful CICA Override Decision, It Had Improperly Circumvented CICA By Awarding The Three-Month Interim Contract To AMK-9 .......... 13

2. The Army's Justification For Its CICA Stay Override Decision Is Predicated On Factual Inaccuracies And Unsupported Conclusions .......... 14

a. The Army Failed to Consider Reasonable Alternatives: [redacted] .......... 15

b. The Army Mischaracterizes The Potential Adverse Consequences Of Overriding The CICA Stay .......... 19

c. The Army's "Analysis" Of The Impact Of The Override On Competition And Integrity Of The Procurement System Does Not Actually Address The Override Decision Itself .......... 20




400810905v1

C. Absent Temporary Or Preliminary Injunctive Relief, EODT Will Suffer Irreparable Harm ....... 22

D. Temporary Or Preliminary Injunctive Relief Will Not Substantially Harm Either The Government Or AMK-9 ....... 23

E. Awarding A Temporary Restraining Order And Preliminary Injunction Is In The Public Interest ....... 24

CONCLUSION ....... 26

## TABLE OF AUTHORITIES

**Cases** **Page**

Aeroplate Corp. v. United States,
67 Fed. Cl. 1, 2 (2005) .......... 12

Al Ghanim Combined Group Co. v. United States,
56 Fed. Cl. 502 (2003) .......... 24

American K-9 Detection Services, Inc.,
B-311008.2 (2008) .......... 4

CIGNA Government Services, LLC v. United States,
70 Fed. Cl. 100 (2006) .......... 12, 14, 24

EOD Technology, Inc.,
B-311349.2 (2008) .......... 4

FMC Corp. v. United States,
3 F.3d 427 (Fed. Cir. 1993) .......... 12

Hybritech Inc. v. Abbott Labs,
849 F.2d 1446 (Fed. Cir. 1988) .......... 12

PGBA, LLC v. United States,
57 Fed. Cl. 655 (2003) .......... 13, 22, 24

Reilly's Wholesale Produce v. United States,
73 Fed. Cl. 705 (2006) .......... *passim*

RONCO Consulting Corporation,
B-311008 (2007) .......... 3

United States Ass'n of Importers of Textiles & Apparel v. United States,
413 F.3d 1344 (Fed. Cir. 2005) .......... 12

**Statutes**

5 U.S.C. § 706 .......... 12

28 U.S.C. § 1491 .......... 12

31 U.S.C. § 3553 .......... 1, 13

# MEMORANDUM IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff EOD Technology, Inc. ("EODT") respectfully submits this memorandum in support of its application for a temporary restraining order and motion for a preliminary injunction, both of which are filed contemporaneously with this brief.

## STATEMENT OF THE CASE

This case challenges an April 11, 2008 decision of the Kandahar Regional Contracting Center, acting through the Department of the Army (the "Army" or "Government"), to override the statutory stay of contract performance imposed by the Competition in Contracting Act of 1984 ("CICA"), 31 U.S.C. § 3553(c)(1), in connection with the Army's unlawful sole-source award of a follow-on contract to an incumbent contractor for contract working dog ("CWD") services in Kandahar, Afghanistan.

The Army's override decision is the latest in a series of poorly-executed procurement decisions by no fewer than three different contracting officers over a span of three months. Their collective actions reflect, at a minimum, a failure of planning, a lack of diligent execution in the procurement for these services, and a lack of accountability.

The override decision highlights the fact that the Army consistently has sought "the easy solution" and not the right solution to the procurement decisions it has faced. EODT twice in five months successfully competed and was selected as offering the best value to the Government for the CWD services, defeating the incumbent both times. Both times EODT began mobilizing to start contract performance. Both times the incumbent protested at the U.S. Government Accountability Office ("GAO"), staying performance of EODT's contract, and both times the Army chose not to attempt to defend its procurement decisions, but instead terminated

EODT's contract for convenience. The Army had been aware of issues with its solicitations, but chose not to address them. After the second protest, the Army also chose another easy solution: awarding a six-month sole-source contract (the "Sole Source Contract") to the incumbent, and justifying the sole-source award on the dubious grounds of "unusual and compelling urgency." That contract is the subject of a bid protest now pending at the GAO. It is not before this Court.

Faced with the CICA stay of its Sole Source Contract, the Army found yet another easy solution. While in a technical sense it "suspended" performance of the protested contract for which performance was stayed, the Army simultaneously awarded *another*, three-month sole source contract to the incumbent for exactly the same services. The Army awarded the shorter sole-source contract briefly, with the intent to circumvent the CICA stay.

