**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| **EOD TECHNOLOGY, INC.,** Plaintiff, v. | ) | **REDACTED VERSION** |
| **THE UNITED STATES,** Defendant, | ) | Case No. ________ |

**DECLARATION OF [redacted]**

I, [redacted], pursuant to 28 U.S.C. § 1746, state as follows:

1. I am the [redacted] for EOD Technology, Inc. ("EODT"). I have been employed by EODT since September 2006. I am responsible for [redacted]

2. EODT is an employee-owned company that has provided munitions response, security services, and critical mission support worldwide in austere and hostile environments since 1987. EODT delivers services to all branches of the military, foreign and domestic governments, and commercial clients. We have been under contract by the U.S. Army Corps of Engineers since 1997; we have provided support to the U.S. Army, Air Force, and Marine Corps; we provide security and IT support to the Multi-National Security Transition Command – Iraq and Security and Construction Services to Joint Contracting Command –Afghanistan; we provide international Embassy Security to the Department of State; and we provide Mine Action and Munitions Response services to a variety of commercial customers throughout the world.

3. EODT has provided or currently provides security services at [redacted] sites in Iraq and at [redacted] sites in Afghanistan. Several of these large security contracts include canine security services requiring Explosive Detection Dogs, Patrol Dogs and Mine Detection Dogs.

4. [redacted]

5. I, along with [redacted], designed the proposals for both contracts previously awarded to EODT for the services at issue, and I have been heavily involved with the implementation and mobilization of these contracts.

6. I have been to Afghanistan on numerous occasions since September 2005, and I have been acting as [redacted]

7. I submit this declaration in support of EODT's action to set aside and enjoin the Army's decision to override the stay imposed by the Competition in Contracting Act when EODT filed a bid protest with the Government Accountability Office ("GAO") challenging the Army's sole source contract award to American K-9 Detection Services, Inc. ("AMK-9").

**A. Background Information**

8. Kandahar Airfield ("KAF") and its outlying Forward Operating Bases ("FOB") in Southern Afghanistan utilize Contract Working Dogs ("CWD") as one of many elements of force protection. AMK-9 had been providing these services as the incumbent contractor, and, upon information and belief, their contract expired on March 31, 2008.

9. The Army issued Solicitation No. W91B4L-08-R-0001 for CWD services in Southern Afghanistan on October 23, 2007. The solicitation contemplated a fixed-price contract for the CWD services with a base period of seven months and a possible three month option period, which was to be awarded on a best value basis. EODT submitted a proposal and received the contract in December 2007.

10. EODT promptly began mobilizing resources in order to perform the CWD services. Two other offerors, AMK-9 and RONCO Consulting Corporation ("RONCO"), protested the Agency's award to EODT at the Government Accountability Office ("GAO"). The protests alleged that the Army had committed several errors in its evaluation of the proposals. The GAO protests triggered a stay of performance of EODT's contract, and on January 11, 2008, EODT received a stop work order. The Army subsequently determined to take corrective action based on the protests. The Army cancelled the solicitation and terminated EODT's contract for convenience. On January 16, 2008, the GAO dismissed the protest as academic.

11. In late January of 2008, during EODT's demobilization after the termination of its contract award, I was approached by Major Thrailkill, the Commanding Officer of the Kandahar Air Field ("KAF") Contracting Office, and asked for advice and guidance on rewriting the Performance Work Statement ("PWS") to accurately reflect the government's needs. I discussed these issues with Major Thrailkill during several informal meetings that occurred on January

20th, 24th and 26th, 2008 (the "January Meetings"). I was told that RONCO and AMK-9 were also approached for the same reason.

12. During the January Meetings, I specifically told Major Thrailkill that the PWS was flawed and that many issues had to be addressed in the revised solicitation. These issues included: nationality and clearance requirements, issues regarding pre-deployment procedures, and timeliness issues in team certification.

13. On February 10, 2008, the Army issued a revised solicitation, Solicitation No. W91B4L-08-R-0013, for identical CWD services. I was surprised at the content of the revised solicitation because, despite my discussions with Major Thrailkill, the new PWS failed to address many of the issues we had discussed during the January Meetings. [redacted] EODT submitted an offer, and, on February 28, 2008, the Army again awarded the contract to EODT. EODT began re-mobilizing in order to perform the CWD services. On March 11, 2008, AMK-9 again protested the Army's decision to award the contract to EODT at the GAO.

