IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| **EOD TECHNOLOGY, INC.,**<br>Plaintiff,<br>v. | ) | **REDACTED VERSION** |
| **THE UNITED STATES,**<br>Defendant, | ) | Case No. __________ |

**DECLARATION OF [redacted]**

I, [redacted], pursuant to 28 U.S.C. § 1746, state as follows:

1. I am the [redacted] for EOD Technology, Inc. ("EODT") Critical Mission Support Business Unit. I have been employed by EODT since May 17, 2006. I am primarily responsible for [redacted] for EODT.

2. EODT is an employee-owned company that has provided munitions response, security services, and critical mission support worldwide in austere and hostile environments since 1987. EODT delivers services to all branches of the military, foreign and domestic governments, and commercial clients. We have been under contract by the U.S. Army Corps of Engineers since 1997; we have provided support to the U.S. Army, Air Force, and Marine Corps; we provide security and IT support to the Multi-National Security Transition Command – Iraq and Security and Construction Services to Joint Contracting Command –Afghanistan; we provide international Embassy Security to the Department of State; and we provide Mine Action and Munitions Response services to a variety of commercial customers throughout the world.

3. EODT has provided or currently provides security services at [redacted] sites in Iraq and at [redacted] sites in Afghanistan. Several of these large security contracts include canine security services requiring Explosive Detection Dogs, Patrol Dogs and Mine Detection Dogs.

4. [redacted]

4. I, along with [redacted], designed the proposals for both contracts, and I have been heavily involved with the implementation and mobilization.

5. I have spent approximately three weeks in Afghanistan in relationship to these two contracts for CWD services at KAF and approximately two months in total. I have been involved in EODT's [redacted] since May 2006

6. I submit this declaration in support of EODT's action to set aside and enjoin the Army's decision to override the stay imposed by the Competition in Contracting Act when EODT filed a bid protest with the Government Accountability Office ("GAO") challenging the Army's sole source contract award to American K-9 Detection Services, Inc. ("AMK-9").

**A. Background Information**

7. Kandahar Airfield ("KAF") and its outlying Forward Operating Bases ("FOB") in Southern Afghanistan utilize Contract Working Dogs ("CWD") as one of many elements of force protection. AMK-9 had been providing these services as the incumbent contractor, and, upon information and belief, their contract expired on March 31, 2008.

8. The Army issued Solicitation No. W91B4L-08-R-0001 for CWD services in Southern Afghanistan on October 23, 2007. The solicitation contemplated a fixed-price contract for the CWD services with a base period of seven months and a possible three month option period, which was to be awarded on a best value basis. EODT submitted a proposal and received the contract in December 2007. EODT promptly began mobilizing resources in order to perform the CWD services. Two other offerors, AMK-9 and RONCO Consulting Corporation ("RONCO"), protested the Agency's award to EODT at the Government Accountability Office ("GAO"). The protests alleged that the Army had committed several errors in its evaluation of the proposals. The GAO protests triggered a stay of performance of EODT's contract, and on January 11, 2008, EODT received a stop work order. The Army subsequently determined to take

corrective action based on the protests. The Army cancelled the solicitation and terminated EODT's contract for convenience. On January 16, 2008, the GAO dismissed the protest as academic.

9. On February 10, 2008, the Army issued a revised solicitation, Solicitation No. W91B4L-08-R-0013, for identical CWD services. EODT submitted an offer, and, on February 28, 2008, the Army again awarded the contract to EODT. EODT began re-mobilizing in order to perform the CWD services. On March 11, 2008, AMK-9 again protested the Army's decision to award the contract to EODT at the GAO.

10. The GAO protest again triggered the stay of EODT's contract, and on March 16, 2008, the Army sent a letter directing EODT to stop work on the contract. Less than a week later, on March 26, 2008, the Army terminated EODT's contract for convenience. The Army subsequently cancelled the solicitation. On April 2, 2008, the Army requested that GAO dismiss AMK-9's protest as academic. The request included a memorandum, signed by then-Captain Michael Tomm, which outlined the Army's reasoning for terminating EODT's contract and canceling the solicitation (the "Memorandum"). The Memorandum implied that the PWS was flawed because it no longer stated the needs of the government. The Memorandum outlined requirements that were not included in the previous solicitation. It identified these requirements as "new" despite EODT having knowledge of many of these requirements from meetings held with the Contracting Officer and Contracting Officer Representatives in December and January. GAO dismissed AMK-9's second protest as academic on April 7, 2008.

