REDACTED VERSION

DEPARTMENT OF THE ARMY
PARC-A REGIONAL CONTRACTING CENTER
KANDAHAR AIR BASE, AFGHANISTAN
APO, AE 09355

2 April 2008

MEMORANDUM FOR RECORD

SUBJECT: Termination for Convenience (T4C) W91B4L-08-M-0232

1. On 12 March 2008, this office received a protest submitted by American K9 (AMK9), filed with the GAO on 11 Mar 2008. The protest involved contract number W91B4L-08-M-0232, for the performance of contract working dog (CWD) services. This contract had been awarded to EODT, Inc. on 28 Feb 2008. After careful review of the protest and an investigation of the pertinent facts by this office, it was determined that the proper course of corrective action is to terminate the current contract with EODT for the convenience of the government per FAR 52.249-2 and issue a new solicitation for the CWD services. In the interim, the government will be issuing a sole source award to the incumbent contractor for the provision of the CWD services for a 6-month period of performance. Once the revisions are ready (even if prior to the bridge contract expiring), a new RFP will be issued. If an award decision is made prior to expiration of the bridge contract, the bridge contract will be terminated for convenience, and the new contract awarded to the successful offeror. There are several reasons why the government has taken this drastic step. The record of this procurement contains evidence that the solicitation and award was flawed and did not serve the needs of the government or the coalition partners.

a. The Performance Work Statement (PWS), paragraph 1.31, states that a "contractor shall plan for and execute deployment to Kandahar Airfield, Afghanistan. Contractor shall provide program management of Contractor's personnel and dogs from home station (U.S.) to designated CONUS Replacement Center (CRC)." Clarification to the solicitation included Contracting Officer responses to offerors' questions regarding the subject solicitation. Question # 24 states "[W]ill contractor personnel be required to deploy through the CONUS Replacement Center?" The Government response was "yes." A second part of Question #24 states, "In the event TCNs (third country nationals) are eligible under this contract would it be possible for a bidder to conduct its own pre-deployment screening, preparation and policy briefings to CRC requirements at an alternative site, since third country nationals (TCN) are not eligible for attendance at the CRC?" The Government's response was "no." Based on the above PWS language and clarifications provided in the Q&A's for solicitation number W91B4L-08-R-0013, it would seem clear that the Government was requiring all contractor personnel to deploy through the CRC, no exceptions. However, in a previous solicitation for the contract working dog services (W91B4L-08-R-0001, 23 Oct 2007), a Contracting Officer, Lt Jun, had provided guidance in an email dated 18 Dec 07 to EODT, Inc. that contractor personnel already in theater were not required to deploy through the CRC. When the Government received notice of the AMK9 protest, it inquired of EODT if it planned to comply with the contract requirement of having its personnel deploy through the CRC. EODT responded that consistent with Lt Jun's and the CRC's guidance, it would not have personnel in theater process through the CRC. Based on the response from EODT and assertions made by AMK9 in the body of their protest, it

became clear that there was confusion concerning the requirement that all contractor personnel, even those already in theater, were required to process through the CRC. AMK9 assumed that this to be the case, while EODT, based on a Contracting Officer's direction, had assumed only personnel not already in theater had to process through the CRC. While this issue may have been resolved by taking corrective action in the form of setting aside the current award to EODT, issuing an amendment to the solicitation by clarifying the CRC processing requirement, re-opening discussions with those offerors in the competitive range, and obtaining final revised proposals, this type of corrective action could not resolve the larger issues which became clear to the Government as we reexamined the current award and its rapidly changing requirements.

b. In examining the CRC requirement, we realized we had not properly articulated one of our customers' key requirements. Specifically, the US and Canadian Special Forces both required that dog handlers who work on their missions possess SECRET security clearances. The foundation of a SF mission is the mission brief comprised of intelligence and operation specifics. The handler is an integral member of a SF mission and is frequently queried for their recommendations on the best use of the canine for a particular mission. These missions range from clearing compounds to route security. The overall importance of the contracted working dog service to the success of the SF mission cannot be overstated. Already one SF unit has reported finding [redacted] solely through use of the contracted working dog services. If the handler does not possess a secret clearance, they cannot be fully integrated into SF missions and cannot be allowed to participate in the briefing. As a result, the mission could be compromised and fail. Furthermore, participation in the brief integrates the handler into the SF team; facilitating a unit cohesion that the handler and canine are part of the team. It is absolutely essential that dog handlers working with the SFs possess a secret clearance. However, the current award to EODT failed to reflect this critical requirement. While the current PWS did contain references to certain other positions possessing clearances, it did not require handlers working with the SFs to possess a secret clearance. The absence of this critical requirement made the current award to EODT left the Army with an unworkable contract. The Government took the drastic step of terminating its contract with EODT is due to the fact that the current award did not satisfy this key requirement. While a contractor may anticipate changes to encompass an increase in the number of dog teams and handlers or the expansion of the number of locations covered by the solicitation and consider these as in-scope changes, it could not possibly anticipate the additional requirement of security clearances for dog handlers. The additional requirement represents a material change to the requirements of the solicitation. While it may not be overly difficult to obtain a secret clearance, it is a costly, lengthy and time-consuming process. It is likely that it would be extremely difficult for those offerors within the competitive range to satisfy this additional requirement within a short window of time. The SFs also required their dog handlers to be armed and physically capable of covering at least 4km with their dogs during missions, which further evidenced the need to cancel the solicitation.

