**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

**REDACTED VERSION**

| | |
|---|---|
| **EOD TECHNOLOGY, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant,<br><br>and<br><br>**AMERICAN K-9, INC.,**<br><br>Intervenor. | Case No. 08-283C<br>(Judge Lettow) |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION**

Of Counsel:
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859

John E. Jensen
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7560
(703) 770-7686 (protected facsimile)

Counsel for Plaintiff
EOD Technology, Inc.

April 24, 2008

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

SUMMARY ..... 1

ARGUMENT ..... 2

I. EODT Is Likely To Prevail On The Merits ..... 2

A. The Government Brief Confirms That The Army Failed To Consider Reasonable Contracting Alternatives ..... 2

B. The Government Brief Fails To Address EODT's Arguments Regarding Adverse Consequences Of Overriding The CICA Stay ..... 7

C. The Government Brief Sidesteps The Failure Of The D&F To Set Forth An Analysis Of The Cost Of The Override Versus The Benefits Of The Override ..... 8

D. The Government Brief Lacks Analysis Of The Impact Of The Override On Competition And Integrity Of The Procurement System ..... 8

II. The Government Brief Fails To Recognize The Impact Of The Army's Actions On EODT's Ability To Succeed In The Afghanistan CWD Sector ..... 9

III. Temporary Or Preliminary Injunctive Relief Will Not Substantially Harm The Government ..... 11

IV. A TRO Or Preliminary Injunction Would Advance The Public Interest ..... 11

CONCLUSION ..... 13

## TABLE OF AUTHORITIES

**Cases** **Page**

Bannum, Inc. v. United States,
56 Fed. Cl. 453 (2003) .......... 10

Beta Analytics Int'l, Inc. v. United States,
69 Fed. Cl. 431 (2005) .......... 12

Filtration Dev. Co., LLC v. United States,
60 Fed. Cl. 371 (2004) .......... 12

Geo-Seis Helicopters, Inc. v. United States,
77 Fed. Cl. 633 (2007) .......... 12

Gentex Corp. v. United States,
58 Fed. Cl. 634 (2003) .......... 12

Impresa Construzioni Geom. Domenico Garufi v. United States,
52 Fed. Cl. 826 (2002) .......... 11

Kropp Holdings v. United States,
63 Fed. Cl. 537 (2005) .......... 12

Maden Tech Consulting, Inc. v. United States,
74 Fed. Cl. 786 (2006) .......... 12

One Source Mech. Servs., Inc.,
2004 CPD ¶ 112 (Jun. 1, 2004) .......... 5

Reilly's Wholesale Produce v. United States,
73 Fed. Cl. 705 (2006) .......... *passim*

Serco Inc. v. United States,
2008 U.S. Claims LEXIS 69 (Fed. Cl. Mar. 3, 2008) .......... 10

United Int'l Investigative Servs., Inc. v. United States,
41 Fed. Cl. 312 (1998) .......... 11

**Statutes and Regulations**

FAR 16.504 .......... 4, 5

FAR 16.505 .......... 13, 14

5 U.S.C. § 706 .......... 2

28 U.S.C. § 1491 .......... 12

41 U.S.C. § 253h .......... 4

41 U.S.C. § 253k .......... 4

Pub. L. No. 103-355 .......... 4

S. REP. NO. 103-258, reprinted in U.S.C.C.A.N. 2561 (1994) .......... 5

**PLAINTIFF'S REPLY IN SUPPORT OF ITS APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff EOD Technology, Inc. ("EODT") respectfully submits this reply in support of its application for a temporary restraining order and motion for a preliminary injunction ("EODT Brief"). For the reasons stated herein, the Court should set aside the Department of the Army's (the "Army") override of the Competition in Contracting Act of 1984 ("CICA") stay of performance of American K-9 Detection Services, Inc.'s ("AMK-9") six-month sole source contact (the "Sole Source Contract") insofar as the override determines that AMK-9 will be the sole provider of contract working dog ("CWD") services in southern Afghanistan. The Court should require that the Army not proceed with continued performance of the Sole Source Contract during the pendency of the Government Accountability Office ("GAO") protest or, in the alternative, should require the Army promptly to award a second contract for CWD services to EODT.

