REDACTED VERSION



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

EOD TECHNOLOGY, INC., )
Plaintiff, )
) Docket No.: 08-283C
v. )
UNITED STATES, )
Defendant. )

Courtroom 7, Room 508
National Courts Building
717 Madison Place NW
Washington, D.C.
Friday,
April 18, 2008

The parties met, pursuant to the notice of the Court, at 3:00 p.m.

BEFORE: HONORABLE CHARLES F. LETTOW
Judge

APPEARANCES:

For the Plaintiff:

JOHN E. JENSEN, Esquire
JACK Y. CHU, Esquire
Pillsbury Winthrop Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102
(703) 770-7900

APPEARANCES: (Cont'd)

For the Defendant:

SEAN M. DUNN, Esquire
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20004
(202) 616-0338

For the Intervenor:

J. PHILIP LUDVIGSON, Esquire
FERNAND A. LAVALLEE, P.C.
DLA Piper U.S. LLP
500 8th Street, N.W
Washington, D.C. 20004
(703) 799-4401



PROCEEDINGS

(3:00 p.m.)

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Charles Lettow presiding.

THE COURT: Please be seated. If I'm looking a little mystified, it's because we have new microphones, and it's the first time in this courtroom that I've used them. In any event, the case before the Court this afternoon is EOD Technology, Inc. v. United States, No. 08-283.

We're here primarily because an application for a temporary restraining order has been filed. We probably also do have some preliminary matters to address, but we ought to take the application for a temporary restraining order first; at least in the Court's view, we should. May I ask counsel for the Plaintiff to identify himself for the record?

MR. JENSEN: Yes, Your Honor, I'm John Jensen with Pillsbury Winthrop Shaw Pittman; and my counsel with me at the table is Jack Chu, also with Pillsbury Winthrop Shaw Pittman, representing EOD Technology.

THE COURT: Thank you, Mr. Jensen, and welcome back, Mr. Chu.



Mr. Dunn, would you acknowledge your presence and that of your colleagues, please, for the Government?

MR. DUNN: Good afternoon, Your Honor. My name is Sean Dunn. I'm representing the United States. With me is Captain John Pritchard from the United States Army.

THE COURT: All right, thank you.

MR. LAVALLEE: Your Honor, Fernand Lavallee and J. Philip Ludvigson for the Intervenor, American K-9 Detention Services, Inc. Your Honor, we filed our notice of intervention just a little earlier this afternoon.

THE COURT: As a matter of fact, you had to file it after noon because we just got it. And your name again, sir?

MR. LAVALLEE: Fernand Lavallee.

THE COURT: Lavallee. And?

MR. LUDVIGSON: J. Philip Ludvigson.

THE COURT: Ludvigson, thank you. Before we go any further, Mr. Jensen, do you have a view on the motion to intervene?

MR. JENSEN: We have no objection.

THE COURT: Mr. Dunn, do you have a view?

MR. DUNN: No objection, Your Honor.



THE COURT: All right, that will be granted. It will be for this afternoon.

Now we had issued earlier an order allowing confidential documents to be filed under seal, so we have the full text in hand. Mr. Jensen, do you have any objection to proceeding first with the application for a temporary restraining order?

MR. JENSEN: No objection, Your Honor.

THE COURT: All right, thank you; Mr. Dunn?

MR. DUNN: No objection, Your Honor.

THE COURT: All right, Mr. Jensen, may we hear from you, please, and you might take the podium.

MR. JENSEN: Thank you, Your Honor; this is a case where we ask and prompt temporary injunctive relief from the Court; the Court's ability to afford effective annual relief to be substantially prejudiced. This case involves a contract for [redacted] [redacted], not just any old dogs, but contract working dogs in Afghanistan.

THE COURT: Now let's just stop right there. Because as the Court understands it, the contract awarded to EOD, later terminated for convenience, was for [redacted] dog teams. But the Army says its requirements are actually [redacted] and that's one of the reasons they give for the override.

MR. JENSEN: The determination of findings issued by the contracting officer indicates that [redacted] dogs are required and are the subject of the sole source contract that has been awarded to American Canine; and that statement in the Determination and Findings, along with the copy of the contract itself which I reviewed, leads me to the view that the Government's requirements are for [redacted] dogs.

I would state that the prior contract that EODT held briefly, in fact, was for roughly [redacted]. In fact, I believe it was for [redacted]

THE COURT: Let's just note that I think the Court gathered from the papers that you filed that there is a controversy both about requirements, not so much about the contract as it was solicited for proposals and entered, but what the requirements are today; and then the extent to which dog teams are used with forward operating bases by the Americans and Canadians in the southern provinces of Afghanistan. Do you think those are fair disputed matters?

MR. JENSEN: I have not seen it in total, Your Honor. I do have a copy of the contract for [redacted] dogs. So I'm operating under the assumption that the requirement is [redacted] dogs today. I would have to look in the document to find out if my interpretation, if it's



inaccurate in that context.

THE COURT: All right, thank you.

MR. JENSEN: Thank you. At issue in this case is the proprietariness of the override of the CICA stay, triggered by EOD's timely protest of this six month sole source contract to the incumbent contractor, American Canine.

In order to, I think, appreciate the discussion that will ensure, I'd like to identify eight dates, Your Honor, if you could indulge me, to walk you through just the very recent chronology.

On February 28, EOD Technology won a competitive contract from the Army. It happened to have been the second competitive contract awarded by the Army for this service within the prior three months.

On March 11, American Canine protested that award of the GAO. That was the second time that the award to EODT was protested by American Canine. On March 26, the Army terminated for convenience EOD Technology's contract. This was the second time that EODT's contract for these services was terminated for convenience by the Government.

On March 31 the Army and American Canine signed a sole source contract to cover six months,



commencing on April 1st.

THE COURT: How many months?

MR. JENSEN: It's a six month contract, Your Honor.

THE COURT: I got a little confused, because there were references to a three month contract. But let's go on.

MR. JENSEN: I'm about to cover that now. On April 1st, the next day, EODT filed a protest at the GAO which triggered the stay of performance of the six month contract.

Some time very promptly thereafter, and the date is unknown to us, the Army awarded a three month sole source contract to American Canine, which upon information and believe, is for the same service and is different only in that it is for a three month of time in lieu of a six month of time.

We know that on April 8th, the contracting officer issued a Determination and Findings, which found that there were urgent and compelling circumstances which justified the override of the stay of the six month protested contract.

Three days later, on April 11th, the Army, in fact, issued its override which states that it authorizes the performance of the six month contract.



THE COURT: Now I don't have the actual override. What the Court has is Major Tomms' -- I take it he pronounces his name Tomms, but I'm not positive -- memorandum in support of an override determination.

MR. JENSEN: Yes, sir, the override decision itself is here. We have four copies, and if Your Honor is interested, I'd be pleased to provide them.

THE COURT: Would you please? If you'd hand at least two copies to the Clerk.

MR. JENSEN: Your Honor, the document I just handed to the Clerk is a document which I received from Captain Pritchard this past Monday, April 14th. It's a 67 page document which Captain Pritchard provided to me under the GAO protective order that was issued in our bid protest.

This document, as you see, contains on the first page the April 11 override decision, immediately below it an April 10th memorandum, and immediately below that the April 8th D&F signed by the contracting officer, which was the document included as Exhibit E in our Appendix to our memorandum this past Wednesday.

Two days later, this past Wednesday, February 16th, we filed this action with the Court. Those are the key facts.

