# In the United States Court of Federal Claims

No. 08-283C

(Filed Under Seal: May 7, 2008)
(Reissued: May 15, 2008)

| | |
|---|---|
| **EOD TECHNOLOGY, INC.**<br>**Plaintiff,**<br>**v.**<br>**UNITED STATES,**<br>**Defendant,**<br>**and**<br>**AMERICAN K-9, INC.**<br>**Intervening Defendant.** | Override determination by the Army of stay arising with post-award bid protest; 31 U.S.C. § 3553(d)(3)(c); canine working dog services to Army Special Forces units operating in Afghanistan; factors affecting preliminary injunction; interests of national defense and national security; 28 U.S.C. § 1491(b)(3) |

John E. Jensen, Pillsbury Winthrop Shaw Pittman, LLP, McLean, Virginia, for plaintiff. With him on the briefs was Jack Y. Chu, Pillsbury Winthrop Shaw Pittman, LLP, McLean, Virginia.

Sean M. Dunn, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Jeffrey S. Bucholtz, Acting Assistant Attorney General, Civil Division, Jeanne E. Davidson, Director, and Mark A. Melnick, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. With him at the hearing was Captain John Pritchard, U.S. Army, Washington, D.C.

J. Philip Ludvigson, DLA Piper US LLP, Washington, D.C., for intervening defendant. With him on the brief was Fernand A. Lavallee, DLA Piper US LLP, Washington, D.C.

## OPINION AND ORDER[1]

LETTOW, Judge.

EOD Technology, Inc. ("EODT") seeks review of an override determination issued by the Department of the Army to nullify the stay that automatically arose when a timely protest was filed by EODT with the Government Accountability Office ("GAO") of a contract awarded by the Army to provide canine, or contract working dog ("CWD"), services to the Army's Special Forces operating in [***] Afghanistan. Contract working dogs are used by Special Forces teams to detect improvised explosive devices ("IEDS") and narcotics and to deal with terrorists and other combatant forces. EODT first applied for a temporary restraining order and now has sought a preliminary injunction against the Army's override of the statutory stay of contract performance imposed by the Competition in Contracting Act of 1984, 31 U.S.C. § 3553(c)(1). The underlying contract is a short-term, six-month, sole-source contract awarded to intervening defendant American K-9, Inc. This override action is complicated by the fact that the contractual award to American K-9 followed a sequence of events in which EODT twice won contracts for the same CWD services in [***] Afghanistan, only to have each award terminated for the convenience of the Government after American K-9 and another offeror protested those awards. In addition, this action is heavily infused with national-security concerns, of an immediate tactical nature.

Because of the urgent need to resolve the dispute over the override as rapidly as possible, the parties and the court arranged to truncate proceedings and provide exceptionally expedited briefing of the issues on EODT's motion for a preliminary injunction. In that connection, the parties have bypassed supplying the court with a formal record of the Army's action in entering the override and have instead provided relevant documents and records as attachments to their briefs. The court has agreed to treat those documents and records as if they were the formal administrative record that would ordinarily be filed with the court in accordance with Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC").[2]

---

[1]Because this opinion and order might have contained confidential or proprietary information, it was initially filed under seal. The parties were requested to review this decision and provide proposed redactions of any proprietary or confidential information on or before May 14, 2008. The resulting redactions are shown by brackets enclosing asterisks as follows: "[***]."

[2]Citations to the documents and records pertinent to the override will be to the party's brief to which the materials were attached and then to the particular exhibit with a parenthetical identification of that exhibit. For example, the Request for Authorization to Continue Performance of [CWD] Services Under Contract W91B4L-08-M-0257 in Face of [GAO] Protest B-311349.2 (April 8, 2008) is cited as Pl.'s Mem. Ex. E (Request for Authorization to Continue Performance).

## FACTS

The Army has used CWD services in Afghanistan for some time. Recently, the Army sought to award a new contract for such services in [***] Afghanistan. American K-9 was the incumbent contractor providing CWD services to the Army's Special Forces in [***] Afghanistan, and its services have remained in place throughout the events recited here.[3]

On October 23, 2007, the Army's [***] Regional Contracting Center ("[***] Center") issued Solicitation No. W91B4L-08-R-0001 for CWD services in [***] Afghanistan. Pl.'s Mem. at 3. EODT, American K-9, and RONCO Consulting Corporation ("RONCO") made offers in response to the solicitation. *Id.* In December, 2007, after determining that EODT's proposal provided the best value to the government, the Army awarded the CWD contract to EODT. *Id.* at 3 and Ex. C (cover sheet of contract award). American K-9 and RONCO protested the award to GAO. Pl.'s Mem. at 3. After the Army announced its intent to take corrective action, the GAO dismissed the protests of American K-9 and RONCO on January 16, 2008. *Id*. at 4. *See Protest of RONCO*, B-311008 (notice of dismissal) and *Protest of American K-9*, B-311008.2 (notice of dismissal). The Army terminated the contract awarded to EODT for convenience, and cancelled the underlying solicitation. Pl.'s Mem. at 4.