Eventually the Army expressly overrode the CICA stay, but in so doing the Army failed to consider alternatives in any meaningful way. The Army failed to consider using EODT as an alternative source of CWD services – even though EODT [redacted] The Army chose not to assess realistic alternatives, based on the faulty rationale that no other company could have *all* the Army's requirements in place *the very next day*. Further, the Army supported its decision by referencing requirements that the Army is not implementing and that the incumbent does not meet. Finally, the Army failed to consider the wide range of alternatives to using working dog services.

Based on the Army's unsubstantiated override action, EODT requests declaratory or injunctive relief. The nature of the relief should be to enjoin the Army from continued performance under the Sole Source Contract and to require the Army to consider other solutions to its interim requirements, including a short limited competition with EODT (twice selected

over the incumbent and the only other CWD contractor with in-country capability) or a second sole-source to EODT, for all or a portion of the interim requirements. This relief is necessary to redress the Army's disregard for the importance that Congress attached to the presumption of the CICA stay.

## QUESTION PRESENTED

Whether EODT is entitled to a temporary restraining order (pending the issuance of a preliminary injunction) and a preliminary injunction (pending the entry of final judgment in this case) to prevent the Army from carrying out its arbitrary, capricious, and otherwise unlawful decision to override the stay of contract performance imposed by CICA when EODT timely filed a bid protest at GAO challenging the Army's award of the Sole Source Contract to the incumbent contractor, American K-9 Detection Services, Inc. ("AMK-9")?

## STATEMENT OF FACTS[1]

### A. The Army's Recent History Of Procuring Contract Working Dog Services

On October 23, 2007, the Army issued a competitive solicitation No. W91B4L-08-R-0001 for CWD services in Southern Afghanistan, with award made based on best value. EODT, AMK-9, and RONCO Consulting Corporation ("RONCO") were offerors. The Army determined that EODT's proposal provided the best value to the Government, and awarded the CWD contract to EODT in December 2007 (cover page of contract award attached hereto as Exhibit C). Both AMK-9 and RONCO protested the Army award to GAO. Following the Army's announcement of its intent to take corrective action, the GAO dismissed these protests as academic on January 16, 2008. See Protest of RONCO Consulting Corporation, B-311008

[1] The Statement of Facts draws generally upon the Declarations of [redacted] (attached hereto as Exhibits A and B, respectively).

(notice of dismissal); Protest of American K-9 Detection Services, Inc., B-311008.2 (notice of dismissal). The Army proceeded to terminate for convenience the contract awarded to EODT and cancelled the underlying solicitation.

On February 10, 2008, the Army issued a revised competitive solicitation No. W91B4L-08-R-0013, with a closing date of February 20, 2008, for the same CWD services. Similar to the previous solicitation, award was to be made based on best value to the Government. EODT and AMK-9 were offerors. On February 28, 2008, the Army again awarded a contract to EODT (cover page of contract award attached hereto as Exhibit D). Two weeks later, on March 11, 2008, AMK-9 protested the Army's latest contract award to EODT.

On March 16, 2008, the Army sent a letter directing EODT to stop work on the contract and terminated EODT's contract for convenience shortly thereafter on March 26, 2008. The Army also cancelled the underlying solicitation.[2] Two days later, on March 28, 2008, EODT first learned of the Army's intent to award the Sole Source Contract for CWD services to AMK-9 pending the issuance of a new solicitation for CWD services later in calendar year 2008. The Army awarded Contract No. W91B4L-08-M-0257 to AMK-9 on March 31, 2008 for a six-month period. On April 1, 2008, EODT protested to GAO the Army's cancellation of Solicitation No. W91B4L-08-R-0013 and the Army's Sole Source Contract to AMK-9. See Protest of EOD Technology, Inc., B-311349.2.

EODT's April 1, 2008 GAO protest triggered an automatic stay of performance of the contract. In response, the Army issued a three-month, sole source "interim contract" to AMK-9 to cover the same work suspended by the CICA stay. Finally, on April 13, 2008, the Army issued a memorandum advising that the head of its contracting authority had approved, on April

[2] Due to the Army's termination of this second EODT contract, GAO subsequently dismissed AMK-9's March 11, 2008 protest as academic on April 7, 2008.