14. The GAO protest again triggered the stay of EODT's contract, and on March 16, 2008, the Army sent a letter directing EODT to stop work on the contract. Less than a week later, on March 26, 2008, the Army terminated EODT's contract for convenience. The Army subsequently cancelled the solicitation. On April 2, 2008, the Army requested that GAO dismiss AMK-9's protest as academic. The request included a memorandum, signed by then-Captain Michael Tomm, which outlined the Army's reasoning for terminating EODT's contract and canceling the solicitation (the "Memorandum"). The Memorandum implied that the Performance Work Statement PWS was flawed because it no longer stated the needs of the

government. The Memorandum outlined requirements that were not included in the previous solicitation. It identified these requirements as "new" despite my having discussed them in January 2008 with Major Thrailkill. GAO dismissed AMK-9's second protest as academic on April 7, 2008.

15. Meanwhile, apparently on March 31, 2008, the Army awarded a 6-month sole source contract to AMK-9 to provide the services expressed in the cancelled solicitation. On April 1, 2008, EODT protested the Army's cancellation of the solicitation and the Army's sole source award to AMK-9 at the GAO. EODT's GAO protest triggered the stay of AMK-9's sole-source contract award and, on information and belief, the Army directed AMK-9 to stop work under that contract. At the same time it stopped work under the protested contract, however, the Army nevertheless authorized AMK-9 to continue with performance of the CWD services pursuant to a second sole source contract. Upon information and belief, on or around April 5, 2008, the Army issued a second sole source contract to AMK-9 commencing immediately with a period of performance of three months. On April 13, the Army notified EODT that the Army overrode the stay on April 11, to resume performance under the six-month contract.

**B. The April 2nd Memorandum**

16. The Memorandum indicated that the Army had new requirements. EODT is capable of meeting the Army's current requirements. AMK-9 does not currently meet the Army's requirements.

1) Increased Number of Dog Teams

17. It is my understanding, based on my knowledge of the Army's requirements and the memorandum issued Major Michael A. Tomm on April 2, 2008, that while the previous solicitations required [redacted].



400803187v1

18. It is clear that the Army knew about its growing requirements as early as December 2007. During the mobilization period after the first contract award, EODT was told by Major White, representing the SF contingents, that the contract was going to grow and that they would be adding contracted working dog teams for their mission requirements.

19. Because EODT was aware of the growing needs of the Army, we teamed with [redacted] so that EODT could be in the best possible position to meet the Army's growing needs.

20. Due to our understanding of the military's growing need, EODT was [redacted] Additionally, as we stipulated in our proposal, [redacted]

21. I am personally aware that AMK-9 is providing the military with [redacted]. In mid-March, I received an e-mail from [redacted], an employee of AMK-9 stationed at [redacted]. He was hoping to be hired by EODT once we began performing on the contract. In this e-mail, he listed his qualifications, which did not rise to the solicitation requirements of handlers because he did not possess the [redacted], which is required by the PWS.

2) Security Clearances of Handlers

22. It is my understanding, based upon my knowledge of the Army's requirements, that, in addition to the stated requirement that the [redacted]



400803187v1

[redacted]. EODT was informed of this by Maj White on the 11th of December and this was communicated to the COR at the Kandahar Regional Contracting Center.

23. While the solicitations did not require that any handlers be [redacted], it is clear that the Army knew about this requirement at least prior to issuing the second solicitation. I discussed this issue with Major Thrailkill at the January Meetings. He specifically stated that he feared that if the new solicitation did not state nationality/clearance requirements, the contractor might later seek contract modification. [redacted]

24. EODT specifically asked the Army during the Question and Answer period of the second solicitation whether there were any specific clearance or nationality requirements for the handlers, and the Army inexplicably did not provide an answer. The question was asked on February 15, 2008, which was 5 days prior to bid closing. The questions read:

- Are there any specific nationality requirements for handlers in support of Combined Joint Special Operations Task Force?
- Are there any specific security clearance requirements for handlers in support of Combined Joint Special Operations Task Force?

25. EODT can easily secure personnel with the requisite clearances in a very short period of time. [redacted]

26. Upon information and belief, AMK-9 is currently providing [redacted] does not hold a clearance and has told me personally that he is incapable of securing one. Additionally, I personally know that AMK-9 has several [redacted]

27. The Memorandum also indicated that the [redacted]. EODT is fully prepared to meet this requirement as each of its handlers already meet these criteria.