11. Meanwhile, apparently on March 31, 2008, the Army awarded a 6-month sole source contract to AMK-9 to provide the services expressed in the cancelled solicitation. On April 1, 2008, EODT protested the Army's cancellation of the solicitation and the Army's sole

source award to AMK-9 at the GAO. EODT's GAO protest triggered the stay of AMK-9's sole-source contract award and, on information and belief, the Army directed AMK-9 to stop work under that contract. At the same time it stopped work under the protested contract, however, the Army nevertheless authorized AMK-9 to continue with performance of the CWD services pursuant to a second sole source contract. Upon information and belief, on or around April 5, 2008, the Army issued a second sole source contract to AMK-9 commencing immediately with a period of performance of three months. On April 13, the Army notified EODT that the Army overrode the stay on April 11, to resume performance under the six-month contract.

**B. The April 2nd Memorandum**

12. The Memorandum indicated that the Army had new requirements. EODT is capable of meeting the Army's current requirements. AMK-9 does not currently meet the Army's requirements.

1) Increased Number of Dog Teams

13. It is my understanding, based on my knowledge of the Army's requirements and the memorandum issued Major Michael A. Tomm on April 2, 2008, that while the previous solicitations required [redacted].

14. It is clear that the Army knew about its growing requirements as early as December 2007. At the Pre-Performance Conference for the first KAF CWD contract, held on December 8th, 2007 at Kandahar Airfield, Afghanistan, I was told by Squad Leader Pope (British) and a Chief Warrant Officer Adams (Canadian) that they both expected that their requirements were going to [redacted] for K-9 services. Lt. Kyung Jun, who was the contracting officer representative working for Maj. Bisbano (contracting officer), led this meeting on behalf of the contracting office.



400803191v1

15. EODT knew [redacted]

16. Because EODT was aware of the growing needs of the Army, we teamed with the [redacted], so that EODT could be in the best possible position to meet the Army's growing needs.

17. Due to our understanding of the military's growing need, EODT was [redacted] Additionally, as we stipulated in our proposal, [redacted]

18. It is my understanding that AMK-9 is not positioned to meet the military's increasing requirements. We know that there have been [redacted].

2) Security Clearances of Handlers

19. It is my understanding, based upon my knowledge of the Army's requirements, that, in addition to the stated requirement that the [redacted].

20. EODT specifically asked the Army during the Question and Answer period of the second solicitation whether there were any specific clearance or nationality requirements for the



400803191v1

handlers, and the Army did not provide an answer. The question was asked on February 15, 2008, which was 5 days prior to bid closing. The questions read:

- Are there any specific nationality requirements for handlers in support of Combined Joint Special Operations Task Force?
- Are there any specific security clearance requirements for handlers in support of Combined Joint Special Operations Task Force?

21. EODT can easily secure personnel with the requisite clearances in a very short period of time. [redacted]

3) <u>Entrance Through CRC</u>

22. The Continental United States ("CONUS") Replacement Center ("CRC") receives and processes individuals and units prior to deployment to theaters of operation such as Iraq and Afghanistan. Attendance at CRC consists of a week-long class, spanning Saturday to Friday, which instructs attendees on theater-specific issues such as rules of engagement.

23. Sending employees through CRC is time consuming because there is only one active CRC, which is located in Fort Benning, GA and CRC classes are generally overbooked.

24. EODT has always adhered to the policy of sending handlers that were not already in-theater through CRC. EODT has [redacted]

[redacted] but has sent hundreds of personnel through CRC since 2003 for contracts with the US Army Corps of Engineers in Iraq.

4) Certification of Teams

25. It is my understanding that the Army plans to require Army certification of all dog teams that are deployed.

26. We are told that currently, [redacted].

27. Currently EODT has [redacted] teams certified by Sgt. Sago and [redacted] uncertified teams in theater and ready for certification.

I affirm under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on April 15, 2008.

[redacted]



400803191v1