c. In addition to the new requirement for security clearances, the Government discovered shortly after contract award that other contract requirements were changing. These changes pushed the current award to EODT even farther from being able to satisfy the Government's requirements and farther out of the scope of the original contract to EODT. First, issues with dog certification came to the forefront. Sufficient time was not provided for certification of the canines in the current award. Per the PWS, teams have to be certified before performing any real world

missions (1.5.3.5). [redacted] While the issue with certification has been an ongoing problem, the Government failed to adequately address it in the current award to EODT, therefore threatening the contractors' ability to perform on time. The Government lacked sufficient resources to certify a contractor's dogs in a manner timely enough to ensure contract performance, which would have allowed critical gaps in security that would have put the health, safety, and security of US and Coalition Forces who operate on Kandahar Airfield and outlying FOBs at risk. [redacted] The CWD service cannot lapse, not even for one day. The dogs must be certified and able to perform their duties competently. The value of this service can be demonstrated at just one FOB location alone where an EDD team found over [redacted] in the past year. The sole source award to the incumbent contractor, AMK9, will satisfy these requirements in that all of AMK9's dogs have been certified. During the interim period of this bridge contract, the Government will work with their customers – CJTF 82, NATO, Canada, Canada SF and US SF, to adequately define their requirements and also ensure that Government resources are available to certify dogs in a timely manner so that contract performance is not compromised.

d. The overall number of dogs has increased exponentially. The current contract to EODT called for [redacted] dog teams, [redacted] In the past month since contract award, the number of dog teams required under the contract has grown beyond the scope of the contract. NATO increased its canine requirement from [redacted] In addition, the current contract failed to account for the requirement of reserve or alternate dog teams. These teams are used to replace canines that are injured, wounded or killed and to relieve canines worked beyond their capacity. Due to the inherent nature of SF or tactics by the enemy it cannot be predicted how long a mission or a posting at an ECP will take or last. These canines may be worked beyond 8 hours and in extreme terrain and climates. Overall, the requirement for dog teams has grown in the past month from [redacted] While this may not seem like a drastic increase, one must take into account the amount of training that is required to produce a certified and competent dog team. The achievement of synchronicity between dog and handler is not achieved overnight. One must also take into account that a dog team consists of both the dog and the handler. For optimum performance, Explosive Detection Dogs (EDD) and Narcotic Detection Dogs (NDD) utilize a one dog-one handler concept. To achieve optimum performance, dogs are not swapped from handler to handler but stay with one person. When the requirement for the number of dog teams increases under a contract, one is not simply asking for an increase in the number of dogs available but an increase in the number of highly specialized teams that work together over a long period of time to build a solid working relationship. The success of the contracted working dog services and the critical role they play at Kandahar Airfield and its outlying FOBs is secured by the establishment of this working relationship between dog and handler.

e. The current contract failed to address issues with regard to transition. The current PWS contains little or no reference to the transition of one contractor to another, even though this is a critical aspect of the service, if the incumbent contractor should not receive the award. There must be continuous coverage of KAF and its outlying FOBs to preserve the safety of the US and Coalition forces. It is critical, if required, for there to be a seamless transition from one contractor to another. Amending the current solicitation to account for transition issues is not possible due to the fact that the Government needs time to adequately define and build this requirement. The Kandahar RCC needs time to meet with its customers, the incumbent contractor, and specifically, the Army certification authorities, to formulate a transition plan that makes sense and provides for no lapse in service.

f. Shortly after contract award, this office was informed that NATO had relieved its contracting agency, NATO Maintenance & Supply Agency (NAMSA), from taking over canine support for KAF since the US decided the confines of the NATO contract would not meet its needs. NATO did not want a NAMSA contract to compete with a US contract, nor would NATO allow for contract personnel to be armed, and thus NATO opted to allow the US to continue as the lead nation for canine support. The current contract awarded to EODT was written only for a base period of six months, with two six month option periods in anticipation of NAMSA taking over the lead for canine support in October 2008. The new contract requirement, based upon the needs of the U.S. Army, and coalition partners, will need to be a one year base with four option periods. With NATO abandoning its obligations to take over the lead for procuring CWD services, the Kandahar RCC was faced with the fact that its current contract failed to satisfy a new Government requirement; the need for a contractual vehicle that provided long-term CWD services to KAF and its outlying FOBs.

2. For the above stated reasons the government determined the best course of action in this case was to terminate the current award to EODT and to build a new solicitation that adequately addresses the outstanding government requirements that until this time have not been adequately defined.

MICHAEL A. TOMM, Maj, USAF
Deputy, Kandahar Regional Contracting Center