**SUMMARY**

The Government's opposition brief ("Government brief"), and particularly the accompanying declaration of Michael A. Tomm, Maj. USAF ("Tomm Declaration"), actually support EODT's request for relief in this case. The Government brief is most significant in that it establishes that the Government, in fact, [redacted]. The Government brief demonstrates, moreover, that [redacted]. The Government brief also confirms that the Army overrode the CICA stay without any consideration of alternatives, including use of EODT as a second contractor, and fails to provide a compelling rationale for not making a second award now.

The Government brief also undertakes to addresses the four factors for injunctive relief, including the four factors bearing on success on the merits first articulated in Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 711 (2006). In addressing these other aspects of this case, however, the Government brief is notably silent in several significant respects. The Government brief, for example, effectively concedes that EODT has the resources to provide essential CWD services quickly. The Government brief also does not argue that the Army is unable to deploy a second certifying official to certify new CWD teams more quickly. The Government brief also does not refute or even address EODT's position that countermeasures other than CWD services could be used, partially or completely, in lieu of an override. In each of these respects, the Government brief offers no substantive rebuttal to major points in EODT's complaint and request for relief.

## ARGUMENT

## I. EODT Is Likely To Prevail On The Merits

The Government brief agrees that the four–prong test of Reilly's Wholesale Produce controls the issue of whether EODT is likely to prevail on the merits of its claim that the Army's determination to override the CICA stay, based on a finding of "urgent and compelling circumstances," was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, see 5 U.S.C. § 706(2), but the Government brief does not effectively rebut EODT's positions with regard to each of these four factors.

### A. The Government Brief Confirms That The Army Failed To Consider Reasonable Contracting Alternatives

Factor (2) of the Reilly's test is critical in this case. The Government brief confirms that the Army never considered reasonable contracting alternatives and, in this regard, establishes that [redacted]. It is no

surprise that the Government brief also does not question EODT's ability to perform CWD services. Further, the Government brief does not offer any specific response to EODT's April 15, 2008 declarations indicating that AMK-9 has [redacted].

On one hand, the contracting officer has stated, in certain documents, that the Army's current needs have [redacted]. This conclusion is supported by statements of the contracting officer issued prior to the instant action, to the effect that, as of March 31, 2008, the Army's requirements had [redacted]. EODT Brief Ex. F (Apr. 2, 2008 Memorandum) at 3; [redacted].

Contradictorily, there is also evidence that the current requirement [redacted]



400810375v1

[redacted].

The Army, however, did not consider the use of a second contractor to fulfill all or some its needs, [redacted]. Using EODT, either as a sole source alternative or as a second contractor for some of the Army's requirements, is a reasonable alternative to sole sourcing all work to AMK-9.

As described by the contracting officer, the Army's requirements are of an indefinite-quantity indefinite-delivery ("ID/IQ") nature. According to the Federal Acquisition Regulation ("FAR"), an ID/IQ contract "provides for an indefinite quantity within stated limits of supplies or services during a fixed period." FAR 16.504(a).

The Army's procurement of CWD services on a multiple-award basis therefore would also be consistent with the congressional mandate set forth in the Federal Acquisition Streamlining Act of 1994 ("FASA"), Pub. L. No. 103-355, 108 Stat. 3243, which established a "preference for awarding, to the maximum extent practicable, multiple task or delivery order contracts for the same or similar services or property." 41 U.S.C. § 253h(d)(3).[1] Indeed, in its report on the bill which became FASA, the Senate Committee on Governmental Affairs explained that the preference for awarding multiple task or delivery order contracts was based on the finding that:

> Indiscriminate use of task order contracts for broad categories of ill-defined services unnecessarily diminishes competition and results in the waste of taxpayer dollars. In many cases, this problem can effectively be addressed, without

---

1 Congress defined a task order contract as a "contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract." 41 U.S.C. § 253k(1).