What we're challenging, Your Honor, of course, is the April 11th override decision, premised on urgent and compelling circumstances, on the grounds that it was arbitrary and capricious and not in accordance with the law.

We contend further that a TRO is warranted today, because the standards for injunctive relief are satisfied, including the fact that our client is suffering irreparable harm and will continue to suffer irreparable harm over the course of the next 10 days.

If I may, Your Honor, I'd like to walk through the reasons why we believe that the override was arbitrary and capricious, and why we believe relief in the form of a temporary restraining order is warranted.

THE COURT: Before you do that, Mr. Jensen, could we cover a couple of points that have to do with your chronology?

MR. JENSEN: Yes, sir.

THE COURT: Who was providing services from the period roughly December 2007 through the first of March 2008 -- well, actually, let's say until the 26th of March 2008?

MR. JENSEN: I believe there is an answer to that in the documents that are filed with the Court.



The answer is American Canine. Their contract, as I understood it from the filings, ended on March 31, 2008. So American Canine is, in the truest sense, the incumbent contractor, performing their contract up through March 31, 2008, with the sole source six month contract commencing the next day, April 1, 2008.

THE COURT: All right, thank you; because the Court understood from the findings that were made that DOD technology had been on the ground with some teams, at least in March, and had qualified through the Sergeant who was present in Afghanistan, eight teams, and two had not been qualified. Is that correct?

MR. JENSEN: It is correct that in the March timeframe, we did have a number of teams on the ground in Afghanistan, totalling approximately 14; and either four or six of them had been certified by Sergeant Sago, who is identified as the certifying authority in Afghanistan.

Did any of those teams actually perform services, either at the Kandahar Airfield or at forward operating basis, or the Canadian Base, as well?

MR. JENSEN: No, none of those teams provided services. They were there still as part of



the mobilization phase of the contracts.

THE COURT: All right, thank you, that clarifies.

MR. JENSEN: In order to grant declaratory or conjunctive relief and for purposes of today, temporary relief, we need to demonstrate at least four factors to the Court's satisfaction.

These factors are the ability of our case to succeed on the merits; the irreparable harm that our client will suffer; that the balance of hardships favors our client; and that the public interest warrants temporary relief. With the Court's indulgence, I'd like to proceed to discuss those four factors.

As far as EODT's ability to succeed on the merits, our allegation, of course, is that there's a violation of the Competition in Contracting Act, and specifically the overall provision of 31 U.S.C. ^U 3553(d)(3). We don't believe that the urgent and compelling circumstance justification is warranted in this case.

There are two violations of that provision, which I'd bring to the Court's attention. First, it appears that there is a violation of Section 3553(d)(3)(c)(II), which is the section which requires



that notification be given to the GAO prior to authorization of performance of the sole source contract.

The April 11 override decision authorizes performance of the contract. To my knowledge, no notification has ever been given to the GAO that the CICA override was issued, or that performance of that contract was authorized to proceed. So on its fact, Your Honor, there appears to be a distinct violation of CICA in the Army's failure to provide the GAO with the notice required by the override provisions.

THE COURT: Are you counsel for EODT in the GAO proceeding?

MR. JENSEN: Yes, I am, Your Honor.

THE COURT: And you're willing to represent that the GAO proceeding shows no notice of the override?

MR. JENSEN: Yes, Your Honor, I can represent that I've received no notice provided to the GAO by the Army.

THE COURT: All right.

MR. JENSEN: Second, Your Honor, there was in this case by the Army an arbitrary application of the four factors test set forth in Riley Wholesale Produce. I'd like to walk through those four factors.

This is a test which has been recognized by subsequent cases of this Court, and is submitted as the appropriate four factor assessment that the Court should consider today.

The first factor is whether there are significant adverse consequences that would occur if the relief that we are seeking is granted. Before I address that, I think it appropriate to address, frankly, the second factor in this test, which is whether or not there are reasonable contracting alternatives. I say that in part because that's the order in which the Determination and Findings purports to address the Riley four factor test.

In this case, there were reasonable contracting alternatives to the override of the decision of the sole source contract stay on April 11th. According to the Determination and Finding, only one alternative was considered. That alternative was to have some other contractor on the ground, presumably at that very moment or the next day, performing all of the services that American Canine had been performing up until that time.

Logically, I would have to admit that it was impossible on a moment's notice for another contractor to deploy all of its resources in Afghanistan on a



moment's notice to perform the work instantly. But that is the only alternative that the Government considered before it overrode the simple stay.

In fact, our client is imminently qualified to do the work, and the Determination and Finding expressly admits that we're imminently qualified to do the work.

The Army selected our client twice as offering the best value to the Government for these same services; and a comparison of EODT's most recent contract, which we received in February and was terminated for convenience in March, matches up exactly with the performance work statement of the new six month sole contract, which is included as one of the exhibits in the April 11th override decision.

THE COURT: Does it match the three month sole source contract?

MR. JENSEN: I've never seen the three month contract.

So there doesn't seem to be any question that EODT can do the work. The issue seems to be, how quickly could EODT get its resources on the ground to start work.

THE COURT: Well, one of the Court's questions, very close to the outset of this



proceeding, focuses on whether EODT can or has the resources to do the work.

Because Major Tomms' memorandum for the Deputy Assistant Secretary of the Army Policy and Procurement does indicate that the requirements have [redacted].

They have [redacted] in the past month, and this is a memorandum, I guess, that was dated April 8th; although I thought it was dated April 11th. But in any event, it has [redacted], and this is on Page 5, from [redacted], which is almost consistent with the contracting requirements, to [redacted] teams; almost a [redacted] overall. What are we talking about?

MR. JENSEN: To my knowledge, the Government has issued a contract that's in place today for six months for [redacted] dog teams; [redacted] of which are apparently in the field, [redacted]. That's what the schedule on the six month contract states.

THE COURT: Well, now that also fits with a statement you make in your supporting memorandum, and I need to find it, that the teams are not being [redacted]

MR. JENSEN: Right.

THE COURT: Well, some or many -- I think it [redacted]



have dog teams.

MR. JENSEN: That is information we provided obviously in the form of declaration, which goes to the issue in the first of the valid factors, which is that there are other counter-measures that are available to the military, other than contract working dogs.

THE COURT: That's undoubtedly true.

MR. JENSEN: To my knowledge, based on my reading of the six month contract work, there are to be [redacted] dog teams that are generally deployed, and there appear to be [redacted]; or at least that's what the schedule for the six month contract says.

THE COURT: Well, one of the questions that arises -- and you have, I was going to say, tiptoed around it -- but you've actually been more explicit than that. If the [redacted], why doesn't it issue a set, a pair or at least a pair, or maybe even three contracts, for these kinds of resources in Afghanistan?

MR. JENSEN: Well, we would fully subscribe to the concept of multiple award contracting, Your Honor. I can't answer that. It's not part of the

Government's procurement specialty.

THE COURT: All right, thank you.

MR. JENSEN: I'm unaware of any information in the record that addresses that. What the D&F totally has failed to consider --

THE COURT: It just seems to the Court, in the most rudimentary way, that the Army, if it needs these [redacted] resources, could gain them by non-sole source, that is a multiple award set of contracts to cover the intervening period. I don't see any mention of that. But, of course, I haven't seen the actual memorandum from Mr. Osmond and Major Tomms' memorandum. There's no mention of that.

MR. JENSEN: Yes, Secretary Osmond's memo does not address that possibility, either.

THE COURT: All right, thank you.