Promptly thereafter, on February 10, 2008, [***] Center issued Solicitation No. W91B4L-08-R-0013, requesting proposals for canine teams to be used in Afghanistan in support of U.S. combat operations, specifically for [***] and the NATO International Security Assistance Force Regional Command [***] Area of Operation ("NATO [***]"). Def.'s Opp'n at 2; *see also* Pl.'s Mem. at 4. The request for proposals sought two trained and certified Patrol/Narcotics Detector Dogs and [***] Explosives Detector Dogs ("EDD"), as well as trained and certified handlers and staff to conduct operations at [***], NATO [***], and the [***] Operations Area. Def.'s Opp'n Br. at 2 (citing Pl.'s Mem. Ex. H). The contractor was to be responsible for planning and executing the fielding of CWD teams to [***], Afghanistan, which serves as a base of operations for CWD services at Forward Operating Bases ("FOBs") and Provincial Reconstruction Teams ("PRT") throughout [***] Afghanistan. *Id*. at 3 (citing Pl.'s Mem. Ex. H). The contractor was to also match the CWD teams to missions, and to coordinate with the Force Protection Officer, NATO Forces, [***] Provost Marshal, as well as field commanders and soldiers. *Id*. (citing Pl.'s Mem. Ex. H). The request for proposal established February 20, 2008 as the closing date for proposal submissions. *Id.*; Pl.'s Mem. at 4.

[***] Center evaluated the proposals of four offerors, including that of intervening defendant American K-9. Def.'s Opp'n at 3. Based on the Center's evaluation, EODT offered the best overall value in services, and [***] Center awarded Contract No. W91B4L-08-M-0232

---

[3]EODT avers that it also currently provides CWD services in Afghanistan, [***] sections of that country, and that [***] it remains "ready to provide the CWD services at issue." Pl.'s Reply at 7 (citing Pl.'s Reply Ex. A, Second Declaration of [***] ¶ 5).

to EODT on February 28, 2008. *Id*. (citing Pl.'s Mem. Ex. D (cover page of contract award)); *see also* Pl.'s Mem. at 4 (citing Ex. D).

On March 11, 2008, American K-9 filed a protest with the GAO respecting the second award of a contract to EODT. Def.'s Opp'n at 3. In light of that protest, [***] Center issued a stop-work order to EODT pursuant to Federal Acquisition Regulation ("FAR") [48 C.F.R.] § 52.233-3 on March 16, 2008. *Id*. at 3. The government avers that after receiving the protest, [***] Center re-examined the award to EODT and "became aware of several problematic issues which threatened the viability of the solicitation" and award. *Id*. at 3 (citing Pl.'s Mem. Ex. E (Request for Authorization to Continue Performance) at 10). [***] Center terminated Contract No. W91B4L-08-M-0232 for convenience on March 26, 2008; the Army also cancelled the underlying solicitation on that date. Pl's. Mem. at 4; *see also* Pl.s' Mem. Ex. F (Mem. for Record (Apr. 2, 2008) (explaining basis for termination for convenience) ("Termination Mem.")).[4]

On March 28, 2008, [***] Center requested that American K-9 submit a proposal on RFP No. W91B4L-08-R-0016 for a sole-source, six-month bridge contract to provide canine detection services at [***] and outlying Forward Operating Bases. Def.'s Opp'n at 3. In support of that action, [***] Center entered a Justification and Approval for Other Than Full and Open Competition, issued pursuant to FAR § 6.302-2(a)(2), which stated:

> [T]o implement corrective action regarding the [American K-9] protest[,] a bridge contract must be awarded to ensure continuity of service. This bridge contract will serve as a stop-gap measure while the [[***] Center] office conducts a re-acquisition for services.
>
> The intent of a six-month bridge allows three months for competitive sourcing of the new contract and three months for transition and mobilization concerns.
>
> The current contract did not fully address the requirements for: 1) a net increase of [***] teams (one handler and one canine); 2) delineation of armed personnel; and 3) security clearance specifications. These requirements will be fully clarified in the new solicitation. As a matter of note, the incumbent for the bridge contract, [American K-9], is already complying with these additional requirements . . . .
>
> Currently [American K-9] is considered the only firm able to fulfill this urgent and compelling need, with no mobilization lead-time required.