11, 2008, both an override of the CICA stay and AMK-9's continued performance of the Sole Source Contract. The Government provided a copy of the written determination and findings (the "D&F") underlying the stay override (prepared by USAF Major Michael A. Tomm, the Contracting Officer) to the undersigned counsel for EODT on April 14, 2008.[3]

**B. The April 2, 2008 Memo**

Prior to the Army's issuance of its decision to override the stay of the Sole Source Contract, Major Tomm on April 2, 2008, had prepared a "Memorandum For Record" (the "April 2 Memo") (attached hereto as Exhibit F) on the Army's letterhead addressing the termination of EODT's most recent contract and subsequent award of the Sole Source Contract to AMK-9:

> On 12 March 2008, this office received a protest submitted by American K9 (AMK9), filed with the GAO on 11 Mar 2008. The protest involved contract number W91B4L-08-M-0232 . . . After careful review of the protest and an investigation of the pertinent facts by this office, it was determined that the proper course of corrective action is to terminate the current contract with EODT for the convenience of the government per FAR 52.249-2 and issue a new solicitation for the CWD services. In the interim, the government will be issuing a sole source award to [AMK-9] for the provision of the CWD services for a 6-month period of performance . . . There are several reasons why the government has taken this drastic step. The record of this procurement contains evidence that the solicitation and award was flawed and did not serve the needs of the government or the coalition partners.

April 2 Memo, ¶ 1 (Ex. F). The April 2 Memo appears to list several areas of need – previously unaddressed by the contract awards to EODT, according to Maj. Tomm – that purportedly reflect the Army's "rapidly changing requirements." These areas of need include: [redacted]; (2) the Army's

[3] The D&F is subject to the protective order in the April 1, 2008 GAO protest, and attached hereto as Exhibit E. EODT has filed a contemporaneous motion for leave to file this brief and the attached exhibits under seal and moved for the entry of a protective order in the instant action.



400810905v1

official certification of a contractor's CWD teams; and (3) an increase in the overall number of CWD teams. Id., ¶¶ 1.b-d (Ex. F). The Memo also discussed the deployment of CWD services contract personnel through the CONUS Replacement Center ("CRC"), but did not state whether the Army would impose such a requirement. Id., ¶1.a (Ex. F).

In particular, the April 2 Memo states that [redacted]. Id., ¶1.b (Ex. F).

Regarding the Army's certification of dog teams, the April 2 Memo states that the prior Performance Work Statement ("PWS") required that dog teams be certified before performing any real world missions. Id., ¶1.c (Ex. F). The Memo alleges that "[s]ufficient time was not provided for certification of the canines" in the terminated EODT contracts, because there was only one available certification authority (SFC Byron Sago), and that authority only had the capacity to certify [redacted]. Id. (Ex. F).

The April 2 Memo further states that the Army's required number of dog teams has [redacted]. Id., ¶1.d (Ex. F).

Based on these primary concerns, the April 2 Memo concludes that "the best course of action in this case was to terminate the current award to EODT and to build a new solicitation that adequately addresses the outstanding government requirements that until this time have not been adequately defined." Id., ¶ 2 (Ex. F).

## C. The Army Has Been Keenly Aware Of Its "Changing Requirements"

Although the Army suggests in the April 2 Memo that its requirements for the CWD services contract had been changing rapidly and had previously not been understood, the Army's

meetings with EODT personnel demonstrate that agency officials were keenly aware of those differing requirements before the Army issued its last competitive solicitation.

In fact, the Army sought feedback from offerors regarding whether the first CWD services solicitation, as drafted, sufficiently met the Government's needs. For example, in late January 2008, during EODT's demobilization after the termination of the December 2007 contract award, Major Thrailkill, the Commanding Officer of the Kandahar Air Field ("KAF") Contracting Office, asked [redacted], for advice and guidance on rewriting the Performance Work Statement ("PWS"). [redacted], ¶ 11 (Ex. A). The Army apparently also had approached RONCO and AMK-9 for similar input regarding the PWS. Id. (Ex. A).

During his meetings with Maj. Thrailkill, [redacted] advised that the initial PWS should be revised to address several issues. Id., ¶ 12 (Ex. A). These issues included nationality and clearance requirements, issues regarding pre-deployment procedures, and timeliness issues in team certification. Id. (Ex. A). For example, with regard to security clearances, Maj. Thrailkill expressed his concern that if the Army's revised solicitation did not state any nationality or clearance requirements, the contractor might later seek contract modification. [redacted] also advised Maj. Thrailkill that the Army's lack of dog team certification resources was a problem – a point that Maj. Thrailkill openly acknowledged. Id., ¶ 35 (Ex. A).