3) Entrance Through CRC

28. The Continental United States ("CONUS") Replacement Center ("CRC") receives and processes individuals and units prior to deployment to theaters of operation such as Iraq and Afghanistan. Attendance at CRC consists of a week-long class, spanning Saturday to Friday, which instructs attendees on theater-specific issues such as rules of engagement.

29. Based on my understanding of Department of Defense's ("DOD") policy, which was stated to me by Chief Warrant Officer 3 (CW3) Condon, Officer in Charge of Reservations, it is not necessary to send employees who are already in theater through CRC. I addressed this issue in person with Major Thrailkill at the January Meetings, and confirmed that his office had in fact personally discussed this issue with CW3 Condon themselves and had instructed EODT to not send any handlers who were already in-theater to CRC. Thus, on information and belief, only those employees deploying from CONUS will be required to process through CRC to meet the Army's requirements.

30. Sending employees through CRC is time consuming because there is only one active CRC, which is located in Fort Benning, GA and CRC classes are generally overbooked.

31. EODT has always adhered to the policy of sending handlers that were not already in-theater through CRC. EODT has [redacted] but has sent hundreds of personnel through CRC since 2003 for contracts with the US Army Corps of Engineers in Iraq.

32. I am aware of several AMK-9 handlers, located on KAF, who have not been through CRC and are currently performing contract services, which confirms my view that the Army does not require personnel hired in theater to process through CRC. [redacted] has not been through CRC nor do I believe the following AMK-9 employees have attended CRC as well: [redacted] Additionally, it is my understanding that none of the AMK-9's employees who are nationals of [redacted] have attended CRC.

4) <u>Certification of Teams</u>

33. It is my understanding that the Army plans to require Army certification of all dog teams that are deployed.

34. We are told that currently, there is only [redacted] certifying authority in Afghanistan, SFC Byron Sago, and he is only capable of certifying [redacted].

35. During the January Meetings, I advised Major Thrailkill that the current lack of certification resources was a problem. He acknowledged the inadequacy of the resources.

36. Currently EODT has [redacted] teams certified by Sgt. Sago and [redacted] uncertified teams in theater and ready for certification.

37. The military has a number of certifying officials around the world, which I estimate to be around 50 in total. The Program Manager, whom I believe to be based out of Washington, D.C., is responsible for designating certifying authorities, which he does based upon their experience and resumes. The Army has not articulated any reason to us why an additional certification authority cannot be deployed to Afghanistan to speed the process of certification.

38. The military is also capable of using verification, which is a much faster process, . On information and belief, the military has previously used the process of verification, whereby former military trainers who are present in Afghanistan, and already in the locations where CWD services are used, would personally verify the qualifications of the teams and confirm those qualification to SFC Sago either in lieu of or until formal certification can occur.

39. I know that AMK-9 has not [redacted].

## C. Harm Suffered by EODT as a Result of the Army's Actions

40. To perform the CWD Services, EODT teamed with [redacted]

41. [redacted]

42. [redacted]



400803187v1

[redacted]

43. [redacted]

44. EODT uses [redacted] as a subcontractor. [redacted]

D. **The Use Of Contract Working Dogs As One Of Many Security Measures**

45. CWDs are useful tools in detecting explosive devices and narcotics, but they are only one of the many counter-measures employed by the military against explosives and narcotics.

46. [redacted].

47. Often, EODT has a hard time convincing units that do not utilize dogs to start using them because there are so many other counter-measures available. For example, [redacted].

48. The Army requirements recognize two different kinds of CWD services: Narcotic Detection Dog ("NDD") Teams and Explosive Detection Dog ("EDD") Teams. Under the Army's previous solicitations, EDD Teams made up about [redacted] of the total teams ordered and NDD Teams made up the additional [redacted] of teams.

49. Military personnel will utilize many counter-measures available to protect against explosives. CWD EDD Teams are just one of those counter-measures. Other counter-measures include:

[redacted]



400803187v1

[redacted]

- [redacted]

50. Military personnel will utilize many counter-measures available to protect against narcotics. CWD NDD Teams are just one of those counter-measures. Other counter-measures include:

[redacted]

I affirm under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on April 15, 2008.

[redacted]