> significantly burdening the procurement system, by awarding multiple task order contracts for the same or similar services and providing reasonable consideration to all such contractors in the award of such task orders under such contracts. The Committee intends that all federal agencies should move to the use of multiple task order contracts, in lieu of single task order contracts, wherever it is practical to do so.

S. REP. NO. 103-258, at 15-16 (1994), reprinted in 1994 U.S.C.C.A.N. 2561, 2576.

Consistent with FASA, the regulations at FAR 16.504(c)(1)(ii)(A) also require the contracting officer, when procuring services under indefinite-quantity contracts, to "determine whether multiple awards are appropriate as part of acquisition planning" and "avoid situations in which awardees specialize exclusively in one or a few areas within the statement of work, thus creating the likelihood that orders in those areas will be awarded on a sole source basis. . . ." The GAO recognized the importance of this principle by sustaining the protests in One Source Mech. Servs., Inc., B-293692 et al., 2004 CPD ¶ 112 (Jun. 1, 2004), where the record did not support the view of the U.S. Army Corps of Engineers that a multiple-award approach could not be used for the procurement at issue. In particular, the GAO rejected the agency's reliance on the exceptions to the multiple-award requirement in FAR 16.504(c)(1)(B), which include, *inter alia*, determinations that only one contractor is capable of performing at the level of quality required because the supplies "are unique or highly specialized."

Here, in issuing its stay override decision, the Army did not even engage in the analysis that the procuring agency was found to have improperly performed in One Source. Moreover, as demonstrated in EODT's initial brief and as the Army found in awarding its two most recent competitive CWD contracts, EODT offered a better value than AMK-9 in performing CWD services effectively. Finally, as explained in this reply brief, because the magnitude of the Army's actual requirements for CWD services [redacted], the issuance of multiple



400810375v1

award contracts to AMK-9 and EODT is not only appropriate but would also be consistent with the policies and purposes underlying the FAR and FASA.

Given the legal presumption, and the strong policy rationale, favoring multiple award ID/IQ contracts, the Army should make a second contract award to EODT, which on two recent occasions was selected as offering the best value to the Government for these CWD services.

At the direction of the Court, and in the heat of this litigation, the Army now has prepared a declaration [redacted]

The Government brief also takes no issue with the fact that EODT, twice selected for this work, is eminently capable and can mobilize quickly. [redacted]

[redacted]

[redacted]

The Government brief does not allege that EODT personnel all must process through the CONUS Replacement Center or possess [redacted]. The Government brief also does not contend that it would be impossible to provide a second certifying official if needed to certify EODT teams more rapidly. Finally, the Government brief does not rebut EODT's specific declarations and emails demonstrating that AMK-9 has [redacted]. EODT is ready and able to do this work, while AMK-9 has demonstrated itself unable to do so.

**B. The Government Brief Fails To Address EODT's Arguments Regarding The Adverse Consequences Of Overriding The CICA Stay**

Regarding factor (1) of the Reilly's test, the Government brief is notable for the Government's continued failure to address EODT's declarations and arguments to the points that the Army has a wide range of alternative options available for detecting narcotics and explosives



400810375v1

in Afghanistan, and that [redacted]. The Government argues only that CWD services are valuable, which they undoubtedly are, but so are other countermeasures. The unrebutted facts continue to create substantial doubt that use of alternative countermeasures, in lieu of all or some of the current CWD services, would cause significant adverse consequences.

### C. The Government Brief Sidesteps The Failure Of The D&F To Set Forth An Analysis Of The Cost Of The Override Versus The Benefits Of The Override

The Government brief mischaracterizes factor (3) of the Reilly's test, which requires an analysis of the cost of the override versus the benefits of the override, as involving the question of whether the override is in best interest of the Government. Government Brief at 11-12. The Government brief takes this tact perhaps because [redacted]

There are always potential costs associated with an override because of the potential disruption and costs that can ensue when the GAO sustains the underlying protest. Conversely, where, as here, there is a second contractor, twice-selected as offering best value, eager to perform all or some of the work, and still partially mobilized with resources on the ground in Afghanistan, sole sourcing all the work to the incumbent does not necessarily generate any net benefits. The D&F, moreover, wholly failed to consider these mandatory considerations.