MR. JENSEN: The alternatives that are reasonable, which the D&F failed to consider, would be the possibility of some short extension of the American Canine contract, to give EODT an opportunity to bring its dogs and other resources on board to start to perform, perhaps on the order of a couple of weeks; or the possibility of dividing the work.

There seem to be several applicable courses of the work set forth in the schedule for the six



month contract. Dogs were required at different locations, required by different operations; some U.S., some Canadians.

The idea of splitting the work in some way was not considered in the D&F. The D&F does show not only that EODT has, according to the Army's six certified teams -- and they are on the ground in Afghanistan -- that the Army can certify up to [redacted] dog teams per week in addition, which would allow EODT to have fully certified dog teams that would fulfill the Government's stated requirements in the contract fully rapidly.

In addition, the D&F doesn't address the possibility of deploying an additional certifying official from somewhere else in the military to help the de-certification of the dogs for some short period of time -- maybe a few weeks -- if the desire is to get EODT's dogs certified more quickly.

THE COURT: Mr. Jensen, there is also the implication in your moving papers that EODT currently is providing services to the Army in Iraq. Is that correct?

MR. JENSEN: EODT provides a substantial amount of services to the Army in Iraq. EODT also provides canine services. I can give you the



specifics of all their canine services; although they are certainly listed in detail in the past performance section of the proposal that is submitted, leading to the February 28th contracting order.

They do have a canine services division. They do provide canine services, currently. They have provided canine services in Afghanistan and in Iraq. I can't speak presently what their current services are.

The D&F does contain broad statements about American Canine's ability to meet the Government's requirements -- sweeping statements, not delineated to any further degree than what I just stated.

For example, there are statements sprinkled in the D&F and its attachments to the effect that the handlers of these dogs need to have security clearances at the [redacted] operating bases. There are certainly statements that the Government's requirements are actually [redacted] Of course, there's the statement that all of the teams, each of the dogs and the teams, be certified in order to do the work.

We have provided evidence in the form of declarations which raise doubt as to whether or not [redacted]



[redacted]. The consequence being that the sole source award and, hence, the override of the sole source award protest has contributed to American Canine continuing to perform work for which they may [redacted], while EODT is standing in the wings, qualified and ready to go to work.

Dropping back to the first factor of the Riley test, Your Honor, whether or not significant adverse consequences would occur if the override were not allowed to continue, the D&F completely failed to address the possibility of other countermeasures being used by the military to achieve the objectives of these dogs. The objectives of the dogs are to detect explosives and to a lesser extent to find narcotics.

There are other countermeasures that are available and in use by the military. There's no discussion about them in the D&F whatsoever.

As I mentioned a moment ago, there are many forward operating bases in Afghanistan; and according to the employees of EODT, who do this work in Afghanistan and have visited the forward operating bases, [redacted] which raises a

Page 22

question of whether or not Canine Services really are as critical as they are represented to be.

THE COURT: Where and for whom do the teams that EODT has in Iraq work -- I'm sorry, Afghanistan?

MR. JENSEN: [redacted] I think that's where our dogs are right now. Obviously, we'd be pleased at a later point, if it were appropriate, to provide more specific information about that.

THE COURT: Well, let me just ask an explicit question. [redacted]

MR. JENSEN: [redacted]

THE COURT: [redacted]

MR. JENSEN: [redacted]

THE COURT: Right.

MR. JENSEN: The third factor in the Riley test is a comparison of the benefits of the override against the cost of the override.

In this respect, the D&F is also deficient. In fact, the D&F admits that the Government didn't perform any cost benefit analysis of this factor.

Page 23

Instead, the D&F relies on the claim that this is a life or death matter; and a life or death matter doesn't need to be stacked up against any costs.

But at the same time, the D&F admits that EODT can do the work. So the D&F seems to contradict itself because EODT is fully qualified to do the work; and if we were the contractor, there wouldn't be certainly any more threat to American life than if American Canine was the contractor. Therefore, there's nothing under this factor that would support the override.

Then the last factor of the Riley test is the impact of the override on competition and the integrity of the procurement system. The D&F is particularly defective in this respect. It fails to consider several very relevant considerations.

First, it doesn't consider the fact that the Army has terminated two competitively awarded contracts to EODT, but has now gone to the extraordinary length of overriding a Congressionally-mandated stay of performance on an identical sole source contract.

The D&F also fails to consider that in the face of a stay, the Army has awarded a second sole source contract, the one for three months, which

Page 24

violates the spirit if not the letter of CICA in and of itself.

THE COURT: You haven't protested that contract, I take it?

MR. JENSEN: No, Your Honor, we have not filed a protest against that award. I would say that it's our understanding that with the authorization to resume performance of the six months sole source contract, that three month contract is no longer being used. I can't prove that, but that's what I understand, at least from my discussions with counsel. I'm sure the Government could speak to that with more authority than I could.

THE COURT: In fact, that's what had the Court confused, because there was a reference to the three month contract. But there was also the reference to the fact that the Army's procuring authority could issue a request for proposals and evaluate those proposals and then make an award, and that process would take three months plus three months or six months. That was the suggestion.

MR. JENSEN: It's different from this three month contract, I believe.

THE COURT: Thirdly, the D&F failures in this respect to acknowledge the fact that the Army

Page 25

still has notified the fact that the Army still has not notified the GAO of the authorization to resume performance of the six month contract, which we believe is a plain violation of 31 U.S. Code ^U 3553(d)(3)(c)(ii).

Fourth, the D&F in this respect really does not acknowledge that the interests of the competitive system are being served; in that there has been, I believe, in this procurement -- and I think if you look at the record, you will see that this has not been the model of a good procurement plan. We think that there's been a failure of the procurement plan in this case, which has contributed to the situation which feels as though it's required to override the CICA stay.

Last and most importantly, we protested a six month contract. The GAO's decision is still on July 10th. It is unclear, at best, to us what meaningful relief we will receive at the GAO, if and when the GAO rules in our favor and sustains that six month contract will be at least half over at that point.

Because of the shortness in length of the protested contract, this seems to be the type of contract that the CICA stay was intended to adjust; a

Page 26

case where the ultimate awardee of that six month requirement is now effectively a fait accompli, unless the CICA stay were honored in this case; a fact that, again, the D&F doesn't consider at all.

Based on the four factors of the Riley decision, we believe that the DNA is arbitrary and capricious and not in compliance with law.

The balance of the factors that warrant the Government's grant of temporary and injunctive relief are, first, irreparable harm. There is no adequate remedy in law at this moment. But we have lost the opportunity to compete for this six month requirement, and as every day passes, we lose the opportunity to earn profits.

Indeed the Tucker Act limits this Court's ability to grant monetary relief, remedy relief, potentially to only bid and proposal costs; and in this case, we didn't submit a proposal for the six month contract.

[redacted]

Page 27

[redacted]

THE COURT: Well, your mobilization costs are reimbursable by the Army for the termination for convenience I would presume.

MR. JENSEN: Well, I would love to get the Army to agree to that. I expect that they will see it's certainly our position. [redacted]

THE COURT: All right.

MR. JENSEN: Third, the balance of purchase -- with respect to EODT, as I've just discussed, clearly, there's a hardship that's being imposed on EODT. With respect to the Government, I don't think it can claim the hardship. At most, what we're asking for here would result in administrative inconvenience to the Government.

We ask the Government to consider some sort

Page 28

of an award of a contract of work, a purchase order, to EOD Technology for some or all of the work while this protest is being resolved at the GAO.

THE COURT: Now that's your alternative request, is that correct?