---

[4]On April 7, 2008, the GAO dismissed American K-9's March 11, 2008 protest as academic due to the Army's termination of EODT's second contract. *See* Pl.'s Mem. at 4 n.2.

Def.'s Opp'n at 4, Ex. 2 (Justification and Approval for Other Than Full and Open Competition Justification) ("Approval for Sole-Source Request")). EODT avers that it first learned on March 28, 2008 of the Army's intent to award the sole-source contract to American K-9, and that the six-month bridge contract would be in effect pending the issuance of a new solicitation for CWD services later in 2008. Pl.'s Mem. at 4. [***] Center awarded American K-9 the six-month sole-source bridge contract on March 31, 2008. *Id.*

On April 1, 2008, EODT filed its protest with the GAO challenging, among other things, the six-month, sole-source contract issued to American K-9. *See Protest of EOD Technology, Inc.*, B-311349.2. EODT alleged that the sole-source award was improper because there was no official notice evidencing the Army's intent to make such an award. *See id.* EODT also contended that the contracting officer did not determine that any of the conditions set forth in 10 U.S.C. § 2304(c) existed to justify such an award. *See id.*

On April 2, 2008, [***] Center's contracting officer, [***] Major [***], prepared a "Memorandum For Record" addressing the termination of EODT's second contract in Afghanistan and the Army's award of the sole-source contract to American K-9. Pl.'s Ex. F (Termination Mem.). The memorandum listed "rapidly changing requirements," including (1) a need for [***] security clearances by dog handlers working with U.S. and Canadian Special Forces units; (2) an emphasis on the Army's official certification of a contractor's CWD teams; and (3) an increase in the overall number of CWD teams from [***] to [***]. *Id.* Ex. F at ¶1.b-d. EODT's protest triggered an automatic stay of performance of the contract, and on April 6, 2008, [***] Center issued a stop work order to American K-9 respecting the six-month, sole-source bridge contract. Def.'s Opp'n Br. at 4. At that point the Army issued a three-month, sole source "interim contract" to American K-9 to cover the period during which the automatic stay would be in effect. Pl.'s Mem. at 4.

On April 8, 2008, [***] Center determined that the six-month, sole-source contract, No. W91B4L-08-M-0257, should be authorized to proceed despite the GAO protest filed by EODT. Def.'s Opp'n at 5 (citing Pl.'s Mem. Ex. E (Request for Authorization to Continue Performance)). The contracting officer, Major [***], stated that "continued contract performance by [American K-9] involves urgent and compelling circumstances that significantly affect the interests of the United States and its Allies, and will not permit waiting for the GAO's decision on the protest." Pl.'s Mem. Ex. E (Request for Authorization to Continue Performance) at 1. The contracting officer also advised that:

> Since [American K-9] is already fully mobilized with certified teams meeting the requirements of the protested contract, the US and its Allies would not suffer any lapse of service. During this bridge contract, this office[']s full intent is to build a new solicitation that adequately addresses the outstanding government requirements that until this time have not been adequately defined.

*Id.*

On April 11, 2008, the Acting Deputy Assistant Secretary of the Army determined that "urgent and compelling circumstances, which significantly affect the interests of the United States, will not permit waiting for the GAO's decision." Def.'s Opp'n Ex. 3 (Request for Authority to Proceed Notwithstanding Government Accountability Office (GAO) Protest) (April 11, 2008)).

On April 13, 2008, the Army issued a memorandum advising that the head of its contracting authority had approved, on April 11, 2008, both an override of the automatic stay and American K-9's continued performance of the sole-source contract. Pl.'s Mem. at 4-5. Plaintiff's counsel avers they were provided with a copy of the written determination and findings underlying the stay override, as prepared by the contracting officer, [***] Major [***], on April 14, 2008. Pl.'s Mem. at 5.

The effect of the Army's override of the automatic stay of the six-month sole-source contract was to keep that contract in place; meanwhile, the three-month temporary contract was rescinded. EODT's action to enjoin the override was filed in this court on April 16, 2008.[5]

A hearing on EODT's application for a temporary restraining order was held on April 18, 2008. Counsel for the government and American K-9 were present and participated in the hearing. Arrangements were made at the hearing to forego formal certification of the administrative record and to provide instead for submission of pertinent documents and records as attachments to briefs, subject to potential objection by any party, and a schedule was set for accelerated briefing. At the hearing, the government's counsel represented to the court that the [***] Center planned to issue a solicitation addressing new requirements within three weeks after April 18, 2008, and to award a contract by June 1, 2008. Hr'g Tr. 35:22-25.