In addition to the matters that [redacted] discussed with Maj. Thrailkill in January 2008, the Army had alerted EODT at least as early as 2007 of impending increased requirements for dog teams. During the mobilization period after the Army's initial contract award to EODT in December 2007, Major White informed [redacted] that the CWD services contract was going to grow and that the Army would be adding teams to meet their mission requirements. Id., ¶ 18



400810905v1

(Ex. A). In addition, at the December 8, 2007 Pre-Performance Conference at Kandahar Airfield for the Army's CWD Services procurement, both Afghanistan Squad Leader Pope (British) and Chief Warrant Officer Adams (Canadian) informed [redacted] that they believed their requirements for K-9 services would [redacted]. [redacted], ¶ 14 (Ex. B). Lt. Jun, the Army's Contracting Officer Representative, was present and led the meeting on behalf of the contracting office. Id. (Ex. B).

Nonetheless, Solicitation No. W91B4L-08-R-0013, which the Army issued on February 10, 2008, did not address any of these issues, which surprised EODT. See [redacted] ¶ 13 (Ex. A).

## D. EODT Can Meet The Army's "Changing Requirements"

EODT always has been and continues to be prepared to meet the Army's "changing requirements" as stated in the April 2 Memo. Regarding the security clearance issue, EODT can easily deploy personnel with the requisite clearances in a very short period of time, because it has many secured handlers at other locations worldwide. [redacted] ¶ 21 (Ex. B). After the termination of the January 2008 CWD services contract, EODT [redacted] Id. (Ex. B). Moreover, EODT currently [redacted] Id. (Ex. B).

For dog team certification, EODT [redacted] ¶ 36 (Ex. A). The U.S. military has approximately fifty certifying officials around the world, and the Army has not articulated any reason why an additional certification authority cannot be deployed to

Afghanistan to speed the process of certification. Id., ¶ 37 (Ex. A). Moreover, the military is capable of using "verification" (a much faster process) in lieu of certification, as it has in the past. In this regard, former military trainers currently in Afghanistan are capable of "verifying" to SFC Sago the qualifications of the teams. Id., ¶ 38 (Ex. A).

Finally, regarding the Army's increased number of dog teams needed, EODT [redacted] ¶ 15 (Ex. B). EODT in fact, [redacted] Id. (Ex. B). Because [redacted]

**E. AMK-9 Lacks The Ability To Meet The Army's "Changing Requirements"**

Upon information and belief, AMK-9 fails to meet the Army's "changing requirements," rendering many statements in the April 2 Memo about AMK-9's capabilities inaccurate.

For example, AMK-9 is likely not positioned to meet the military's increasing staffing requirements because EODT is aware of complaints about AMK-9 [redacted]

[redacted]. Id. (Ex. B).

Furthermore, EODT understands that AMK-9 has not [redacted]. Id. (Ex. A).

EODT also has reason to believe that AMK-9 is currently providing [redacted]. Id., ¶ 26 (Ex. A). [redacted] does not hold a clearance and has told [redacted] that he is incapable of securing one. Id. (Ex. A). [redacted] knows that AMK-9 has employed several [redacted] Id. (Ex. A).

Finally, to the extent that the Army may claim that all dog handlers must be deployed through CRC, EODT is aware of several AMK-9 handlers located on KAF who have not been through CRC but nonetheless are currently performing CWD services for the Government. Id., ¶ 32 (Ex. A). No AMK-9 employee who is also a "national" of the [redacted] has attended CRC. Id. (Ex. A). Based on this limitation, EODT also has reason to believe that the following AMK-9 employees have not attended CRC: [redacted] In short, if CRC deployment is a requirement, then AMK-9 is non-compliant. Id. (Ex. A).

**F. The Use Of Contract Working Dogs Is One Of Many Security Measures**

Although CWDs are valuable tools in detecting explosive devices and narcotics, they are not the only method, as [redacted]. Id., ¶ 46 (Ex. A). This estimate is based on the number of FOBs in-country and the number of canine resources, both military and contracted, used to support these bases. Id. (Ex. A). EODT in fact has had difficulty convincing units that do not utilize CWDs to start using them because there are so many other countermeasures available. Id., ¶ 47 (Ex. A). As just one example, [redacted]. Id. (Ex. A).