### D. The Government Brief Lacks Analysis Of The Impact Of The Override On Competition And Integrity Of The Procurement System

The Government brief, like the D&F, is notable for its failure to address factor (4) of the Reilly's test, which requires assessment of the impact of *the override* on competition and the integrity of the procurement system, as reflected in CICA. The Government brief tries to justify

the termination of EODT's contracts, the Sole Source Contract and Army's procurement plans, but *does not even mention* the stay.

The Government brief also does not mention the three-month sole source contract, which the Army awarded around the time that the Army suspended performance of the six-month Sole Source Contract. Captain Pritchard stated during the April 18, 2008 hearing that the Army had now terminated the three-month sole source contract, but that contract nonetheless circumvented the CICA stay.

Regarding the Army's formal April 11th override decision, it too has damaged the integrity of the procurement system by undermining the purposes underlying the CICA-mandated stay. As discussed above, the April 11th override decision failed to consider contracting alternatives that would have a less adverse impact on the competitive system.

Also, by overriding the stay of performance of a protested short-term contract, such as the Sole Source Contract, the agency is effectively depriving the protester of any chance to receive that contract award. By the time GAO renders its decision, performance of the contract is substantially complete, rendering it unlikely that the protester will ever actually receive the contract it protested. Reilly's, 73 Fed. Cl. at 710. The Government brief, like the D&F, ignores this critical point too.

## II. The Government Brief Fails To Recognize The Impact Of The Army's Actions On EODT's Ability To Succeed In The Afghanistan CWD Sector

Regarding the irreparable harm that EODT will suffer absent injunctive relief, the Government's analysis relies on a strained characterization of [redacted]. While the Government may be correct that as a theoretical and general matter, the loss of profits and business opportunities are claims that any disappointed bidder may allege, Government Brief at 14, the Government has ignored

the salient facts and circumstances of this case. In particular, the Government does not even address [redacted].

In support of its contentions, the Government engages in an expansive construction of this Court's rulings regarding the extent to which economic injury constitutes irreparable harm. For example, the Government cites Bannum, Inc. v. United States, 56 Fed. Cl. 453, 456 (2003), for the alleged proposition that "purely financial or economic injury does not constitute irreparable injury." Government Brief 13. In Bannum, this Court noted at "[o]nly in extraordinary circumstances, such as the prospect of insolvency or an inability to collect damages, will monetary damages alone give rise to irreparable harm." Bannum, 56 Fed. Cl. at 456. Neither the plaintiff in Bannum nor EODT sought a remedy of monetary damages, or relied on allegations of prospective monetary damages. As stated above, EODT's primary contention regarding irreparable harm absent injunctive relief [redacted]. Thus, this Court did not rule in Bannum that "purely financial or economic injury does not constitute irreparable injury" as the Government suggests, and Bannum is inapposite here. Aside from the misplaced reliance on Bannum, decisions from the U.S. Court of Appeals of the District of Columbia Circuit and the

U.S. District Court for the District of Columbia comprise the remaining authority cited in the Government's brief regarding irreparable harm.

The Government's primary reliance on cases outside this Court is telling, because the well-settled rule in this Court continues to be that the lost opportunity to compete on a level playing field for a contract – which injury EODT has alleged – *is* sufficient to establish irreparable harm. See Serco Inc. v. United States, 2008 U.S. Claims LEXIS 69, *132 (Fed. Cl. Mar. 3, 2008) (finding that the plaintiffs demonstrated irreparable harm if injunctive relief was not granted because the potential for recovery of bid preparation costs, the only other relief available, would not compensate them for the loss of valuable business on the contract at issue) (citing, *inter alia*, Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 826, 828 (2002); United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998)). Thus, based on the record at hand, and for reasons explained in its initial brief, EODT has demonstrated the requisite irreparable harm for injunctive relief.