MR. JENSEN: Yes, Your Honor, while we ask that the CICA override be enjoined, we believe that what may be appropriate in this case would be the Government to work very quickly towards awarding some or all this work on a competitive basis, or perhaps on a split sole source basis, with the only other company that's in Afghanistan with the capability to do this more quickly, which is my client, EOD Technology.

THE COURT: The Court is awful confused about whether there were three or four people who offered proposals in response to the request for proposals. A third one started with Ronco.

THE COURT: Your Honor, with Ronco, they were protested in the first round of protests against our first contract. After our second contract, only American Canine protested to the GAO. But we're, I believe, correct to infer that Ronco was an offeror, and I can't tell you the scope of the interested companies initially in this.

But I do note that EOD Technology has the

Page 29

resources on the ground, and the Government can convert to them very quickly for some or all of the services.

Last, with regard to the balance of hardship, this is American Canine. I don't think American Canine can legally claim any hardship of the possible loss of an improperly awarded work. I don't believe it qualifies as a hardship.

And then the last factor, Your Honor, is the best interest. We have the Competition in Contracting Act. We have Congress's mandate that the Government advance competition to the fullest extent practicable. And we have a CICA stay to ensure that the relief that the GAO extends is not empiric and meaningless. We don't want the ultimate awardee of this six month requirement to be, as I said, a fait accompli.

On the other hand, the government will undoubtedly argue national defense and national security as the overriding public interest in this case. We believe that's a red herring, because EODT's work on the job will not, in any way, jeopardize national defense or national security. In fact, we've been selected twice as offering the best value to the Government. If we're on the job, we're going to provide services of equal or greater quality to those

Page 30

provided now by American Canine.

For all these reasons, Your Honor, we believe that temporary and injunctive relief is warranted in this case.

THE COURT: Thank you, Mr. Jensen.

Mr. Dunn, obviously the Court has a set of questions about what's actually going on in Afghanistan.

MR. DUNN: Yes, Your Honor, and I believe I've asked before that if there's any question that Your Honor asks that I can't answer sufficiently, I would prefer to have a further type of session on the factual knowledge.

THE COURT: All right.

MR. DUNN: Now may it please the Court. The relief requested by EODT would put the lives of the service men and women in southern Afghanistan at a greater risk. The contract working dogs in service today would be stopped from providing that service. This is not the type of contract that can be put on hold for a day.

These dogs detect IEDs. They are used on missions to search for Taliban, and they detect drugs. Evidence in the record shows that these units have discovered at least [redacted]. The bottom line is that

Page 31

these units save lives.

Regarding the TRO that's requested, the injunctive relief, and the likelihood of success on the merits, the first CICA factor, absent the CICA override, as I just stated, lives will be put at a greater risk in southern Afghanistan.

THE COURT: Mr. Dunn, there are a couple of questions about that. One is that the Court would enter a temporary restraining order that would be effective, for example, several weeks after its issuance. That would be an unusual temporary restraining order, but it could be crafted that way to ensure that there was no hiatus in the service.

MR. DUNN: I understand that, Your Honor, and I don't object that that could be effective if the facts were that EODT could provide [redacted] contact working dogs, if used.

But that's not the case. As counsel for EODT states, they have four working dogs that have been certified in Afghanistan. The way we read under the current contract, under the six month sole source award, it's [redacted] contract working dogs ready to perform. That's what American Canine has there right now.

THE COURT: You say that's the contractual requirement, and certainly Mr. Jensen emphasized that

Page 32

very point. Yet, Major Tomms' memorandum suggests [redacted]

MR. DUNN: Yes.

THE COURT: All right.

Page 33

MR. DUNN: At the time of the six month sole source award, American Canine was the only company able to fulfill the requirements.

[redacted]

Sergeant Pritchard can only certify [redacted] dog teams per week.

If you do the math, it will take a long time, at least [redacted] weeks, and that is assuming that every dog team that is put through the certification process passes, and [redacted]

THE COURT: Well, that's another confusing

aspect about the record. It's not probably a material point. But it appears that some of the handlers and dogs have been essentially co-opted by American Canine; that is, some of the EODT teams.

MR. DUNN: I'm not sure what you mean by co-opted.

THE COURT: They now are working for American Canine and not EODT.

MR. DUNN: That is not my understanding. I haven't read anything, and Captain Pritchard, you can correct me if I'm wrong.

MR. PRITCHARD: That is not the case, Your Honor, at all.

THE COURT: It is not?

MR. PRITCHARD: No, Your Honor.

THE COURT: All right, thank you.

MR. DUNN: There are a lot of other alternatives that EODT raises as viable options in its brief. I'll touch upon a few of those.

They suggest that verification would be an option. My understanding of verification is that that is a process whereby the handler verifies that his or her dog is qualified to fulfil the services. So it is a subjective test. The standard could vary depending upon the handler. It is not a test that is admitted



by the U.S. Army.

Also stating the work as DOT suggests, the additional units, as I've stated earlier are not required at the present time. The [redacted] units are in Afghanistan now providing services.

This also would not really be an alternative to a CICA override, because that would still necessitate a CICA override. So suggesting that that's an alternative is not really true, because the CICA override would still have to take place.

Lastly and most astonishing, EODT alleges that there are counter-measures that would take the place of these working canines in Afghanistan.

THE COURT: You can pass over that point. Let's cover the security clearance point for the handlers.

MR. DUNN: Your Honor, under the previous contract and under the six month sole source contract, [redacted].

That is what the future contract which will be the subject of the solicitation that's going to be implemented as we expect within three weeks. The new solicitation, the RFP, will be out in three weeks is what we expect. We expect an award by June 1st. So things are happening at a very quick pace.



The idea is that the handlers for the new contractor will have a [redacted], and that is necessary because if they have a [redacted], they can participate in all the mission planner and other things that are very valuable for each of the missions that are being done.

THE COURT: Does the Army plan that the solicitation that will be issued, you say, in three weeks will be a sole source contract? I'm sorry, it will be a single award contract?

MR. DUNN: My understanding is yes. Captain Pritchard?

MR. PRITCHARD: Yes, Your Honor, that is the goal for a single award for all of Regional Command South. That is correct, because the contract that the Army envisions only encompasses the [redacted] Your Honor.

MR. DUNN: So, if that answers your question regarding the [redacted] matter, I'll move on.

THE COURT: Well, it does and it doesn't, because I take it that from your response, it's an implication from omission that the current six month



contract that was subject to protest filed by EDT by the GAO on April 1st [redacted]

MR. DUNN: They could be, Your Honor. Speaking from my knowledge now, I couldn't tell you. I'll ask Captain Pritchard if you know.

[redacted]

Page 38

[redacted]

THE COURT: So you're telling me that part of the requirement for not only this current six month contract that is the result of the override and the new solicitation will be only partially written in [redacted]

Page 39

[redacted]

THE COURT: Thank you.

MR. DUNN: Your Honor, regarding the third factor in considering the CICA override, the costs of proceeding with the override here are minimum as compared to the benefits. [redacted] Well, I don't want to get into it again. But that is not irreparable harm.

THE COURT: Well, it could be to EODT. [redacted] Go ahead.

MR. DUNN: [redacted] but it does not rise to the level of irreparable harm, unsupported by anything else in the record.

Also, when you compare it to the lost ability to use these canine working dogs in southern Afghanistan, there is no comparison. These units are absolutely essential to the safety of the service people in southern Afghanistan.

Regarding the factor of the CICA overrides, there will be a positive impact on competition in the

Page 40

integrity of the procurement system here. The reason this was all necessary, that this all happened, is because the Army had to re-assess its needs.