The briefs that were subsequently filed by the parties clarified several factual points raised by the court at the hearing. Among other things, a major reason for the Army's changing requirements for CWD services in [***] Afghanistan is that NATO will no longer be employing CWD services after a certain date, and instead the United States will be providing all dog services, requiring an increase from the presently needed [***] teams to [***] teams. The Army advised that this anticipated increase in CWD services will begin after the award of a new contract. Def.'s Opp'n at 10 (citing Ex. 1, appended Decl. of Major [***] ("[***] Decl.") at ¶ 11). The teams provided under that contract will be used at [***] and by American and Canadian Special Forces operating in [***] Afghanistan.

There is no dispute over the value of K-9 units to the Army's mission in [***] Afghanistan. As stated in the [***] Center's Approval for Sole-Source Request:

---

[5]EODT's protest remains pending before the GAO as docket B-311349.2.

> CWDs perform an invaluable service and any lapse in service could result in security breaches at [***] and in the FOBs. To date CWD teams have discovered [***] improvised explosive devices (IEDs) in and around [***] outlying FOBs.

Def.'s Opp'n at 4, Ex. 2 (Approval for Sole-Source Request).

**Jurisdiction**

The Competition in Contracting Act requires that federal agencies, upon receiving notice within 10 days of a contract award that the award is being protested before GAO, shall "direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under the contract." 31 U.S.C. § 3553(d)(3)(A)(ii). This "automatic stay" provision further provides that "[p]erformance [of the contract] may not be resumed while the protest is pending." 31 U.S.C. § 3553(d)(3)(B).

An agency may override the stay in statutorily specified circumstances. The head of the contracting activity may authorize contract performance despite a post-award protest, upon a "written finding" that

> (I) performance of the contract is in the best interests of the United States; or
> (II) urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest.

31 U.S.C. § 3553(d)(3)(C). In this instance, the Army based its override on "urgent and compelling circumstances."

This court has jurisdiction over "an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). An "alleged violation of statute" includes an override determination by a federal agency that an interested party contends does not accord with law. *See RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1288-89 (Fed. Cir. 1999); *Superior Helicopter LLC v. United States*, 78 Fed. Cl. 181, 186-87 (2007).[6]

As a successful bidder whose contracts were terminated before American K-9's short-term bridge contract was put in place, EODT qualifies as an "interested part[y]." *See Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004) (noting that the term

[6]This so-called "third category" of the court's bid-protest jurisdiction encompasses other circumstances besides override cases. *See OTI America, Inc. v. United States*, 68 Fed. Cl. 108, 113 (2005) (addressing another such circumstance). Challenges to pre-award and post-award procurement actions by federal agencies constitute the first two categories.

"interested party" in 28 U.S.C. § 1491(b) has the same meaning as that term is given in 31 U.S.C. § 3551 and thus includes "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract") (quoting *American Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)); *see also* 31 U.S.C. § 3551(2)(A).

**Standards for Decision**

1. *The APA criteria for review.*

Judicial review in this override case is governed by a provision of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also Superior Helicopter*, 78 Fed. Cl. at 187. The pertinent standard requires a court to determine whether an agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Alion Sci. and Tech. Corp. v. United States*, 69 Fed. Cl. 14, 22-24 (2005) (discussing the applicability of 5 U.S.C. § 706(2)(A) to review of an agency's override decision); *Spherix, Inc. v. United States*, 62 Fed. Cl. 497, 503 (2004) (same). The court's review under the APA is limited to an evaluation of whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105 (1977) (abrogating *Overton Park* to the extent it recognized the APA as an independent grant of subject matter jurisdiction). The court may not "substitute its judgment for that of the agency" in conducting a review under these standards, *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Overton Park*, 401 U.S. at 416), and may overturn an agency's decision only if "the procurement official's decision lacked a rational basis; or . . . the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citing *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). If a protestor succeeds in making these showings, the court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).

2. *Evaluating national-security considerations.*

As required by 28 U.S.C. § 1491(b)(3), the court "give[s] due regard to the interests of national defense and national security" in analyzing the public interest in this case. *See Geo-Seis Helicopters, Inc. v. United States*, 77 Fed. Cl. 633, 650 (2007). The all too evident national-security considerations here present no bar to the court's exercise of jurisdiction. Although the government has cited *Kropp Holdings, Inc. v. United States*, 63 Fed. Cl. 537 (2005), and *Maden Tech Consulting, Inc. v. United States*, 74 Fed. Cl. 786 (2006), as decisions indicating that a case may involve such strong interests of national security that this court may decline to exercise jurisdiction, those decisions, even assuming that they are correct, may be distinguished from this