CWDs are one type of countermeasure for explosives and narcotics detection, but the military possesses many other countermeasures: [redacted]. Id., ¶¶ 49, 50 (Ex. A).

## ARGUMENT

**A. Standard of Review**

In considering EODT's motion for preliminary injunctive relief, this Court must weigh the following four factors: (1) EODT's likelihood of success on the merits; (2) the immediate

and irreparable injury to EODT; (3) the public interest; and (4) the balance of the hardship on all the parties. See United States Ass'n of Importers of Textiles & Apparel v. United States, 413 F.3d 1344, 1347-48 (Fed. Cir. 2005); Aeroplate Corp. v. United States, 67 Fed. Cl. 1, 2 (2005). No single factor is determinative, and "the weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); see also Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1451 (Fed. Cir. 1988) ("These factors, taken individually, are not dispositive; rather, the . . . court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested.")

Applying these factors to the circumstances of this case, EODT is entitled to injunctive relief.

**B. EODT Is Likely To Prevail On The Merits**

EODT is likely to prevail on the merits of its claim that the Army's recent determination to override the CICA stay of performance on the Sole Source Contract contravenes the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).[4]

Under those standards, the Court must overturn the procuring agency's override decision if it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. CIGNA Government Services, LLC v. United States, 70 Fed. Cl. 100, 109 (2006) (citing the APA, 5 U.S.C. § 706(2)(A)). "In order to prevail, the protestor must show by a preponderance of the evidence that the agency's actions were either without a reasonable basis or in violation of applicable procurement law." Id. at 109-10. An agency's override decision may lack a

[4] Although the instant action does not arise under the APA, the APA provides the applicable standard of review for this Court. See 28 U.S.C. § 1491(b)(4) ("[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5").

reasonable basis if the agency considered factors that were irrelevant or ignored factors that were relevant. Id. at 110 (citing PGBA, LLC v. United States, 57 Fed. Cl. 655, 664 (2003)).

For reasons detailed below, the Army's decision to override the CICA stay here, based on a finding of "urgent and compelling circumstances," lacks a reasonable basis and is therefore arbitrary, capricious, and contrary to law.

#### 1. Even Before The Army's Unlawful CICA Override Decision, It Had Improperly Circumvented CICA By Awarding The Three-Month Interim Contract To AMK-9

The Army's decision to override the stay of performance on the Sole Source Contract is simply the latest example of Government's continuing violations of CICA regarding AMK-9.

When an offeror files a bid protest at GAO within the statutorily prescribed time frame, CICA imposes a mandatory stay of contract performance. 31 U.S.C. § 3553(d)(3)(A). Where the contractor has begun performance, the agency must "immediately direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract." 31 U.S.C. § 3553(d)(3)(A)(ii). The agency may not authorize the contractor to resume performance while the protest is pending. 31 U.S.C. § 3553(d)(3)(B).

The Army violated this restriction in awarding the three-month interim contract for CWD services to AMK-9 on or around April 5, 2008. That award permitted AMK-9 to resume performance of the same CWD services for essentially the duration of the GAO protest proceeding. The three-month interim contract award thus circumvented the CICA stay and was itself unlawful.

**2. The Army's Justification For Its CICA Stay Override Decision Is Predicated On Factual Inaccuracies And Unsupported Conclusions**

The head of the Army's contracting activity may override a CICA-mandated stay in contract performance upon a written determination that:

> (i) performance of the contract is in the *best interests* of the United States; or
>
> (ii) *urgent and compelling circumstances* that significantly affect the interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest.

31 U.S.C. § 3553(d)(3)(C)(i) (emphasis added). See also CIGNA Government Services, LLC v. United States, 70 Fed. Cl. 100, 110 (2006).