## III. Temporary Or Preliminary Injunctive Relief Will Not Substantially Harm The Government

The Government brief asserts without any evidentiary support that any solution other than sole sourcing all CWD work to AMK-9 during the pendency of the GAO bid protest would substantially harm the Government. As indicated, however, better options exist. These options would not harm the Government, and in fact can benefit the Government, but the D&F failed to consider them.

## IV. A TRO Or Preliminary Injunction Would Advance The Public Interest

The Army has selected EODT twice in the past five months over the offers of AMK-9 and others. Following EODT's second contract mobilization in March, [redacted]



400810375v1

[redacted]. It is eminently sensible to put these teams to work for the U.S. military. Doing so would not impinge national security interests, indeed it would advance them.

As a related point, but almost as an afterthought, the Government brief states that the Court should not reach the merits of this case because the Army has established legitimate interests of national security that warrant declining the exercise of jurisdiction over EODT's claim that the Army's CICA stay override was improper. Government Brief at 15. In support of its contention, the Government relies on Kropp Holdings v. United States, 63 Fed. Cl. 537 (2005), and Maden Tech Consulting, Inc. v. United States, 74 Fed. Cl. 786 (2006). The Government fails to point out, however, that Kropp and Maden Tech represent the rare exceptions to how this Court has consistently exercised jurisdiction over procurement protest cases pursuant to 28 U.S.C. § 1491(b), even in cases involving interests of national defense and national security. Indeed, to the extent that judges of this Court have considered such interests in procurement actions, they have typically done so in analyzing whether the issuance of injunctive relief is appropriate – after having already exercised jurisdiction and adjudicated the merits of the underlying actions. See, e.g., Geo-Seis Helicopters, Inc. v. United States, 77 Fed. Cl. 633, 650 (2007) (granting injunctive relief to plaintiff and noting that the Government's allegations involving national security "must be evaluated with the same analytical rigor as other allegations of potential harm to the parties"); Beta Analytics Int'l, Inc. v. United States, 69 Fed. Cl. 431, 433 (2005) (granting injunctive relief to plaintiff even after giving due regard to interests of national security); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 388 (2004) (limiting scope of sole-source procurement after giving due regard to interests of national security); Gentex Corp. v. United States, 58 Fed. Cl. 634, 655 (2003) (considering national security interests in weighing the balance of hardships between the parties, after having ruled in favor of plaintiff on

the merits). Thus, Plaintiff respectfully submits that well-settled precedent justifies and warrants this Court's exercise of jurisdiction over the instant CICA stay override action. Indeed, reversing the override of the CICA stay would advance both the public interest in competition and the nation's security interests.

## CONCLUSION

The Government brief does little to undermine EODT's argument that, because the Army's decision to override the CICA-mandated stay of performance on the Sole Source Contract lacks the requisite justification, EODT is likely to prevail on the merits of its position that the Army's actions are arbitrary, capricious, and contrary to law, and that absent injunctive relief, continued performance on the Sole Source Contract would inflict further irreparable harm on EODT. By contrast, injunctive relief would cause little if any harm to the Government and may in fact benefit the Government.

EODT respectfully requests that this Court issue declaratory and injunctive relief that prevents the Army from utilizing AMK-9 for all of its needs during the pendency of the GAO protest and the duration of the Sole Source Contract. EODT requests that this Court direct the Army to conduct a limited and expedited (i.e., in two weeks) competition between AMK-9 and EODT for all of its required CWD services. Alternatively, the Court should require the Army to use EODT, which the Army has found to be the most qualified of all interested offerors, as a second source, thus creating two multiple award contracts. The Army should be enjoined from [redacted] from AMK-9 on a sole source basis, and should be required to follow the fair opportunity ordering procedures of FAR 16.505 for all such additional requirements.

[redacted] that the Army is currently purchasing similarly should, in an expedited time frame, be subject to the fair opportunity ordering procedures of FAR 16.505.

Dated: April 24, 2008

Respectfully submitted,

s/ John E. Jensen by s/ Jack Y. Chu
John E. Jensen
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7560
(703) 770-7686 (protected facsimile)
Counsel for EOD Technology, Inc.

Of Counsel:

Jack Y. Chu
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859