Therefore, when they awarded the contract and the first protest came up, there were problems that arose that came to awareness of the Army. Therefore, they decided that it was in the best interest to re-solicit, to terminate for convenience and re-source it.

Your Honor, regarding the second factor regarding injunctive relief, a balance of the hardships does not tip in EODT's favor. [redacted] So I won't get into that again, unless the Court would like to talk about that.

Finally, a preliminary injunction is not in the public interest here. For the reasons that I've stated, these canine working dogs are very important to the troops in southern Afghanistan for a variety of reasons, including searching for IEDs, searching for Taliban and searching for narcotics.

And finally, Your Honor, there is not a need to reach the merits here based on the decision in Kropp Holdings, Inc. v. United States and Maden Tech

Page 41

Consulting, Inc. v. United States.

The Army's decision to override the automatic stay has established that the contract services are in the interest of national security. Therefore, there really should not be a need to reach the merits of these issues.

For those reasons, Your Honor, we respectfully request that the Court deny injunctive relief.

THE COURT: Thank you, Mr. Dunn.

Mr. Lavallee?

MR. LAVALLEE: Your Honor, may it please the Court, Intervenor American Canine, of course, does join fully with the Government and concurs both their arguments here, and join them in the question that this request for TRO be denied.

There are a few points that I would like to illuminate further, which I think may be helpful to the Court's decision.

Certainly, we do agree fully that the record clearly indicates that the Army has provided sufficient factual basis for the Court to be able to determine that there are legitimate interests of national defense that are implicated here, which we agree with the Army would indicate that except for

Page 42

some very unusual circumstances, would certainly argue that the Court should not look into the specific facts.

However, to the extent that the Court reaches the facts, we believe that the record supports again a decision to deny the Plaintiff's motion.

Before I go to that, in terms of the sufficient facts to establish that a national defense is indicated, they are simply evident throughout the entire D&F that the Army has presented.

Just to cite a couple, starting on page one, the Army cites to the fact that the need relates to the need to execute force protection requirements. On the same page later, [redacted] Again, life critical and life saving service the Army cites as being impugned here.

On page 2, the contractor plans to execute fielding of the working dogs at [redacted] Those types of recitals of facts occur throughout D&F.

THE COURT: Well, now as the Court understands it, [redacted]

Page 43

[redacted]

MR. LAVALLEE: Your Honor, perhaps not at this point, but the Army in its justification has pointed out that that is part of its national security needs. Of course, that's an important point, because I think that the logic of Kropp is that we really need to defer to the commanders who are on the ground.

In fact, the Army D&F refers to information obtained by the contracting officer from a number of actual ground commanders who are saying that these are the needs, this is where they are going to have to be able to respond, this is how they have to be able to respond. And it's difficult really to properly second guess those ground commanders on these needs, and that's what the Army is trying to be responsive to.

THE COURT: Well, I'm going to ask you, do you have Major Tomms' memorandum in front of you?

MR. LAVALLEE: Yes, Your Honor.

THE COURT: Would you look at page five, please?

MR. LAVALLEE: Page five?

THE COURT: Yes, in the middle of the paragraph that begins in the middle of the page, there is a sentence that begins with "overall". It says, [redacted]

Page 44

[redacted]

What is the requirement and what is American Canine providing?

MR. LAVALLEE: At the moment, Your Honor, American Canine is attempting to meet the entire needs that have been expressed to it. We try on the order, I believe, of [redacted]

THE COURT: I'm sorry?

[redacted]

MR. LAVALLEE: At the present time, Your Honor, that's what the six month contract is calling for. That's another important point. I think we want to keep separate the six month contract that is at issue here, as opposed to arguing the merits of the solicitation or of the longer ranging contract, which EODT seems to be confusing here.

THE COURT: I don't know if it's EODT that's confusing it. The Court got a little confused from Major Tomms' memorandum. [redacted]

MR. LAVALLEE: Your Honor, I don't know precisely. I do know that American Canine is meeting all of those, and it is on the order of [redacted]

Page 45

teams.

Your Honor, this point though before we leave it, points up to another issue which goes directly to the ability to succeed on the merits. As EODT has conceded, there is a three month contract that exists, as well, that could allow for [redacted] teams, I believe, in addition.

THE COURT: Well, I don't know that. Because the Court doesn't have anything related to that contract except the fact that it existed. It's probably been superseded.

MR. LAVALLEE: And Your Honor, we also have the fact that EODT has conceded that they don't believe that it's been superseded, and they have not challenged. So even if, for some reason, the Court would issue the injunction, the Army would be permitted to perform under the three month contract. So it's not been challenged by EODT.

THE COURT: Well, if the Court were to stay the override then --

MR. LAVALLEE: The 301 contract is a separate contract and action, Your Honor.

THE COURT: Well, but then you get into multiple awards. That's what I was struggling with.

MR. LAVALLEE: Well, Your Honor, let's talk

Page 46

about that for a moment.
THE COURT: All right, just a moment, Mr. Dunn. We'll give you a chance.
MR. DUNN: Your Honor, maybe I can enlighten the Court.
THE COURT: Mr. Lavallee, would you mind?
MR. LAVALLEE: I do not mind, Your Honor.
THE COURT: Thank you.
MR. DUNN: I'm sorry.
THE COURT: Go ahead.
MR. DUNN: The three month contract has been terminated.
MR. LAVALLEE: Your Honor, with respect to the multiple contracts, again, this is the danger, I think, that Kropp Holdings is forewarning about; which is the danger of second guessing the commander on the ground when it's a national defense issue. That is, it may well be that multiple award contracts would not sufficiently satisfy or meet the security need.
Because remember here, it's not merely the number of dogs that the Army is contending that it can certify dogs, which EODT by the way has not or cannot. However, it's the fact that the Army -- and you see some of this on page six and page seven of the D&F -- is trying to negotiate with multi-national forces.

Page 47

They have at least five different countries. They have the sensitivity with NATO.
So in other words, it may well be that the Government has determined that the multiple award contracts do not meet its total security and national defense needs in the peculiar circumstances. Lest we forget, we are talking about an area where there are ongoing hostilities and combat operations.
THE COURT: You don't have to tell the Court that, Mr. LaVallee.
MR. LAVALLEE: Yes, Your Honor; Your Honor, with respect to them turning to the factors which we believe EODT has failed to carry, the first is, as we mentioned, they succeed in the merits. We do not believe that it's likely because of the important national defense rationale that exists here, and the case law in that area suggesting that the Court should defer to the Executive on those issues.
With regard to the undue hardship, as EODT also testified, they had as the Army pointed out, as the Government pointed out, [redacted]

Page 48

[redacted]
In addition, it's not as if EODT is performing currently. So there's no hardship in terms of the de-mobilization. More than that, to the extent that some of the issues about the number of teams that would be needed to fill has been highlighted here. Frankly, they've had difficulty in performing, which is part of what led, as I understand it, to the Government's decisions.
A number of the facts recited by EODT simply don't square with reality, in terms of American Canine's ability to field a sufficient number of persons, dog handlers, who are highly skilled to meet the minimum requirements of the Government, and who have or are capable of obtaining security clearances. There is no issue or no evidence that American Canine would fall short.
With respect to the Court's concern, you mentioned a concern about teams that maybe -- Your Honor. It's actually the reverse. It was EODT that has been attempting or was attempting, prior to the

Page 49

termination of their contract, to co-op a number of the American Canine teams that are in-theater and operating fully skilled and fully prepared to go. It has been the reserve. So that consideration is exactly the opposite from what the Court was concerned about.
With respect to the balance of hardships, Your Honor, certainly the Government has made its case that the hardship with respect to the security of not only American force, but coalition forces, and again, don't forget contractor personnel, all of whom are relying on these dogs and the ability of these teams to work consistently and without any breaks.
But the hardships go beyond that. For instance, American Canine would suffer irreparable harm if, in fact, it's qualified personnel were co-opted, if they had to leave, or if it had to have a break in service under the contract. Then EODT tends to go ahead, as it has in the past, to take those teams.
In addition, American Canine has made substantial investments with respect to performing even in the six month period, that include the cost of having foods brought back to the United States, because the CRC, in certification, is only available

Page 50

at a single point of location in the United States, currently at Ft. Benning.