case. When considering national security interests in procurement cases, the court has typically done so in determining whether to provide injunctive relief after exercising jurisdiction and adjudicating the merits. *See, e.g.*, *Geo-Seis Helicopters*, 77 Fed. Cl. at 650 (noting that the government's allegations involving national security "must be evaluated with the same analytical rigor as other allegations of potential harm to the parties," but tailoring injunctive relief to avoid impinging upon national security); *Beta Analytics Int'l, Inc. v. United States*, 69 Fed. Cl. 431, 433 (2005) (granting injunctive relief to plaintiff after giving due regard to interests of national security); *Filtration Dev. Co. v. United States*, 60 Fed. Cl. 371, 388 (2004) (limiting scope of sole-source procurement after giving due regard to interests of national security); *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 655 (2003) (considering national security interests in weighing the balance of hardships between the parties, after having ruled in favor of plaintiff on the merits). The court must balance national security concerns with the "overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations." *Hospital Klean of Tex, Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005); *see also Geo-Seis Helicopters*, 77 Fed. Cl. at 650; *Cincom Systems, Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997).

3. *Conversion of an application for a temporary restraining order into a motion for preliminary injunction.*

EODT has applied for a temporary restraining order and also moved for a preliminary injunction. RCFC 65(b) governs the issuance of temporary restraining orders and applies absent adequate notice to the adverse party or a hearing. A restraining order is "temporary" in that it is limited to ten days to prevent enjoining conduct for extended time periods without providing an adverse party the opportunity to present its position. *See* RCFC 65(b) ("Every temporary restraining order granted *without notice* shall . . . expire by its terms within such time after entry, not to exceed 10 days, as the court fixes . . . .") (emphasis added). By contrast, RCFC 65(a)(1) requires notice to the adverse party prior to issuance of a preliminary injunction. To constitute adequate notice, a hearing must be held "in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 432 n.7 (1974) (construing Fed. R. Civ. P. 65(a)). [7]

When the adverse party has received adequate notice and a hearing has been held prior to the issuance of a temporary restraining order, the court follows the same procedures as it would when considering a motion for a preliminary injunction. *See Kansas Hosp. Ass'n v. Whiteman*, 835 F. Supp. 1548, 1551 (D. Kan. 1993) (treating application for a temporary restraining order as a motion for a preliminary injunction under Rule 65(a) of the Federal Rules of Civil Procedure); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2951 (2d ed. 1995) ("Indeed, even if a court denominates an order as a 'temporary restraining

[7] RCFC 65(a) and (b) are virtually identical to Fed. R. Civ. P. 65(a) and (b), except that the preservation of rights to trial by jury in the latter is not present in the former.

order' [when notice is provided,] Rule 65(b) may not apply and, if there is an adversary hearing or the order is entered for an indeterminate length of time, the 'temporary restraining order' may be treated as a preliminary injunction."). In short, an application for a temporary restraining order becomes a motion for a preliminary injunction both with regard to the duration of the order and the jurisdiction of appellate courts to review on appeal an order entered after notice or with indefinite duration. *See Sampson v. Murray*, 415 U.S. 61, 86-87 (1974); *Baker Elec. Coop, Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994).

Here, the government received advanced notice of the filing of this bid protest case pursuant to RCFC Appendix C, ¶ 2. Counsel for the government also had advanced notice of, and an opportunity to prepare for, the hearing held two days after plaintiff's filing of the complaint and application for a temporary restraining order. At that hearing, counsel presented the government's initial response. At the close of that hearing, the court determined that circumstances allowed time for the government and intervening defendant to submit briefs, and for plaintiff to reply, albeit on a very accelerated schedule, prior to rendering a decision. Hr'g Tr. 57:12-25. Those briefs have been filed and considered by the court. Accordingly, EODT's application for a temporary restraining order has been subsumed into its motion for a preliminary injunction.

EODT bears the burden of showing that a preliminary injunction is appropriate. "To obtain the extraordinary relief of an injunction prior to trial, the movant carries the burden to establish a right thereto in light of the following factors: (1) that the movant is likely to succeed on the merits at trial; (2) that it will suffer irreparable harm if preliminary relief is not granted; (3) that the balance of the hardships tips in the movant's favor; and (4) that a preliminary injunction will not be contrary to the public interest." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *see also United States Ass'n of Importers of Textiles & Apparel v. United States Dep't of Commerce*, 413 F.3d 1344, 1346-48 (Fed. Cir. 2005) (reciting the four factors); *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (listing the comparable four factors governing issuance of permanent injunctive relief). In the balance, "[n]o one factor . . . is necessarily dispositive. If a preliminary injunction is granted . . . the weakness of the showing regarding one factor may be overborne by the strength of the others. If the injunction is denied, the absence of an adequate showing [as to] one factor may be sufficient . . . to justify the denial." *FMC Corp.*, 3 F.3d at 427 (citing *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 952 (Fed. Cir. 1990)).