This Court has ruled that in preparing the justification underlying its CICA stay override decision, the Government must at least consider (1) whether significant adverse consequences will necessarily occur if the stay is not overridden; (2) whether reasonable alternatives to the override exist that would adequately address the circumstances presented; (3) how the potential cost of proceeding with the override, including the costs associated with the potential that the GAO might sustain the protest, compare to the benefits associated with the approach being considered for addressing the agency's needs; and (4) the impact of the override on competition and the integrity of the procurement system, as reflected in CICA. Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 711 (2006).[5]

---

[5] In Reilly's, the procuring agency, which operated commissaries for the military, initially awarded a contract that the plaintiff protested at the GAO. 73 Fed. Cl. at 706. Per CICA, that initial contract was stayed and the agency issued a nearly identical interim contract rather than override the stay, because the agency conceded that it lacked sufficient justification for a stay override. Id. at 706-07. The plaintiff again protested the interim contract at the GAO, and performance on the interim contract was stayed. Ultimately, the agency decided to override the stay of the interim contract and the plaintiff filed a CICA stay override suit in this Court, seeking preliminary injunctive relief. Id. at 707-08. This Court ruled that the agency's CICA stay override decision was arbitrary and capricious because, *inter alia*, the circumstances underlying the purported urgency of the agency's override decision were a result of the agency's

Although the Army's D&F purports to address these factors, as explained below, the D&F is predicated on several factual inaccuracies about whether there were reasonable alternatives to the override request and reaches unsupported conclusions about the significant adverse consequences that will allegedly occur if the stay is not overridden. The D&F also purports to but does not actually analyze the impact of the stay override on competition and procurement integrity. For these reasons, the override decision is arbitrary and capricious, and EODT is likely to prevail on the merits.

**a. The Army Failed to Consider Reasonable Alternatives:** [redacted]

In issuing the formal override, the Army did not consider whether reasonable alternatives to the override existed that would adequately address the circumstances, required by factor (2) of the Reilly test. In fact, there were several alternatives to simply sole-sourcing all its requirements to AMK-9. The D&F and the Sole Source Contract indicate that [redacted]

[redacted]

lack of advance planning. Id. at 715. This Court granted preliminary injunctive relief to the plaintiff and enjoined the Government from the further performance of the contracts. Id. at 717.

Exhibit E at 8 (emphasis added).

The Government's rationale fails the Reilly test because [redacted]

EODT, of course, was under a newly-awarded contract as recently as March to provide [redacted]

EODT's contract, awarded because EODT was the most qualified contractor to provide the service at the best price, and [redacted]

---

[6] The Performance Work Statements for the Sole Source Contract and EODT's contract are attached hereto as Exhibits G and H, respectively.

[redacted], demonstrates that the Army had very reasonable alternatives to a six-month sole source award to AMK-9. As for timing, the D&F acknowledges [redacted] The Army, however, never even *asked* EODT how quickly it could mobilize more resources and unreasonably assumed otherwise.

[redacted] It is difficult to believe that the U.S. military's ability to use canine services to help fight the war in Afghanistan – and its ability to make reasonable efforts to respect the competition requirements of CICA – is actually limited by one person's availability. EODT understands that the U.S. military has approximately fifty dog certification officials around the world. In any event, it is the agency's responsibility under Reilly to consider reasonable alternatives, and the D&F is defective because it does not explore any other way that would allow a contractor to field more dogs quickly, when a military or legal need arises.

Evidence also suggests that immediate formal certification of all dogs is not an actual requirement. [redacted] Exhibit G at 7. Second, EODT understands through telephone conversations with many former EODT handlers (who currently work for AMK-9 on the Sole Source Contract), that [redacted]. Thus, [redacted]

Additionally, with regard to the Army's choice of AMK-9 to meet the apparent requirement of [redacted] dog teams, AMK-9 has had significant problems providing [redacted]

[redacted]

[redacted]

[redacted]

[redacted].

December 30, 2007 E-mail from Adams.CE@forces.gc.ca to Army Lieutenant Kyung Jun, et al. (copy of e-mail string attached hereto at Exhibit I).[7]

Again, by contrast, EODT – [redacted]

[7] EODT was one of the recipients of this e-mail (presumably because the Canadian Forces mistakenly thought that EODT was the Army's contractor), but at the time of the email transmission, AMK-9 was the contractor for CWD services.

In short, EODT always has been positioned to serve as a "reasonable alternative" to a stay override permitting AMK-9's continued performance, regardless of how the Army has characterized its requirements (and had made specific preparations in the event that the Army changed its requirements). Not only could the Army have conducted an expedited competition between EODT and AMK-9, it could have awarded all – or some significant portion – of its CWD services requirements on a sole source basis to EODT, which was under contract to perform CWD services for the Government as recently as March 2008. Thus, the Army, based on the facts at hand, cannot credibly maintain that in overriding the stay of the Sole Source Contract, it properly evaluated alternative strategies to the override.