It's a week long, rigorous process. All of that would be an investment that would be lost and for not, as well as costs that perhaps could not be recovered currently.

That does also go, Your Honor, to the point that multiple contracts may not be possible. If you look at page seven on the Government's D&F, the Army points out that they may have one military personnel who is available and capable of working with certification. So it may well be that having multiple contractors and multiple awards simply won't work because of the Government's own constraints on personnel and capacity to deal with certified personnel in ensuring those sort of finishings are properly attended.

Your Honor, in terms of the public interest, again, we think the balance still tilts in favor of the Government. That is, as explained in the D&F, the Government's concern certainly includes the welfare of the troops who are in harm's way in combat; but also the integrity of the procurement system, which was why the EODT awards were set aside in the first place.

The Government obviously has made it clear

Page 51

that it needs to provide a better statement of its minimum edge needs; and that is something that the Government is doing and preparing. But that did not offer in favor of disrupting the contracts and its performance under the terms of the six month bridge period.

Your Honor, all in all, again, Intervenor joins the Government in urging the Court to see that the Government has shown that there are sufficient national defense interests implicated such that the D&F and the sole source, the overrun should not be disturbed at this time.

THE COURT: Thank you, Mr. Lavallee.

MR. LAVALLEE: Thank you.

THE COURT: Mr. Jensen?

MR. JENSEN: If I may, Your Honor?

THE COURT: Yes, certainly, please.

MR. JENSEN: I have a number of very brief points if I may in response. [redacted] I can't explain the disparity.

However, should there be any suggestion, and I'm afraid there was an implication in some of the remarks that somehow that was EODT's fault; [redacted]

Page 52

[redacted] is that the Army simply stopped the certification process after the last GAO protest. There was a suspension of work, and then a termination for convenience. The Army just stopped the process.

Second, there is evidence in the record in the form of our declarations that certain of EODT's employees have now been employed by American Canine.

Third, it's news to me or at least a clarification to me that a [redacted] for the six month contract. The implication that I draw from that for purposes of the CICA stay override case is that it would be all the more easy and quick for EODT to provide capable handlers to perform the services during the course of the GAO protest if we don't have to deliver [redacted] personnel.

THE COURT: Did EODT think it had to supply handlers with [redacted] in performing the contract that was awarded on the 28th of February?

MR. JENSEN: I can say this much, Your Honor. There is a provision in that statement of work or performance work statement, copies of which are included in the Appendix, which says that the Government can issue DD-254s in the course of the

Page 53

contract.

The company is absolutely prepared. The company does a lot of work in Iraq. That's where they do most of their work. They have a lot of secure personnel. They are certainly prepared to deliver personnel with clearances, and statements to that effect are also central in our declarations.

Fifth, regarding the point of the public interest, the propriety of the Government's decision to terminate for convenience EODT's two contracts over the last three months is not relevant for purposes of determining whether the override decision advances the interests of integrity in the procurement process.

The Government made the termination for convenience decisions based on whatever their rationale was. It wasn't conveyed to us, so I presume it was not conveyed to American Canine.

One could imply that since the terminations occurred in the context of bid protest, that there may have been some issue with the Government's concern over the evaluations. There may have been concern over whether or not the contract actually reflected the Government's requirements.

But there should be no suggestion that there was any fault on the part of EODT in the termination

Page 54

of those contracts. There is no evidence to that effect in this record.

With regard to the actual requirements, going back to this point, I think for clarity, I'd like to point out that the D&F on page eight does refer to the number [redacted] as the Government's current requirements for purposes of the sole source six month contract, and that number of [redacted] matches exactly with the claims listed in the schedule in the sole source contract which is contained as an attachment to the D&F, which we presented earlier to this Court.

And last, with regard to the decisions of this Court in Kropp and Maden Tech, we would submit that those decisions did not properly apply the national security and national provisions of the Tucker Act; that we gave the national defense and national security all rights and considerations to this Court in exercising its jurisdiction.

However, we don't believe that the Government simply can't touch cases that involve national security and national defense; and furthermore, we don't think that this is a case where national security and defense are being jeopardized in any way, shape, or form, given the alternative that EODT is offering; thank you

Page 55

THE COURT: Mr. Jensen; Mr. Dunn?

MR. DUNN: Your Honor, I just have a few brief comments. Your Honor, just to inform the Court, the Army did notify GAO of the override on April 13th, and we can provide documentation to support that.

THE COURT: Please, let's just clean up the record.

MR. DUNN: Sure, we can provide it today. I was shown by Captain Pritchard an email on his Blackberry. We'd be happy to let the Court take a look at that.

THE COURT: No, because I have another request coming. Let's go ahead.

MR. DUNN: Finally, Your Honor, the purpose of the bridge contract was to allow the Army to get from where it is today to where it needs to be; to get [redacted] That's why this was all done; just to allow the Army to get what it needs.

The Army is trying to make this process as efficient as possible; and it's doing everything it can to make it as quick as possible. That's why the RFP is planned to be issued in the next several weeks, with an award date of June 1. Your Honor, if you have

Page 56

any more questions, I'd be happy to clarify.

THE COURT: All right, why don't you stay right there? Let's ask Mr. Lavallee if he has anything further.

MR. LAVALLEE: Yes, Your Honor, may it please the Court.

THE COURT: Yes.

MR. LAVALLEE: May I speak from here?

THE COURT: Yes.

MR. LAVALLEE: Your Honor, I have just two points, really. The first is that even should the Court decide that it wants to reach for D&F in this case in spite of the national defense implications, certainly the standard then would be the Administrative Procedure Act standard of whether the Government has articulated a rationale basis, not whether it is the best basis that could have possibly been articulated under the same facts or one that EODT or EODT's attorneys outside of EODT would have made on the same record, and clearly we know they would like to make a different one.

And if you listen to the arguments here, as I know the Court has, that is exactly what's going on. EODT would substitute its judgment over the ground commanders and contracting officer who is reflecting

Page 57

that input. With regard to whether or not this is what the Army needs to do to secure its forces; whether or not it needs to deploy the dog team in the numbers and locations that the D&F indicates.

What we had at the end of the day is a mere disagreement -- well articulated, but still a disagreement with the rational decision the Army has articulated in its D&F and that supports its decision to override; thank you, Your Honor.

THE COURT: Thank you; let's take this a step at a time. The base request in the application for the temporary restraining order, we're dealing with the override of the automatic stay that arose with the EODT protest of the six month temporary contract that was issued to American Canine.

The Court will not temporarily restrain the entire override. I say the entire override for good reason. The Court requests that Mr. Dunn, you and your colleagues, with the Government, respond by next Wednesday, and next Wednesday must be the 23rd, respecting whether the Court should set aside the override insofar as it deals with the sole source aspect of the American Canine contract. In other words, leave the American Canine contract in place as a potential multi-award contract. Do you see what I'm

Page 58

driving at? I'm sorry, you looked like you wanted to say something, Mr. Dunn.