## ANALYSIS

When determining if an agency's override decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), courts have looked to the agency's consideration of factors that include: "(1) whether significant adverse consequences would occur if the agency did not override the stay, (2) whether reasonable alternatives to the override were available, (3) how the benefits of overriding the stay compared to the potential cost of the override, including the costs associated with the potential that the protestor might prevail before GAO, and (4) the impact of the override on competition and the integrity of the

procurement system." *Superior Helicopter*, 78 Fed. Cl. at 188-89 (citing *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 711( 2006), *appeal dismissed*, No. 2007-5114, 2008 WL 1777425 (Fed. Cir. Apr. 10, 2008); *see also Advanced Sys. Dev., Inc. v. United States*, 72 Fed. Cl. 25, 31 (2006) ("The overarching goal of the [automatic] stay is to preserve competition in contracting and ensure a fair and effective process at GAO. Therefore, [the agency] may only override the automatic stay upon a proper determination that the best interests of the United States outweigh this Congressional policy."); *CIGNA Gov't Servs., LLC v. United States*, 70 Fed. Cl. 100, 111 (2006) (override improper where agency had flexibility to adapt means and still meet a statutory deadline); *Alion Science*, 69 Fed. Cl. at 27 (court must determine whether agency "had a rational basis for determining that only [the awardee] could provide the necessary services").[7]

The override determination may not be based simply on the agency's view that the new contract is better than the old one or that the agency simply prefers to override the stay rather than await GAO's decision. *Reilly's Wholesale*, 73 Fed. Cl. at 711 (irrelevant that the new contract would be better than the old one); *Advanced Sys. Dev.*, 72 Fed. Cl. at 31 ("The allegation that the new contract is better than the old one in terms of cost or performance is not enough to justify a best interests determination.").

A. Evaluation of This Override

The first factor guiding the evaluation of the override can be speedily addressed. The government contends that significant adverse consequences would have resulted had the [***] Center not overridden the stay, emphasizing that any lapse in CWD services might "result in security breaches at [***] and in the F[orward] O[perating] B[ases]." Def.'s Opp'n at 4 & Ex. 2 ¶ 10 (Approval for Sole-Source Request). As Major [***] put it in his memorandum requesting the override,

> The CWD service cannot lapse, not even for one day. The dogs must be certified and able to perform their duties competently. The value of this

[7]The precedents addressing these considerations deal equally with override determinations made on either "best interests" or "urgent and compelling circumstances" bases. *See Reilly's Wholesale*, 73 Fed. Cl. at 711 n.10 ("[T]he rationale employed in ['best-interests'] cases has, where indicated, application to the review of an override decision based upon urgent and compelling circumstances."); *Advanced Sys. Dev.*, 72 Fed. Cl. at 31 ("*Spherix* advocated a lesser showing for 'best interests' determinations than for 'urgent and compelling circumstances' – an approach with which we disagree."). *But see Spherix*, 62 Fed. Cl. at 505 ("Failing the ability to show that urgent and compelling circumstances justify the override, the agency head can elect to make the unremarkable determination that contract performance is in the best interests of the United States.").

> service can be demonstrated at just one F[orward] O[perating] B[ase] location alone where an EDD team found over [***] IEDs in the past year.

Pl.'s Mem. Ex. E (Request for Authorization to Continue Performance) at 5. Manifestly, CWD services were and are critical to the Allied operations at [***] and the Special Forces' forward operating bases in [***] Afghanistan.

The second factor requires more analysis. Major [***] and then the Army concluded that relying upon American K-9 was the only way the Army could obtain essential CWD services during a bridge period before another procurement could be initiated and completed. *See* Pl.'s Mem. Ex. E (Request for Authorization to Continue Performance) at 5 ("[T]he incumbent contractor, A[merican] K-9, will satisfy these requirements."). EODT contests this finding, accepting the Army's critical need but contending that the Army failed to consider whether the bridge contract awarded to American K-9 should have been issued on a sole-source basis. Pl.'s Mem. at 15-19. EODT notes that it had commenced preparations for performance of the second of its contracts terminated for convenience, and had obtained the requisite training and certification of [***] CWD teams before that termination occurred. *See* Pl.'s Reply at 7. EODT also represents that it still has available in Afghanistan [***] teams ready to provide the CWD services at issue, apart from [***] EODT teams that are being supplied for CWD work at other stations in Afghanistan under other contracts. Pl.'s Reply at 6-7.