**b. The Army Mischaracterizes The Potential Adverse Consequences Of Overriding The CICA Stay**

The D&F also fails to satisfy factor (1) of the Reilly test, which requires a showing that significant adverse consequences will necessarily occur if the stay is not overridden. The Statement of Facts, which demonstrates that there will not be significant adverse consequences of a continued stay, notes that CWDs are merely one of many methods that the warfighter implements for security at FOBs, and that CWD services are by no means foolproof. Instead of using CWD services during the pendency of EODT's protest at the GAO, the Army would still have a wide range of options available for detecting narcotics and explosives at FOBs in Afghanistan in the [redacted].

[redacted]



400810905v1

[redacted].

Thus, it stands to reason that if this Court were to enjoin performance of the Sole Source Contract and permitted the CICA stay to remain in effect (or alternatively, permitted AMK-9 to continue performance pending an expedited two-week competition), no significant adverse consequences, if any, would occur. The D&F is therefore deficit in this respect as well.

**c. The Army's "Analysis" Of The Impact Of The Override On Competition And Integrity Of The Procurement System Does Not Actually Address The Override Decision Itself**

The D&F also fails to meet factor (4) of the Reilly test, which requires assessment of the impact of the override on competition and the integrity of the procurement system, as reflected in CICA. Contrary to the Government's suggestion, the Army's decision to override the stay of the Sole Source Contract has damaged the integrity of the procurement system by undermining the purposes underlying the CICA-mandated stay. Such stays were established for several reasons, including, *inter alia*:

> Congress fully recognized that a major deficiency in the existing bid protest process was the inability to stop a contract award or contract performance while a protest was pending, observing that the result was that agencies . . . often proceeded with their contracts, simply ignoring the protest process. As a result, in those instances in which GAO recommended relief that involved staying performance, the agencies often rejected that recommendation, finding that it was in the "best interests" of the government to continue the contract . . . a key element of the [CICA stay was to] preclude such *faits accomplis* and to facilitate a fair and equitable remedy to vendors who are illegally denied Government contracts.

Reilly's, 73 Fed. Cl. at 710 (citations and internal quotations omitted). By circumventing the CICA-mandated stay of the Sole Source Contract through its award of the three-month interim contract, the Army had already signaled its disregard for the CICA stay as an integral part of the procurement integrity process. Its latest decision to expressly override the stay appears to reflect a continuation of such disregard. The D&F, rather than addressing the impact of the stay override on competition and the integrity of the procurement system, simply [redacted] It does not undertake any actual analyses regarding the impact of the override on competition, which analyses a D&F is required to address.

The Army did not analyze whether it could have procured at least a portion of its CWD services requirements competitively in lieu of overriding the stay. [redacted] In sum, the D&F was deficient on this fourth Reilly factor as well.

In short, the Army has failed to demonstrate that it has met not just one, but at least three, of the criteria for a valid CICA stay override as set forth in Reilly's Wholesale Produce. Thus, the Army's April 11, 2008 override decision is arbitrary and capricious, and EODT is likely to prevail on the merits. Moreover, apart from the Army's deficient analysis in issuing its CICA stay override, EODT is likely to prevail on the merits because any "urgent and compelling circumstances" that the Army may cite in support of its stay override decision, much like the procuring agency in Reilly's, resulted from the Army's lack of advance planning. See 73 Fed. Cl. at 715 ("many of the circumstances that [the procuring agency] now faces [in alleging urgent and compelling circumstances for a stay override] are the result of a "lack of advance planning"). As demonstrated in the Statement of Facts, EODT repeatedly advised the Army in late 2007 and early 2008 – months before the Army's award of the Sole Source and three-month interim contracts to AMK-9 – that the performance work statements and technical requirements underlying the Army's CWD services procurements were potentially deficient in the same areas that the Army now appears to cite as its "rapidly changing" needs, and the Army well understood this fact at that time.

**C. Absent Temporary Or Preliminary Injunctive Relief, EODT Will Suffer Irreparable Harm**

"When assessing irreparable injury, the relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." PGBA, 57 Fed. Cl. at 664. It has long been held that the wrongful government action depriving a contractor of the "opportunities of the market place establishes the requisite 'irreparable injury' which no legal remedy would either value or redress." Id.