MR. DUNN: I'll let you proceed, Your Honor, before asking any questions.

THE COURT: All right, that's a safe thing to do.

(Laughter.)

THE COURT: But I'm going to ask you to address it in due course. The Court just is not interested in putting itself in the position of the Army procuring authority, in trying to figure out whether it's best to have a single provider of these services or multiple providers of these services. The Court just doesn't have any idea what would be involved in having multiple providers of these services in the southern provinces of Afghanistan.

Conceptually, it looks like it would work. It looks to the Court like it would provide a response to the two salient criteria you mentioned, Mr. Dunn; that is, the Army wants to [redacted] The Court is certainly interested in doing everything it can to ensure that the Army can do that, as well.

The last thing the Court wants to do is put

Page 59

the Army in a position that it cannot meet its mission requirements for Afghanistan. I think it's the 23rd. I asked Mr. Jensen if he would respond, and you can provide the additional material regarding the notice to GAO that the override was entered at that time.

Then, Mr. Jensen, I'm going to ask if you and your colleagues, Mr. Chu and others, would respond the next day, if Mr. Dunn files by noon on next Wednesday. If you would then provide a response by 5:00 Thursday, the Court will try to do what it can to issue a decision within a few days thereafter.

Because it looks like this situation is just not going to stand for the ordinary progression of filing the administrative record, getting cross motions for judgment on the administrative record, and so on. It's just much more time sensitive than that. Now if I'm wrong, Mr. Dunn, please tell me.

MR. DUNN: No, I do not submit that the Court is wrong.

THE COURT: Well, no, please.

MR. DUNN: I just have one clarification.

THE COURT: The Court of Appeals once in awhile does that.

(Laughter.)

MR. DUNN: Your Honor, the only question I

Page 60

have is just to clarify the issue that you'd like to address.

THE COURT: Yes.

MR. DUNN: The Court, from my understanding, is considering whether to instruct the Army to issue as a multiple provider award, versus a sole source award?

THE COURT: Not instruct -- I'm just saying that it's possible to tailor a preliminary injunction -- which is really what it would be; not a temporary restraining order -- that overturns the override insofar as the sole source aspect is concerned, to free up, if you will, and in other words, let the GAO process go forward on EODT's protest of the six month contract; but ensures, at least from the Court's perspective, the Army has the ability, if it chooses, to issue a multiple award.

I'm not going to say that it's to EODT. It might be to, what is it, Ronco or something else; I don't know. But right now, the way the matter stands, American Canine has the only contract.

MR. DUNN: Your Honor, the only comment I have is --

THE COURT: Please.

MR. DUNN: -- my understanding is that the

Page 61

Army, at this point in time, only needs [redacted] working dogs.

THE COURT: Well, that's not exactly what Major Tomms says, and that's not exactly what you said. That's why I asked all the questions I did about the Army's requirements at the beginning. Again, I'm giving you until noon Wednesday to think this thing through, and to tell the Court what you've gotten on it. Because there's a mismatch here.

Major Tomms' memorandum speaks of a [redacted]

MR. DUNN: Yes, Your Honor, that's true. That's one thing that the Army wants to improve upon.

THE COURT: I understand. But I'm just saying re-think that and come back and tell the Court what you've got in mind.

MR. DUNN: Thank you, you.

MR. PRITCHARD: Your Honor?

THE COURT: Captain Pritchard, please.

MR. PRITCHARD: At this point, the Army does not need any additional themes in southern Afghanistan. The six month bridge contract was simply

Page 62

the vehicle that would allow us to keep in place the minimums that we have, so that we can get to the contract that we want.

The problem, the way I see it at this point, is if the Army would go back and try to re-work this to allow two awardees or multiple awardees, we're in a position where we would have to issue a solicitation on an RFP for multiple awards.

THE COURT: We're not saying you do that. I'm not saying you change what you've got in mind in three weeks. The Court has worked out that that would be somewhere in the area of May 9th, that you would issue a request for proposals. I'm not telling you to do anything specifically.

I am just concerned that what was identified in the override memorandum is not fully consistent with the result. You know, practically, as a matter of fact, you're going to be paying DOD technology. Because you have their mobilization cost to take care of, one way or another. You know, you've got some teams certified that are there.

Well, why aren't they working and trying to help the special forces that are in the field? You have to answer those questions. The Court can't do that. You have to do it, and your colleagues.

Page 63

All right, I'm somewhat sympathetic, shall we say, to the troops in the field; and you've got to sort out in your own mind what is best for them and cost effective for them. You're going to take me back to when I was a very, very young man, and serving as a very young lieutenant with an infantry division. I wanted whatever help I could get. You answer that question, please.

MR. DUNN: Yes, Your Honor.

THE COURT: Mr. Lavallee?

MR. LAVALLEE: Yes, Your Honor; Your Honor, if I waive clarification, will the Intervenor also be afforded the opportunity to provide any response?

THE COURT: Absolutely; you're a party for all purposes, Mr. Lavallee.

MR. LAVALLEE: Thank you, Your Honor; the other thing, Your Honor, is as you know, and this may be pertinent certainly to meaningfully address from me, from the Intervenor's perspective, this filing has been done under seal. If the Court could see that the parties receive a redacted version as soon as possible and perhaps Monday, ideally, so that we can show that the client can address the very specific means and very specific issues that were raised.

THE COURT: I'm not sure you can do that.

Page 64

Mr. Jensen provided the redacted copy of the filings. Now let me ask a couple of questions. Do you want a protective order in this case? You've moved for a protective order, Mr. Dunn.

MR. DUNN: Yes, Your Honor.

THE COURT: You do?

MR. DUNN: Yes, we'd like a protective order.

THE COURT: If the Court issues the standard protective order, would that suffice?

MR. DUNN: Yes, Your Honor.

THE COURT: Mr. Jensen?

MR. JENSEN: Yes, Your Honor.

THE COURT: Mr. Lavallee?

MR. LAVALLEE: I believe so, Your Honor.

THE COURT: All right, we'll do it. Now that takes care of one small problem. Now the Court maybe was anticipating the fact that this case, because of the time pressures, is going to go sufficiently fast, that it really isn't practicable to gather the administrative to file everything that was filed at GAO, when we're only dealing with the override; and then to have cross motions. Am I right or wrong? Mr. Jensen, what do you want to do?

MR. JENSEN: Your Honor, the more quickly

Page 65

that this case could be resolved would be best.

THE COURT: All right, thank you; Mr. Dunn?

MR. DUNN: Your Honor, I agree with that; that the more quickly this case is resolved, the better. The only contingency I have is that I'll be out of town on May 1 through May 5th.

THE COURT: Well, I think you might be done before that happens, Mr. Dunn.

MR. DUNN: That's just in case, Your Honor.

THE COURT: Just in case -- but that's right. Now what that means basically, is you've got the task of gathering togethers relatively early in the coming weeks, that you want to put forward to the Court.

MR. DUNN: Your Honor, I think the documents that have been submitted by the parties, and that the parties already have will be sufficient. We may need to get a declaration from a few relevant personnel.

THE COURT: I understand. I would just urge you to do that. That's why I'm asking you to do a little re-thinking and just see what you really want.

MR. DUNN: Thank you, Your Honor.

MR. LAVALLEE: Your Honor, on the practical issues of the redacted version of the Defendant's filing, I don't believe we received a redacted version

Page 66

of that.