The Army resists potential use of more than one contractor to provide CWD services to Special Forces in [***] Afghanistan, arguing that placing another contract or contractors into service with American K-9 would "negatively impact mission effectiveness." Def.'s Opp'n at 10. Use of two or more contractors would "disrupt the integrity of the teams currently working together" and "elicit disruption and harmful competition." Def.'s Opp'n at 2, 10 & Ex. 1 ([***] Decl. ¶ 13-14).

Major [***]'s reasons for issuing the six-month bridge contract as a sole-source award rather than opening multiple-award contracts appear for the first time in his post-hearing declaration, submitted after the court had raised questions about the sole-source nature of the award. Neither of the reasons appears in the Army's prior memoranda, including Major [***]'s memorandum supporting the override determination, *see* Pl.'s Mem. Ex. E (Request for Authorization to Continue Performance), or the memorandum bearing on the sole-source nature of the bridge contract. *See* Def.'s Opp'n Ex. 2 (Approval for Sole-Source Request). Accordingly, Major [***]'s reasons for use of a sole-source award must be examined with a critical eye. *See Overton Park*, 401 U.S. at 420 (a reviewing court must critically examine any *post hoc* rationalization); *see also Vermont Yankee Nuclear Power Corp. v. National Res. Def. Council, Inc.*, 435 U.S. 519, 530-34, 536-37, 549-56 (1978); *Co-Steel Raritan, Inc. v. International Trade Comm'n*, 357 F.3d 1294, 1316 (Fed. Cir. 2004); *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 204 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).

Major [***]'s observation that the Army's Special Forces would not want teams from two different contractors working on the same missions has merit. The Special Forces rely on

closely integrated teams in operations, and any conflict or tension between or among team members could be counterproductive. On the other hand, the Special Forces assigned to [***] Afghanistan are located in a number of different forward operating bases and consist of both American and Canadian troops. Major [***] does not explain why only one contractor must supply CWD teams to all of these bases, nor does the Army in its briefing papers offer any such explanation. Thus, the Army's consideration of alternatives is at least partially deficient because it does not realistically consider multi-award contracts.

The Army also notes that the incumbent, American K-9, has a distinct advantage because the Army has only one certification authority, a Sergeant First Class, located in Afghanistan, and that individual can only certify [***] teams a week. Pl.'s Mem. at 17 & Ex. F (Termination Mem.) at ¶ 1.c. Prior to the termination of its second contract, EODT had [***] obtained certification of [***] teams. Pl.'s Reply at 6-7. That circumstance favors an override insofar as American K-9's retention is concerned, but it does not support the sole-source nature of the contract affected by the override.

Similarly, the Army emphasizes that it will require all dog handlers who work on Special Forces missions to have a [***] security clearance. Pl.'s Mem. Ex. F (Termination Mem.) at ¶ 1.b. The Army averred that American K-9 was already complying with this future requirement. Def.'s Mem. Ex. 2 (Approval for Sole-Source Request) ¶ 5. [***], EODT brought forward evidence that American K-9 was [***] with this emerging specification. Pl.'s Mem. Ex. A (Decl. of [***] (Apr. 15, 2008) ("[***] Decl.")) at ¶ 25-26. EODT indicates [***] that it has handlers at other locations with the requisite security clearances and that these handlers could be reassigned to work with the Special Forces. *Id*. Ex. A ( [***] Decl.) at ¶ 25. As a result, these further aspects of the Army's evaluation of alternatives are also not supportive of the Army's use of American K-9 as a sole supplier for such services.

The third factor relating to balancing benefits and costs, including the costs that would arise should the protestor prevail before GAO, is not as meaningful in this context as in other override situations. American K-9 and EODT were [***] in their offers responsive to the second solicitation, with EODT having a [***] per team. Pl.'s Mem. at 16. And, because the override relates to the bridge contract, not the second award to EODT, the Army would have relatively low costs associated with a termination.

The fourth factor, the impact on the integrity of the procurement system, in this instance requires consideration not just of the Army's actions regarding the bridge contract with American K-9 but also of the Army's terminations of the two earlier contracts awarded to EODT for the same services. Besides the factual circumstances addressed in the context of the first three factors, the Army noted that its requirements were "rapidly changing." *See* Pl.'s Mem. Ex. E (Request for Authorization to Continue Performance) at 9. Shortly after the award of the second contract to EODT, NATO relieved its contracting agency, NATO Maintenance & Supply Agency, from providing canine support for [***]. *Id*. at 6. In addition, the need for CWD teams at forward operating bases was rising. *Id*. at 7. Termination of the second contract awarded to EODT enabled [***] Center to plan for a new solicitation that would meet the increased

requirements. *Id.* at 9. The six-month, sole-source contract awarded to American K-9 was intended to bridge the gap. *See* Hr'g Tr. 61:23 to 62:3 ("The six-month bridge contract was simply the vehicle that would allow us to keep in place the minimums that we have, so that we can get to the contract that we want.").