Here, as explained in the Statement of Facts, EODT faces the prospect of injury that is substantial and goes well beyond the potential loss of the opportunity to compete for the work

that the Army improperly permitted AMK-9 to continue performing by issuing the stay override. Apart from the injury that EODT has already suffered, [redacted] Thus, although the Army has expressed its intent to issue a revised competitive solicitation, the Army's continuing violations of CICA will already have significantly compromised EODT's ability to compete for that work.

### D. Temporary Or Preliminary Injunctive Relief Will Not Substantially Harm Either The Government Or AMK-9

The harm to EODT, as described above, far outweighs any arguable harm to the Government or AMK-9. The Army has already demonstrated that it is capable of conducting a competition for CWD services on an expedited basis. After it had terminated for convenience the first contract award to EODT, the Army issued a new solicitation on February 10, 2008 with a closing date of February 20, 2008. Eight days later, on February 28, 2008, the Army made its contract award to EODT. Thus, if this Court were to enjoin the Army from overriding the stay in performance of the Sole Source Contract, the Army similarly could readily conduct and complete, over a period of two weeks, a limited competition between EODT and AMK-9 to

perform CWD services until a long-term contract is awarded and begins. Such a limited competition could easily [redacted] It stands to reason that any alleged harm to the Government in being required to conduct a competition for the Sole Source Contract would be mitigated significantly if only a portion of such work were subject to the expedited competition.

Finally, because AMK-9 benefited from a violation of CICA, it cannot be deemed to have suffered harm if the violation is corrected. See Al Ghanim Combined Group Co. v. United States, 56 Fed. Cl. 502, 520 (2003) (when an award process is flawed, an awardee is not harmed when an injunction prevents the awardee's performance).

### E. Awarding A Temporary Restraining Order And Preliminary Injunction Is In The Public Interest

As the Court's discussion of the legislative history in PGBA makes clear, Congress has determined that the public interest is best served by maintaining a vigorous bid protest regime, preserved and buttressed by the automatic stay provisions. See PGBA, 57 Fed. Cl. at 660 & n.8. In CIGNA, this Court went even further by determining that the Congressional mandate for competition is a relevant factor in an override decision and that the procuring agency there erred by failing to take it into account when it decided to override the automatic stay:

> Nor did the override decision consider the statutory mandates for competition in both CICA and the [new Medicare law] and the adverse effect on competition that the override could effect.

CIGNA, 70 Fed. Cl. at 102.

In both its decision to circumvent CICA by awarding the three-month interim contract and its decision to override expressly the CICA-mandated stay of the Sole Source Contract, the Army likewise failed to give any real consideration to the issue stated above. Indeed, as this

Court has recognized in other cases, the Army's award of the three-month interim contract to AMK-9 "was tantamount to overriding the automatic stay" on the Sole Source Contract. See Reilly's, 73 Fed. Cl. at 715. As this Court also recognized, from a competition standpoint, awarding a sole source contract should have been viewed not as a first but a last resort, undertaken only after all reasonable alternatives to the override were fully explored. Id. The procuring agency's decision to award a sole source interim contract effectively circumvented the stay that had been in effect, thereby "undercutting the important policy considerations underlying the collective Congressional wisdom to create the stay." Id. Thus, for reasons described above and as demonstrated in the Statement of Facts, the Army's decision-making here is strikingly parallel to that in Reilly's and warrants scrutiny through a similar lens.

## CONCLUSION

Because the Army's decision to override the CICA-mandated stay of performance on the Sole Source Contract lacks the requisite justification, EODT is likely to prevail on the merits of its contention that the Army's actions are arbitrary, capricious, and contrary to law. Absent injunctive relief, continued performance on the Sole Source Contract would inflict further irreparable harm on EODT beyond the harm that it has already suffered. By contrast, injunctive relief would cause little if any harm to the Government and may in fact benefit the Government.

Thus, EODT respectfully requests that this Court issue a temporary restraining order preventing AMK-9's continued performance of the Sole Source Contract pending the issuance of a preliminary injunction, as well as a preliminary injunction preventing performance of the Sole Source Contract pending final judgment. In the alternative, EODT respectfully requests that this Court direct the Army to conduct a limited and expedited (i.e., in two weeks) competition between AMK-9 and EODT for all or a substantial portion of its required contract working dog services.

Dated: April 16, 2008

Respectfully submitted,

Of Counsel:

Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859

________________________
John E. Jensen
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7560
(703) 770-7686 (protected facsimile)
Counsel for EOD Technology, Inc.