THE COURT: Well, all right. You aren't admitted as a party. You weren't admitted, and well you won't be actually officially until we issue an order probably in about 45 minutes or an hour. At that point, you ought to be able to have access to the CM/ECF system, and you'll have the materials.

MR. JENSEN: Your Honor, if I could address the question of whether there is a redacted version of the complaint memo and Appendix, the answer is yes. We enclosed the proposed redacted version as Tab 2 to our motion for leave to file the documents under seal. If for some reason you didn't get that, we'd be happy to give you a copy.

THE COURT: Thank you. Probably we'll end up issuing the protective order on Monday. But we'll issue the order granting your intervention today, Mr. Lavallee.

MR. LAVALLEE: Thank you, Your Honor.

THE COURT: The first thing the Court is trying to do here is to do no harm, but the second thing the Court is trying to do is to be absolutely fair to the parties.

Now I do have a question. Mr. Jensen, it appears you're not on the CM/ECF system. I know Mr.

Page 67

Chu and his colleagues are. But you just get kick-backs.

MR. JENSEN: I am now.

THE COURT: Okay, that solves that problem.

MR. DUNN: Your Honor?

THE COURT: Mr. Dunn?

MR. DUNN: Your Honor, if I might, I need another clarification.

THE COURT: Yes.

MR. DUNN: If the Government were to provide a declaration clarifying some of the ambiguous points within the April 8th memorandum from Major Tomms, I just want to make sure that I don't provide something that the Court isn't looking for. Clarifying the dates and what the needs of the Army are --

THE COURT: I'm just giving you a broader range of options than that, Mr. Dunn. Don't have that as your tunnel vision. If you want to respond that way, that's fine. But the Court would urge you to take a somewhat broader view of this exercise; Mr. Jensen?

MR. JENSEN: May I ask the Court if you will be issuing a regular order, specifying the scope of the responses that you're expecting from the Government?

Page 68

THE COURT: No, you can get a copy of the transcript, today.

MR. JENSEN: Thank you, Your Honor.

THE COURT: Frankly, this is going to move fast enough that it's probably not a good idea. By the time the Court got around to publishing a written order, you would have already largely developed your responses.

MR. JENSEN: Thank you; may I also, and maybe this is implicit or maybe I missed it, but will the transcript today be filed under seal and be covered by the protective order. I ask because I do believe that there is proprietary information of my client, and perhaps sensitive information of the other parties involved, that was discussed today.

THE COURT: Now it turns out that probably everyone in the courtroom would be allowed access under the protective order anyway. But we have not closed the courtroom. Mr. Dunn, do you have a view?

MR. DUNN: Your Honor, I just briefly discussed this with Captain Pritchard. As far as we're concerned, it doesn't appear that anything that was discussed today would be subject to the protective order. However, if there's something that opposing counsel identifies that it is, we can take it from

Page 69

there.

We really do want to get a copy of this transcript as soon as possible, because it would be helpful in crafting our response to the Court.

THE COURT: You'll have to work that out with the court reporter.

MR. DUNN: Yes, so I just want to make sure there's no barriers in place to prevent that from occurring via a transcript that can be sent by email.

THE COURT: Well, Mr. Jensen?

MR. JENSEN: The items that occurs to me that EODT would consider to be proprietary and sensitive, [redacted]

THE COURT: Now those, in detail, are covered in your moving papers. If the Court had your comments in Loen, there's nothing in detail at the hearing today address those.

MR. JENSEN: My statements today, I believe, [redacted]

THE COURT: All right, we'll seal the transcript, but allow the sealed transcript to be transmitted to counsel for the parties by electronic means. That will solve that problem.

We short circuited a fair number of things on the ordinary bid protest process. I want to make sure that you've thought about -- Mr. Jensen, Mr. Dunn, Mr. Lavallee -- whether that short circuiting is something that you accept and want to do. You earlier indicated that speed and expedition is more important in this than following every step along the way of those extended procedures. I'm a cautious man, and I want to make sure that that's okay.

MR. JENSEN: We have no objection.

THE COURT: All right, thank you, Mr. Jensen; Mr. Dunn?

MR. DUNN: Your Honor, we have no objections.

THE COURT: Thank you; Mr. Lavallee?

MR. LAVALLEE: Your Honor, I have one concern. We generally have no objections. But as you know from the pleadings, names were named, specific point of information. But the Intervenors have the distinct disadvantage because it cannot be disclosed to them in order to respond fully and meaningfully.



So if there could be an accommodation so that we could release at least that type of information post haste, we would have no objection.

THE COURT: You will not be able to do that. The parts of Mr. Jensen's filings that actually name certain names are redacted as the Court understands it. You will not be able to do that in any event. You will have access, Mr. Lavallee.

MR. LAVALLEE: Yes, Your Honor. And so bear in mind I guess what I hope we could work through here, because these are employees who in theater where allegations have been made about certain things about them or not about them. I don't know how we can meaningfully obtain information that could be very helpful to resolve.

THE COURT: All I'm saying is, the expedition with which this proceeding is being conducted will bear on that issue one way or another.

MR. LAVALLEE: I see what you're saying.

THE COURT: The issue you're raising would arise anyway, and that's why I'm a little puzzled.

MR. LAVALLEE: I have no objection, Your Honor.

THE COURT: All right, thank you; I just wasn't sure here. Now on the other hand, if you want



to disclose something to your clients that is redacted that you have access to, because we'll issue the protective order on Monday and you'll have access to the sealed document, then you can always move the Court for access to particular parts of it. Then the Court can hear from the parties, and we can take that in hand at that time. So it's not that we're foreclosing any position you might have, Mr. Lavallee.

MR. LAVALLEE: Thank you, Your Honor, and I understand that we will also continue to work closely with Plaintiff's counsel to see what we can agree to in terms of redacting.

THE COURT: All right, well, thank you; this is one of those unexpected proceedings that you all probably were a little surprised about. But in any event, certainly the Court was.

Rather than go through, I think we've short circuited or by-passed the standard items that one would cover in an initial conference. If, on reflection, any of the parties have anything procedural they want to raise, mid-week or next week is the time to do it. Is there anything further, Mr. Jensen?

MR. JENSEN: No, Your Honor.

THE COURT: Thank you very much; Mr. Dunn?



MR. DUNN: Your Honor, will there be a hearing regarding the submissions?

THE COURT: Do you want one?

MR. DUNN: I'm not sure at this point, Your Honor.

(Laughter.)

MR. DUNN: I was just checking to see if Your Honor planned on doing that.

THE COURT: Well, let's just put it this way. The Court is more than willing. It depends on what you come up with and what the responses are. The short answer is, it depends.

In fact, we tried to schedule this hearing for yesterday at the same time, but it became readily apparent that you, Mr. Dunn, and Captain Pritchard would not necessarily have time to be prepared. So we had to put it off a day, to today. We will do our best to accommodate your schedules. If you want a hearing, we'll have a hearing.

Is there anything further, Mr. Jensen?

MR. JENSEN: No, Your Honor.

THE COURT: Mr. Dunn?

MR. DUNN: No, Your Honor.

THE COURT: Thank you; Mr. Lavallee?

MR. LAVALLEE: No, Your Honor.

THE COURT: All right. We're in adjournment for the day. Thank you very much.

THE CLERK: All rise.

(Whereupon, at 4:40 p.m., the hearing in the above-entitled matter was concluded.)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//



REPORTER'S CERTIFICATE

DOCKET NO.: 08-283C
CASE TITLE: EOD Technology v. U.S
HEARING DATE: April 18, 2008
LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: April 18, 2008

John Del Pino
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018