Overall, taking into account considerations related to each of the factors bearing on the override, the Army's determinations in acting to override the automatic stay were rational and supported by the record insofar as the six-month, sole-source bridge contract is concerned, with one exception: the Army's justification for a sole-source rather than a multiple-source award lacks support as explained above.

B. Consideration of Injunctive Relief

The first three factors bearing on preliminary injunctive relief may be addressed summarily. EODT has demonstrated that it is likely to succeed on the merits only insofar as the Army's evaluation of alternatives to the override focused on a sole-source provider of CWD services rather than multiple providers. Otherwise, the Army has demonstrated a necessity to maintain without pause CWD services to support Allied units at [***] and American and Canadian Special Forces units at forward operating bases in [***] Afghanistan. The override accomplishes that end.

EODT claims that it will suffer irreparable harm if the override is not preliminarily enjoined, primarily because it has inactive CWD teams presently located in Afghanistan and will have [***], "all of whom have repeatedly expressed dissatisfaction at the Army's termination of the prior contract awards to EODT and at the current sole-source award to [American K-9]." Pl.'s Mem. at 23 & Ex. A ([***] Decl.) at ¶¶ 40-44. That harm pales in comparison to the likely detriment to Allied forces if CWD services were not available to support their operations. Thus, the balance of harm tips strongly in favor of keeping the override in place.

The balance of harms favoring the Army's override seemingly also guides the analysis of the public interest, the final factor bearing on preliminary injunctive relief. However, perhaps anticipating this result, EODT puts forward an alternative request, *i.e.*, that if the Army requires additional CWD services beyond those supplied under the sole-source bridge contract, it be required to consider EODT and other CWD suppliers as contractors for those additional services. Pl.'s Reply at 13. This alternative request has merit because it ensures that the Army's contract with American K-9 will provide an essential baseline of CWD services while addressing the flawed evaluation by the Army of alternatives to the override. Prior precedent in this court supports a limited injunction along these lines where a partially flawed override was entered by an agency in a situation infused with strong national-security considerations. In *Filtration Development*, the court sustained an override by the Army related to a contract to supply inlet filter kits for Blackhawk helicopters, but it enjoined the Army from expanding the procurement on a non-competitive basis. *See* 60 Fed. Cl. at 388. Here also, the Army's override of the automatic stay will not be preliminarily enjoined, but the Army will be precluded from expanding the six-month bridge contract with American K-9 on a continued sole-source basis.

For additional CWD requirements, the Army must consider EODT and other potential suppliers of CWD services, absent exigent circumstances.

RCFC 65(c) requires that the court consider the giving of security by the applicant in any case in which it enters a restraining order or preliminary injunction. In this instance, because the override will remain in place and the bridge contract will be performed absent action by GAO to sustain EODT's protest, and the preliminary injunction bears only on action by the Army to obtain additional CWD services beyond those covered by the contract at issue, the court concludes that no security is necessary. *See Doctor's Associates, Inc. v. Distajo*, 107 F.3d 126, 135-36 (2d Cir. 1997) (trial court has discretion to issue a preliminary injunction without bond where the risk of monetary loss is minimal); *compare Urbain v. Knapp Bros. Mfg. Co.*, 217 F.2d 810, 815-16 (6th Cir. 1954) (security bond not required by trial court upon issuance of preliminary injunction where no material damage could ensue), *with Maryland Dept. of Human Res. v. United States Dept. of Agriculture*, 976 F.2d 1462, 1483 (4th Cir. 1992) (district court erred in failing to require a security bond for preliminary injunction where substantial monetary damage was possible).

## CONCLUSION

For the reasons stated, the court DENIES EODT's motion for a preliminary injunction to nullify the Army's override of the automatic stay arising with EODT's protest of a sole-source bridge contract awarded by the Army to American K-9 for CWD services in [***] Afghanistan, EXCEPT THAT for the term of the bridge contract THE COURT PRELIMINARILY ENJOINS the Army from procuring additional CWD services from American K-9 on a sole-source basis, absent exigent circumstances.

On or before May 14, 2008, the parties are requested to submit proposed redactions of any confidential or proprietary information that may be set out in this decision rendered under seal.

On or before May 30, 2008, the parties shall submit a joint status report that addresses further proceedings in this action.

s/ Charles F. Lettow
Charles F. Lettow
Judge